

**COMMONWEALTH OF MASSACHUSETTS**
**NORFOLK COUNTY**
**Docket Report**

---

**2282CV00982 Doe, Ind. And ON Behalf Of All Others, John et al vs. Atrius Health, Inc.**

| | | | |
|---|---|---|---|
| **CASE TYPE:** | Torts | **FILE DATE:** | 10/17/2022 |
| **ACTION CODE:** | B99 | **CASE TRACK:** | F - Fast Track |
| **DESCRIPTION:** Other Tortious Action | | | |
| **CASE DISPOSITION DATE:** 12/27/2022 | | **CASE STATUS:** | Closed |
| **CASE DISPOSITION:** Transferred to another Court | | **STATUS DATE:** | 12/27/2022 |
| **CASE JUDGE:** | | **CASE SESSION:** | Civil C |

### DCM TRACK

| Tickler Description | Due Date | Completion Date |
|---|---|---|
| Service | 01/17/2023 | 12/27/2022 |
| Answer | 02/15/2023 | 12/27/2022 |
| Rule 15 Served By | 02/15/2023 | 12/27/2022 |
| Rule 12/19/20 Served By | 02/15/2023 | 12/27/2022 |
| Rule 15 Filed By | 03/17/2023 | 12/27/2022 |
| Rule 12/19/20 Filed By | 03/17/2023 | 12/27/2022 |
| Rule 15 Heard By | 04/18/2023 | 12/27/2022 |
| Rule 12/19/20 Heard By | 04/18/2023 | 12/27/2022 |
| Discovery | 08/14/2023 | 12/27/2022 |
| Rule 56 Served By | 09/13/2023 | 12/27/2022 |
| Rule 56 Filed By | 10/13/2023 | 12/27/2022 |
| Final Pre-Trial Conference | 02/12/2024 | 12/27/2022 |
| Judgment | 10/17/2024 | 12/27/2022 |

### PARTIES

| | |
|---|---|
| **Plaintiff**<br>Doe, Ind. And ON Behalf Of All Others, Jane | **Attorney**        681627<br>Jonathan Tucker Merrigan<br>Sweeney Merrigan Law, LLP<br>Sweeney Merrigan Law, LLP<br>268 Summer St<br>Boston, MA 02210<br>Work Phone (617) 391-9001<br>Added Date: 10/17/2022 |
| **Plaintiff**<br>Doe, Ind. And ON Behalf Of All Others, John | **Attorney**        681627<br>Jonathan Tucker Merrigan<br>Sweeney Merrigan Law, LLP<br>Sweeney Merrigan Law, LLP<br>268 Summer St<br>Boston, MA 02210<br>Work Phone (617) 391-9001<br>Added Date: 10/17/2022 |

| Defendant | Attorney | 709197 |
|---|---|---|
| Atrius Health, Inc.<br>275 Grove Street, Suite 3-300<br>Newton, MA 02466 | Kayla H Ghantous<br>Hogan Lovells US LLP<br>Hogan Lovells US LLP<br>125 High St<br>Suite 2010<br>Boston, MA 02110<br>Work Phone (617) 702-7749<br>Added Date: 12/27/2022 | |

### FINANCIAL DETAILS

| Date | Fees/Fines/Costs/Charge | Assessed | Paid | Dismissed | Balance |
|---|---|---|---|---|---|
| 10/17/2022 | Fee for Blank Summons or Writ (except Writ of Habeas Corpus) MGL 262 sec 4b Receipt: 25689 Date: 10/18/2022 | 5.00 | 5.00 | 0.00 | 0.00 |
| 10/18/2022 | Civil Filing Fee (per Plaintiff) Receipt: 25689 Date: 10/18/2022 | 240.00 | 240.00 | 0.00 | 0.00 |
| 10/18/2022 | Civil Security Fee (G.L. c. 262, § 4A) Receipt: 25689 Date: 10/18/2022 | 20.00 | 20.00 | 0.00 | 0.00 |
| 10/18/2022 | Civil Surcharge (G.L. c. 262, § 4C) Receipt: 25689 Date: 10/18/2022 | 15.00 | 15.00 | 0.00 | 0.00 |
| 11/10/2022 | Fee for Blank Summons or Writ (except Writ of Habeas Corpus) MGL 262 sec 4b Receipt: 25847 Date: 11/10/2022 | 5.00 | 5.00 | 0.00 | 0.00 |
| | **Total** | **285.00** | **285.00** | **0.00** | **0.00** |

## INFORMATIONAL DOCKET ENTRIES

| Date | Ref | Description | Judge |
|------|-----|-------------|-------|
| 10/18/2022 | 1 | Complaint electronically filed. (E-Filed on 10/17/2022). | |
| 10/18/2022 | 2 | Civil action cover sheet filed. (E-Filed on 10/17/2022). | |
| 10/18/2022 | | Case assigned to: DCM Track F - Fast Track was added on 10/18/2022 | |
| 10/18/2022 | | EDocument sent: A Tracking Order was generated and sent to: Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com | |
| 10/18/2022 | | Docket Note: On this date one summon sent | |
| 10/28/2022 | 3 | Plaintiff Atrius Health, Inc.'s Motion for impoundment of personal identifying information (E-filed 10/25/2022) | |
| 10/28/2022 | 3.1 | Affidavit of attorney J. Tucker Merrigan in support of plaintiffs motion for impoundment of personal identifying information (E-filed 10/25/2022) | |
| 11/10/2022 | | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Request for a (1) blank summon. | |
| 11/10/2022 | | Docket Note: On this date one summon sent request sent by email. | |
| 11/16/2022 | | Endorsement on Motion for impoundment of personal identifying information. (#3.0): ALLOWED (dated 11/8/2022) ns ni  Judge: Sanders, Hon. Janet L | Sanders |
| 11/16/2022 | | EDocument sent: A Clerk's Notice (eDoc) was generated and sent to: Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com Defendant: Atrius Health, Inc. 275 Grove Street, Suite 3-300, Newton, MA 02466 | |
| 11/27/2022 | | One Trial case reviewed by Clerk, case to remain in the Superior Court.  Judge: Hickey, Mary K | Hickey |
| 12/15/2022 | 4 | Service Returned for Atrius Health by delivering in hand to Janice Luisi, agent, person in charge at the time of service at 275 Grove Street Suite 300 Newton Ma 02459 on 12/6/22  (Rec'd on E File 12/14/22 | |
| 12/27/2022 | | Attorney appearance On this date Kayla H Ghantous, Esq. added for Defendant Atrius Health, Inc. | |



**COMMONWEALTH OF MASSACHUSETTS**
**NORFOLK COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 12/27/2022 | 5 | Defendant Atrius Health, Inc.'s Notice of Removal | |
| | | Applies To: Ghantous, Esq., Kayla H (Attorney) on behalf of Atrius Health, Inc. (Defendant) | |
| 12/27/2022 | | Case transferred to another court. | |
| 12/27/2022 | 6 | ORDER: ORDER(Sanders, J)(dated; 11/8/22) certified copy sent pl | Sanders |
| | | Judge: Sanders, Hon. Janet L | |
| 12/27/2022 | | EDocument sent: A Clerk's Notice (eDoc) was generated and sent to: Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com Defendant: Atrius Health, Inc. 275 Grove Street, Suite 3-300, Newton, MA 02466 Defendant, Attorney: Kayla H Ghantous, Esq. kayla.ghantous@hoganlovells.com Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com | |
| 12/27/2022 | | Docket Note: On this date  Certified copy of the case was mailed to Attorney Kayla Ghantous, Esq. | |
| 12/27/2022 | 7 | Plaintiff's Notice of intent to file motion of Removal | |
| | | Applies To: Ghantous, Esq., Kayla H (Attorney) on behalf of Atrius Health, Inc. (Defendant) | |

I ATTEST THAT THIS DOCUMENT IS A
CERTIFIED PHOTOCOPY OF AN ORIGINAL
ON FILE

Deputy Assistant Clerk
12/07/22

Date Filed 10/17/2022 2:10 Case 1:22-cv-12196-FDS   Document 12   Filed 01/03/23   Page 5 of 204
Superior Court - Norfolk
Docket Number

1

Docketed on 10/18/2022

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, S.S.                     SUPERIOR COURT

JOHN DOE AND JANE DOE,           §
INDIVIDUALLY AND ON              §       C.A. No. 2282CV00982
BEHALF OF ALL OTHERS SIMILARLY   §
SITUATED,                        §
                                 §
            Plaintiffs           §
                                 §
v.                               §
                                 §
ATRIUS HEALTH, INC.              §
                                 §
                                 §
            Defendant.           §

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs John Doe and Jane Doe ("Plaintiffs"), individually and on behalf of all other persons similarly situated, bring suit against Defendant Atrius Health, Inc. ("Defendant"), and upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based upon investigation by counsel, allege as follows:

## NATURE OF ACTION AND ALLEGATIONS

1.      This case arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2.      As Defendant's Medical Information Privacy Notice explains to patients, Defendant is prohibited by law from "selling your health information to others" or "using or disclosing your health information" for "promotional communications" without patients'

"written authorization."[1]  Defendant's Privacy Notice further notes that Defendant is "required by law to protect the privacy of your health information."[2]

3.      Contrary to these assurances, Defendant does not follow this policy, nor the law prohibiting such disclosures.

4.      At all relevant times, Defendant disclosed information about its patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook and other third parties without their patients' knowledge, authorization, or consent.

5.      Defendant discloses this protected health information through the deployment of various digital marketing and automatic rerouting tools embedded on its websites that purposefully and intentionally redirect patients' personal health information to third parties who exploit that information for advertising purposes.  Defendant's use of these rerouting tools causes its patients' personally identifiable information and the contents of its patients' communications exchanged with Defendant to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of Massachusetts, and both the express and implied promises of Defendant.

6.      Defendant's conduct in disclosing such protected health information about its patients to Facebook and other third parties violates Massachusetts law, including G.L. c. 272,

---

[1] https://www.atriushealth.org/patient-information/privacy-practices.  Defendant's current Privacy Notice went into effect on September 30, 2022.  Defendant's prior "Notice of Privacy Practices" may be found at https://web.archive.org/web/20220713190254/https://www.atriushealth.org/patient-information/privacy-practices. That Privacy Notice informed patients that "Access" to patients' medical records and other information maintained by Atrius Health "is restricted to clinicians and staff who need the information for treatment, payment, or health care operations purposes."  Defendant's prior Privacy Notice further promised patients that "We will not use or share your information other than as described here unless you tell us we can in writing."  Defendant's prior Privacy Notice also promised that Defendant would "never share your information" for "Marketing Purposes" or "Sale of your information" unless "you give written permission."
[2] https://www.atriushealth.org/patient-information/privacy-practices

§ 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

7.     On behalf of themselves and all similarly situated persons, Plaintiffs seek an order enjoining Defendant from further unauthorized disclosures of their personal information; awarding liquidated damages in the amount of $1,000 per violation, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

## PARTIES TO THE ACTION

8.     Defendant Atrius Health, Inc. is a Massachusetts corporation with its principal office at 275 Grove St., Suite 3-300, Newton, Massachusetts, 02466. Defendant is the parent company for more than 30 medical practice locations in Massachusetts, including Harvard Vanguard Copley, Harvard Vanguard Chestnut-Hill Roxbury, Harvard Vanguard Beverly, Harvard Vanguard Braintree, Harvard Vanguard Burlington, Harvard Vanguard Cambridge, Harvard Vanguard Chelmsford, Harvard Vanguard Quincy, Harvard Vanguard Concord, Duxbury-PMG, Bourne-PMG, and Dedham Medical Associates.[3]

9.     Plaintiff, Jane Doe, is an individual living in Norfolk County, Massachusetts, has been treated by Defendant's physicians, and has been a patient at Harvard Vanguard Quincy, one of Defendant's facilities,[4] and thus also a patient of Defendant.

10.     Plaintiff, John Doe, is an individual living in Middlesex County, Massachusetts, has been treated by Defendant's physicians, a patient at Harvard Vanguard Chelmsford, one of Defendant's facilities,[5] and thus also a patient of Defendant.

---

[3] https://www.atriushealth.org/locations; *see also* https://www.atriushealth.org/about-us
[4] https://www.atriushealth.org/locations/quincy-harvard-vanguard
[5] https://www.atriushealth.org/locations/chelmsford-harvard-vanguard

## JURISDICTION AND VENUE

11.    This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Massachusetts and has its principal place of business at 363 Highland Avenue, Fall River, Massachusetts, 02720.  G.L. c. 223A, § 2; G.L. c. 223A, § 3.

12.    Venue is appropriate in this Court because Plaintiff, Jane Doe, resides in Norfolk County and the acts or conduct giving rise to the cause of action took place in Norfolk.   G.L. c. 223, § 8(4).

## FACTUAL BACKGROUND

**A.    Defendant routinely discloses the protected health information of its patients to third parties including Facebook.**

13.    Plaintiff Jane Doe is a patient of Defendant who receives treatment at Harvard Vanguard Quincy.[6]

14.    Plaintiff John Doe is a patient of Defendant who receives treatment at, among other of Defendant's facilities, Harvard Vanguard Chelmsford.[7]

15.    Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

16.    Medical patients in Massachusetts such as John Doe and Jane Doe have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

17.    As a health care provider, Defendant has fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

---

[6] https://www.atriushealth.org/locations/quincy-harvard-vanguard
[7] https://www.atriushealth.org/locations/chelmsford-harvard-vanguard

4

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

18.     Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of personally identifiable patient information and communications.

19.     Defendant operates websites for patients, including www.atriushealth.org.

20.     Defendant's websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues treatment options, and joining support groups.

21.     Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant discloses the contents of patients' communications and protected healthcare information via automatic re-routing mechanisms embedded in the websites operated by Defendant without patients' knowledge, authorization, or consent.

**B.      The nature of Defendant's unauthorized disclosure of patients' health care information.**

22.     Defendant's disclosures of patients' personal healthcare information occurs because Defendant intentionally deploys source code on the websites it operates, including www.southcoast.org, that causes patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

23.     By design, third parties receive and record the exact contents of a patient communications before the full response from Defendant to patients has been rendered on the screen of the patient's computer device and while the communication between Defendant and the patient remains ongoing.

24.     Websites like those maintained by Defendant are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

5

25.    The basic command that web browsers use to exchange data and user communications is called a GET request.[8]  For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

26.    The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button.  POST sends the data entered in the form to the server hosting the website that the user is visiting.

27.    In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

28.    Unbeknownst to most users, however, the website's server may also redirect the user's communications to third parties.  Typically, users are provided no notice that these disclosures are being made.  Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

29.    In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon.  These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

---

[8] https://www.w3schools.com/tags/ref_httpmethods.asp

6

30.    Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the third parties to whom user data is transmitted.

31.    These tracking pixels can collect dozens of data points about individual website users who interact with a website.  One of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

32.    A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications.  This source code operates invisibly in the background when users visit a site employing such code.

## C.    Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.

33.    Tracking pixels are lines of source code embedded in websites such as Defendant's.  Tracking pixels are particularly pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal identities of website visitors.  While most users believe that the internet provides them with anonymity when, for example, they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third party tracking devices, as Defendant has.

34.    For example, an IP address is a number that identifies a computer connected to the internet.  IP addresses are used to identify and route communications on the internet.  IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content.  IP addresses also offer

advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[9]

35. Because of their uniquely identifying character, IP address are considered protected personally identifiable information by HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(O). Tracking pixels can (and typically do) collect website visitors' IP addresses.

36. Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

37. Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

38. Cookies fall within the personal identifiers protected by HIPAA. *See* 45 C.F.R. § 164.51(b)(2)(i)(H), (J), (M), and (R), and tracking pixels can collect cookies from website visitors.

39. A third type of personally identifying information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

---

[9] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

40.     These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.  As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[10]  The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[11]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[12]

41.     In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[13]

42.     Browser-fingerprints are considered protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(M), (R), and tracking pixels can collect browser-fingerprints from website visitors.

43.     A fourth kind of personally identifying information is the unique user identifier (such as Facebook's "Facebook ID") that permits companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered.  A Facebook ID is a number string that is connected to a user's Facebook profile.[14]  Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[15]

---

[10] https://www.blog.google/products/chrome/building-a-more-private-web/
[11] https://pixelprivacy.com/resources/browser-fingerprinting/
[12] https://www.blog.google/products/chrome/building-a-more-private-web/
[13] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/
[14] https://www.facebook.com/help/211813265517027
[15] https://smallseotools.com/find-facebook-id/

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

44.    Unique personal identifiers such as a person's Facebook ID are protected by HIPAA, 45 C.F.R. § 164.514(2)(i)(R), and are likewise capable of collection through pixel trackers.

**D.    Facebook**

45.    Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

46.    Facebook describes itself as a "real identity" platform.[16]  This means that users are permitted only one account and must share "the name they go by in everyday life."[17]  To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[18]

47.    In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[19]  Facebook has since evolved into one of the largest advertising companies in the world.[20]  Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[21]  This allows Facebook to make inferences about users based on their interests, behavior, and connections.[22]

48.    Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network.  Facebook has more than 2.9 billion

---

[16] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[17] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/
[18] https://www.facebook.com/help/406644739431633
[19] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[20] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[21] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[22] https://www.facebook.com/business/ads/ad-targeting

10

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

users.[23]

49.     Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications.  These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers.  Facebook also tracks non-users across the web through its internet marketing products and source code.

50.     Facebook offers several advertising options based on the type of audience that an advertiser wants to target.  Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting."  Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited).  This audience can be created by Facebook, the advertiser, or both working in conjunction.

51.     Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level.  For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[24]  Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

---

[23] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/
[24] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

**E.**     **Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

52.     To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

53.     One of Facebook's most powerful tools is called the "Meta Pixel."

54.     The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[25] Once activated, the Meta Pixel "tracks the people and type of actions they take."[26] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[27]

55.     For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook collects identifying information like IP addresses, Facebook IDs, and other data that allow Facebook to identify the user. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences.

56.     Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

---

[25] https://developers.facebook.com/docs/meta-pixel/
[26] https://www.facebook.com/business/goals/retargeting
[27] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

12

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

57.    Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[28]  According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[29]

58.    Facebook warns web developers that its Pixel is a personal identifier because it enables Facebook "to match your website visitors to their respective Facebook User accounts."[30]

59.    Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[31]

60.    Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website.[32]  Meta Pixel tracks this data regardless of whether a user is logged into Facebook.[33]

61.    For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information. The information is sent in data packets, which include personally identifying data such as a user's IP address.

---

[28] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[29] https://www.oviond.com/understanding-the-facebook-pixel
[30] https://developers.facebook.com/docs/meta-pixel/get-started
[31] https://developers.facebook.com/docs/meta-pixel/get-started
[32] https://developers.facebook.com/docs/meta-pixel/
[33] https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients

62.    For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[34]    HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[35] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[36]

63.    Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID, which identifies an individual's Facebook user account. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[37]

64.    Facebook has a number of ways to uniquely identify the individuals whose data is being forwarded from third-party websites through the Meta Pixel.

65.    If a user has a Facebook account, the user data collected is linked to the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

66.    Alternatively, Facebook can link the data to a user's Facebook account through the "Facebook Cookie."[38]    The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[39]

---

[34] https://developers.facebook.com/docs/meta-pixel/
[35] https://developers.facebook.com/docs/meta-pixel/
[36] https://developers.facebook.com/docs/meta-pixel/
[37] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[38] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/
[39] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

67.    Facebook can also link user data to Facebook accounts through identifying information collected through Meta Pixel through what Facebook calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching.[40] Manual matching requires the website developer to manually send data to Facebook so that users can be linked to data. Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

68.    While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from using the data.[41] In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[42]

69.    Facebook also receives personally identifying information in the form of user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

70.    Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

---

[40] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[41] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[42]https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

71.    The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie.  One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#."  For example, the c_user cookie for Mark Zuckerberg is 4.  Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

72.    Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser.  Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers.  Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[43]  These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[44]

73.    Facebook also uses browser fingerprinting to uniquely identify individuals.  Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more.  Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like www.southcoast.org, and target users with advertising based on their web activity.

---

[43] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.
[44] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

16

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

**D.  Defendant has discretely embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of patients' protected health information to Facebook.**

74.    A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic.  The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertisement efforts.

75.    Facebook's intrusion into the personal data of the visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented.  When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[45]  Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

76.    Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads.[46]  For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[47]  Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

[45] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[46] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[47] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/

17

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

77.     Meta Pixel is wildly popular and embedded on millions of websites. Shockingly, Meta Pixel is incorporated on many websites that are used to store and convey sensitive medical information, that by law must be kept private. Recently, investigative journalists have determined that Meta Pixel is embedded on the websites of many of the top hospitals in the United States and on the password-protected patient portals of many healthcare systems.[48] This results in sensitive medical information being collected and then sent to Facebook when a user interacts with these hospital websites. For example, when a user on many of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

78.     Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or logout of a patient portal or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

79.     Defendant is among the hospital systems who have embedded Meta Pixel on their websites. When a patient enters their personal information through Defendant's websites that incorporate Meta Pixel, such as to locate a doctor or make an appointment, this information, including what the patient is being treated for, is transmitted to Facebook via the Meta Pixel.

---

[48] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

80.     This data, which can include health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, and other personally identifying information ("Personal Health Information"), is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.

81.     For example, a patient searching for a doctor on Defendant's website is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the patient's condition, the patient's hometown, the patient's language preference, and other information that the patient provides.

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

82.    All this data is disclosed to Facebook in real time as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

83.    Defendant discloses such Personal Health Information even when patients are searching for doctors to assist with them conditions such as HIV:



84.    Unbeknownst to patients, even their searches across Defendant's website for information about the most sensitive medical conditions imaginable, including HIV, psychotherapy, and addiction treatment are automatically sent to Facebook, along with patients' personally identifying information:



Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

85.     Defendant also discloses patient information from other sections of its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Defendant, and communications made when patients are researching specific medical conditions such as COVID-19.

86.     By compelling visitors to its websites to disclose personally identifying data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients Personal Health Information to their private identities and target them with advertising.

87.     Defendant facilitated the disclosure of Plaintiff John Doe's Personal Health information, including sensitive medical information, to Facebook without his consent or authorization when he entered information on the website that Defendant maintains at www.atriushealth.org.   Plaintiff continued to have his privacy violated when Defendant permitted Facebook and other companies to send him targeted advertising related to his medical condition.

88.     For example, Plaintiff John Doe visited Defendant's website in 2022 at www.atriushealth.org and entered data, including sensitive medical information, such as details about his medical condition and doctor.   The information that Plaintiff John Doe transmitted included queries about treatment for shoulder injuries.

89.     After entering his medical information on Defendant's website, Plaintiff John Doe began receiving ads on his Facebook page related to his medical condition, including advertisements for shoulder braces.

22

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

90.     As a result of Defendant's compliance and aid in the illegal interception and disclosure of John Doe's Personal Health Information, Plaintiff received advertisements that were specifically tailored to his Personal Health Information, including sensitive medical information, that Plaintiff entered on Defendant's website.  These advertisements were tailored and directed to Plaintiff by Facebook as part of Facebook's advertising business in which Facebook profits from providing third parties with access to those individuals most likely to be interested in their products or services, otherwise known as the "target audience."[49]

91.     Plaintiff Jane Doe also visited Defendant's website at www.atriushealth.org in 2022 and entered data, including sensitive medical information, such as details about her medical condition and doctor. Defendant facilitated the disclosure of Plaintiff Jane Doe's Personal Health Information, including sensitive medical information, to Facebook without her consent or authorization when she entered information on the website that Defendant maintains at www.artriushealth.org.

92.     Defendant knew that by embedding Meta Pixel—a Facebook advertising tool—it was permitting Facebook to collect, use, and share Plaintiffs' and the Class Members' Personal Health Information, including sensitive medical information and personally identifying data.

**F.      Plaintiffs and the Class Members did not consent to the interception and disclosure of their protected health information.**

93.     Plaintiffs and Class Members had no idea when they interacted with Defendant's websites that their personal data, including sensitive medical data, was being collected and transmitted to Facebook.   That is because, among other things, Meta Pixel is seamlessly integrated into Defendant's websites and is invisible to patients visiting those websites.

---

[49] https://www.facebook.com/business/ads/ad-targeting?content

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

94.    For example, when Plaintiff Jane Doe visited Defendant's website in 2022 at www.southcoast.org, there was no indication that Meta Pixel was embedded on that website or that it would collect and transmit her sensitive medical data to Facebook.

95.    Plaintiffs and their fellow Class Members could not consent to Defendant's conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

96.    While Defendant purports to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Notice of Privacy Practices" that is concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:



97.    Defendant's current "Notice of Privacy Practices," which went into effect on September 30, 2022, gives no indication to patients that Defendant routinely allows Facebook to capture and exploit patients' Personal Health Information.    Indeed, Defendant expressly promises in its "Notice of Privacy Practices" that it would never share patient's medical information with marketing companies without express written authorization from patients:

> [W]e will use and disclose your health information only with a
> written authorization from you.  This includes, except for limited

24

circumstances allowed by federal privacy law, not using or disclosing psychotherapy notes about you, selling your health information to others, or using or disclosing your health information for certain promotional communications that are prohibited marketing communications under federal law, without your written authorization.[50]

98.     Defendant's prior "Notice of Privacy Practices" likewise not only assured patients that Atrius would protect their Personal Health Information, but also expressly promised that Defendant would *never* sell or share patients' health information for marketing purposes without patients' written consent:

> Protecting patient privacy is an important element of the trust between our caregivers and their patients, and an important legal and ethical obligation. Atrius Health is deeply committed to protecting our patients' rights to privacy, and to safeguarding patient information....[51]
>
> In these cases we never share your information unless you give us written permission:
>
> • Marketing purposes
> • Sale of your information

99.     Even if a patient stumbled upon Defendant's carefully concealed "Notice of Privacy Practices," nothing in Defendant's various privacy notices would be understood by any reasonable patient to mean that Defendant is routinely allowing Facebook to capture and exploit patients' Personal Health Information.

100.    Defendant does not have a legal right to share Plaintiffs and Class Members' Protected Health Information with Facebook, because this information is protected from such disclosure by laws by the Health Insurance Portability and Accountability Act of 1996's ("HIPAA") privacy rules, which protect all electronically protected health information a covered entity like Defendant "creates, receives, maintains, or transmits" in electronic form.  45 C.F.R.

---

[50] https://www.atriushealth.org/patient-information/privacy-practices
[51] https://web.archive.org/web/20220517025937/https://www.atriushealth.org/patient-information/privacy-practices

§ 160.103. HIPAA's privacy rules do not permit Defendant to sell patient information to Facebook in return for access to Meta Pixel. Further, HIPAA does not permit Defendant to disclose patients' Protected Health Information to an advertising and marketing company like Facebook without express written authorization from patients. 45 C.F.R. § 164.508.

101. Defendant failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications for marketing purposes.

102. A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Such "Browser-Wrap" statements do not create an enforceable contract against consumers. Further, Defendant expressly promised its patients that it would never sell or use their Personal Health Information for marketing purposes without express authorization.

103. Accordingly, Defendant lacked authorization to intercept, collect, and disclose Plaintiffs and Class Members' Personal Health Information to Facebook or aid in the same.

**G.      The disclosures of personal patient data to Facebook are unnecessary.**

104. There is no information anywhere on the websites operated by Defendant that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are any of the disclosures of patient Personal Health Information to Facebook necessary for Defendant to maintain its healthcare website.

105. For example, it possible for a health care website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

allowing disclosure of patients' Personal Healthcare Information to companies like Facebook.

106.     Despite these possibilities, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third-parties, including Facebook.

**H.     Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

107.     Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information.   Defendant's surreptitious interception, collection, and disclosure of patients' Personal Health Information to Facebook violated Plaintiffs and Class Member's privacy interests.

108.     Patient health information is specifically protected under federal law by HIPAA.

109.     HIPAA sets national standards for safeguarding protected health information.  For example, HIPAA limits the permissible uses of health information and prohibits disclosure of this information without express written authorization from patients.  45 C.F.R. § 164.502. These prohibitions include prohibitions against disclosing personally identifying data such patient names, IP addresses, and other unique characteristics or codes.   45 C.F.R. § 164.514(b)(2)(i).   HIPAA also requires that covered entities like Defendant implement appropriate safeguards to protect this information.  45 C.F.R. § 164.530(c)(1).  And both HIPAA and Massachusetts law subject medical providers who treat conditions such as substance abuse to heightened duties of confidentiality.  42 C.F.R. § 2.12(a)(1)(i); M.G.L. c. 111B, § 11.  This legal framework applies to health care providers, such as Defendant.

27

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

110.    Given the application of HIPAA and state law to Defendant, Plaintiffs and the Members of the Class had a reasonable expectation of privacy in their protected health information.

111.    Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

112.    Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

113.    For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[52]

114.    Users act consistently with these preferences.  For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[53]

115.    The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable.  Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born.  As one recent article noted, "What is particularly

---

[52] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[53] https://www.wired.co.uk/article/apple-ios14-facebook

28

worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[54]

116.    Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

I.    **Plaintiffs' Personal Health Data that Defendant collected, disclosed, and used is Plaintiffs' property, has economic value, and its illicit disclosure has caused Plaintiffs harm.**

117.    It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiffs and Class Members.

118.    In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[55]

119.    In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[56]   That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data

---

[54] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/
[55] https://ig.ft.com/how-much-is-your-personal-data-worth/
[56] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

can vary from $15 to more than $40 per user.[57]

120.    In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[58]    This price is only increasing.    According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[59]

121.    Despite the protections afforded by HIPAA, there is an active market for health information.    Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by HIPAA, state laws, and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[60]

122.    Further, individuals can sell or monetize their own data if they so choose.    For example, Facebook has offered to pay individuals for their voice recordings,[61] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[62]

123.    A myriad of other companies and apps such as DataCoup, Nielsen Computer,

---

[57] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[58] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[59] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[60] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also* *https://slate.com/technology/2022/06/health-data-brokers-privacy.html*
[61] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounnunciations-app
[62] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[63]

124.    Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiffs and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiffs and the Class Member's property.

**J.      Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' protected health information.**

125.    In exchange for disclosing Personal Health Information about its patients, Defendant is compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

126.    Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

127.    For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

128.    Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant loses the ability to control how that

---

[63] https://www.creditdonkey.com/best-apps-data-collection.html; *see also* https://www.monetha.io/blog/rewards/earn-money-from-your-data/

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

information is subsequently disseminated and exploited.

129.    The monetization of the data being disclosed by Defendant, both by Defendant and Facebook, demonstrates the inherent value of the information being collected.

**K.    Facebook's history of egregious privacy violations.**

130.    Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information.

131.    Due to its ability to target individuals based on granular data, Facebook's ad-targeting capabilities have frequently come under scrutiny.    For example, in June 2022, Facebook entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics in a discriminatory manner.    That settlement, however, reflected only the latest in a long history of egregious privacy violations by Facebook.

132.    In 2007, when Facebook launched "Facebook Beacon," users were unaware that their online activity was tracked, and that the privacy settings originally did not allow users to opt-out.    As a result of widespread criticism, Facebook Beacon was eventually shut down.

133.    Two years later, Facebook made modifications to its Terms of Service, which allowed Facebook to use anything a user uploaded to its site for any purpose, at any time, even after the user ceased using Facebook.    The Terms of Service also failed to provide for any way for users to completely delete their accounts.    Under immense public pressure, Facebook eventually returned to its prior Terms of Service.

134.    In 2011, Facebook settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third-party apps were able to access only the data they needed to operate when—in fact—the apps

32

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[64]

135.    That same year, Facebook was sued in the Northern District of California after it was discovered that Facebook had been tracking users across other websites, even after they had logged out of their Facebook accounts, by installing cookies on users' computers.[65] The class action suit, which alleged that Facebook had violated numerous privacy, communications, and wiretapping laws eventually settled for $90 million.[66]

136.    Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously downloaded Facebook user data. That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking for their consent or providing notice. Facebook ultimately settled claims related to this unlawful act for $650 million.[67]

137.    In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytics may have harvested the data of up to 87 million users in connection with the 2016 election. This led to another FTC investigation in 2019 into Facebook's data collection and privacy practices, resulting in a record-breaking five-billion-dollar settlement.

---

[64] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter
[65] https://www.cnet.com/personal-finance/facebooks-90-million-data-tracking-settlement-tomorrow-is-the-deadline-to-file-claim/
[66] https://www.cnet.com/personal-finance/facebooks-90-million-data-tracking-settlement-tomorrow-is-the-deadline-to-file-claim/
[67] A similar case is pending in Texas.

33

138.    Likewise, a different 2018 report revealed that Facebook had violated users' privacy by granting access to user information to over 150 companies.[68]  Some companies were even able to read users' private messages.

139.    In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[69] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

140.    On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data.  The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway.  The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective ... at preventing the receipt of sensitive data."[70]

141.    The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data is not misplaced.  In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data.  In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling:  the company was sharing their data with Facebook.[71] When a user was having her

---

[68] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html
[69] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/
[70] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf
[71] https://slate.com/technology/2022/06/health-data-brokers-privacy.html

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[72]

142.    More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[73]

143.    These revelations were confirmed by an article published by the Markup in 2022, which found during the course of its investigation that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[74]

144.    Despite knowing that the Meta Pixel code embedded in its websites was sending patients' Personal Health Information to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients'

---

[72] https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[73] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes
[74] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

expense.

## TOLLING, CONCEALMENT, AND ESTOPPEL

145.    The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

146.    Defendant seamlessly incorporated Meta Pixel and other trackers into its websites, providing no indication to users that they were interacting with a website enabled by Meta Pixel. Defendant had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites that Plaintiffs and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

147.    Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

148.    The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

149.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort.    Defendant's illegal interception and disclosure of patients' Personal Health Information has continued unabated through the date of the filing of Plaintiffs' Original Complaint.    What's more, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

36

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

150.    Defendant's conduct violates the law and breaches its express and implied privacy promises.

151.    Defendant's unlawful conduct has injured Plaintiffs and Class Members.

152.    Defendant's conduct is ongoing.

153.    Plaintiffs bring this action individually and as a class action against Defendant.

154.    Plaintiffs seek class certification for the following proposed Class:

> **The Atrius Health Class:** During the fullest period allowed by law, all Massachusetts residents who are, or were, patients of Atrius Health, Inc. or any of its affiliates and who exchanged communications at Atrius Health, Inc's websites, including www.atriushealth.org, and any other Atrius Health, Inc. affiliated website that caused disclosures of patient personally identifiable information and communications to third parties, including (but not limited to) Facebook.

155.    Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

156.    Plaintiffs reserve the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

157.    This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

158.    **Numerosity:** While the exact number of Class Members is unknown to Plaintiffs at this time, the Class, based on information and belief, consists of thousands of people dispersed throughout the Commonwealth of Massachusetts, such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

maintained by Defendants.

159.    **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

    a.    Whether Defendant's acts and practices violated Plaintiffs and Class Members' privacy rights;

    b.    Whether Defendant's acts and practices violate G.L. c. 272, § 99;

    c.    Whether Defendant's acts and practices violate G.L. c. 214, § 1B;

    d.    Whether Defendant's acts and practices violate G.L. c. 111, § 70E;

    e.    Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiffs and Class Members' Personal Health Information to Facebook;

    f.    Whether Defendant's acts and practices constitute a breach of fiduciary duty;

    g.    Whether Defendant profited from disclosures of patient Personal Health Information to third parties including Facebook;

    h.    Whether Defendant was unjustly enriched;

    i.    Whether Defendant's acts and practices harmed and continue to harm Plaintiffs and Class Members and, if so, the extent of that injury;

    j.    Whether Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

    k.    Whether Plaintiffs and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

160.    These common questions of law and fact predominate over any questions affecting only the individual Class Members.

161.    **Typicality:** Plaintiffs' claims are typical of the claims of other Class Members and Plaintiffs have substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonist to, or in conflict with, the interests of other

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

members of the Class.  Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members.  Plaintiffs and all Class Members are patients of Defendant who used the websites set up by Defendant for patients and are victims of Defendant's respective unauthorized disclosures to third parties including Facebook. All claims of Plaintiffs and Class Members are based on Defendant's wrongful conduct and unauthorized disclosures.

162.    **Adequacy of Representation:** Plaintiffs are committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are coincident with, and not antagonistic to, those of other Class Members they seek to represent. Plaintiffs have no disabling conflicts with Class Members.  Accordingly, Plaintiffs are adequate representatives of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

163.    **Superiority:**    A class action is the superior method for fair and efficient adjudication of the controversy.  Although all Class Members have claims against Defendant, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.  Serial adjudication in numerous venues is not efficient, timely, or proper.    Judicial resources would be unnecessarily depleted by prosecution of individual claims.    The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Cass, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications.  If a class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

164.    Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

165.    For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of
### G.L. c. 272, § 99
### (On Behalf of Plaintiffs and the Class)

166.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

167.    Plaintiffs bring this claim on behalf of themselves and all members of the Class.

168.    All conditions precedent to this action have been performed or have occurred.

169.    G.L. c. 272, § 99 prohibits any person from willfully and secretly intercepting the contents of any wire communications through the use of any intercepting device unless given prior authority by all parties to a communication to do so.

170.    Any person aggrieved by a violation G.L. c. 272, § 99 "shall have a civil cause of action against any person who so intercepts, discloses, or uses such communications or who so violates his personal, property, or privacy interest."

171.    Defendant qualifies as a person under the statute.

172.    All alleged communications between Plaintiffs or Class Members and Defendant qualify as wire communications under Massachusetts law because each communication is made using personal computing devices (e.g., computers, smartphones,

40

tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

173.    An "interception" under the statute means "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire … communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99B(4).

174.    Defendant engaged in and continues to engage in an "interception" by aiding others (including Facebook) to secretly record the contents of Plaintiffs' and Class Members' wire communications.

175.    An "intercepting device" is "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire … communication." G.L. c. 272, § 99B(3).

176.    The "intercepting devices" used in this case include, but are not limited to:

a.   Plaintiffs and Class Members' personal computing devices;

b.   Plaintiffs and Class Members' web browsers;

c.   Plaintiffs and Class Members' browser-managed files;

d.   Facebook's Meta Pixel;

e.   Internet cookies;

f.   Defendant's computer servers;

g.   Third-party source code utilized by Defendant; and

h.   Computer servers of third parties (including Facebook) to which Plaintiffs and Class Members' communications were disclosed.

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

177.    Under the statute, "contents" are defined to mean "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." G.L. c. 272, § 99B(5).

178.    Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiffs and/or Class Members and Defendant that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

179.    Defendant aided in the interception of "contents" in at least the following forms:

a.    The parties to the communications;

b.    The precise text of patient search queries;

c.    Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d.    The precise text of patient communications about specific doctors;

e.    The precise text of patient communications about specific medical conditions;

f.    The precise text of patient communications about specific treatments;

g.    The precise text of patient communications about scheduling appointments with medical providers;

h.    The precise text of patient communications about billing and payment;

i.    The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j.    The precise dates and times when patients click to Log-In on Defendant's website(s);

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

     k.  Information that is a general summary or informs third parties of the general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

     l.  Any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

180.    Plaintiffs and Class Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook and other third parties.

181.    Neither Plaintiffs nor Class Members consented to the disclosure of their Personal Health Information by Defendant to Facebook and other third parties. Nor could they have consented, given that Defendant never sought Plaintiffs or Class Members' consent.

182.    Plaintiffs and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal Health Information, including using their sensitive medical information to develop marketing and advertising strategies.

183.    Under the statute, aggrieved persons are entitled to recover appropriate injunctive relief and "(1) actual damages but not less than liquidated damages computed at the rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) a reasonable attorney's fee and other litigation disbursements reasonably incurred."

184.    In addition to statutory damages, Defendant's breach caused Plaintiffs and Class Members the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

## COUNT II
### Invasion of Privacy in Violation of G.L. c. 214, § 1B
### (On Behalf of Plaintiffs and the Class)

185.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

186.    Plaintiffs bring this claim on behalf of herself and all members of the Class.

187.    G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy.  The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

188.    All health care providers owe their patients a duty not to disclose medical information about a patient without a patient's informed consent.

189.    G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

190.    Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

191.    Plaintiffs and Class Members are patients of Defendant.

192.    Defendant owes Plaintiffs and Class Members a duty of confidentiality.

193.    Despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiffs and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

194.    The information disclosed included personally identifiable information, Plaintiffs and Class Members' statues as patients of Defendant, and the exact contents of communications exchanged between Plaintiffs and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

195.    The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiffs and Class Members' rights to privacy.

196.    Plaintiffs and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook and other third parties at the time it occurred.  Plaintiffs and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

197.    Defendant's intentional disclosure of patients' Personal Health Information to a third-party advertising company like Facebook without consent would be highly offensive to a

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

reasonable person.  Plaintiffs and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third party advertising companies.

198.    Defendant's disclosure of Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms.  Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

199.    Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e. "Alzheimer's"), the condition selected from dropdown menus (i.e. "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

200.    Defendant's breach caused Plaintiffs and Class Members, at minimum, the following damages:

a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b.    Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c.    Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

d.      Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e.      Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

201.    Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

202.    Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

203.    Plaintiffs and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiffs and Class Members' privacy.

204.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which caused injury to Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

205.    Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## COUNT III
### Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality
### (On Behalf of Plaintiffs and the Class)

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

206.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

207.    Plaintiffs bring this claim on behalf of themselves and all members of the Class

208.    All conditions precedent to this action have been performed or occurred.

209.    In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

210.    As medical provider for Plaintiffs and Class Members, Defendant owes Plaintiffs and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendant and Plaintiffs or Class Members.

211.    Defendant breached its duty of confidentiality by disclosing Personal Health Information about Plaintiffs and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

212.    Defendant's breach caused Plaintiffs and Class Members the following damages:

a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b.    Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c.    Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d.    Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e.    Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

## COUNT IV
### Breach of Express Contract
### (On Behalf of Plaintiffs and the Class)

213.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

214.    Plaintiffs bring this claim on behalf of herself and all members of the Class.

215.    Plaintiffs and Class Members entered into written agreements with Defendant as part of the medical services Defendant provided to Plaintiffs and Class Members. The agreements involved a mutual exchange of consideration whereby Defendant provided these services in exchange for payment from Class Members, Class Members' insurance carriers, and/or government programs remitting payment on Class Members' behalf.

216.    Plaintiffs and Class Members and/or their insurance carriers paid Defendant for its services and performed under these agreements.

217.    Defendant's disclosure of Plaintiffs and Class Members' Private Health Information without their consent constitutes a material breach of the terms of these agreements by Defendant.

218.    As a direct and proximate result of Defendant's breach of contract with Plaintiffs and Class Members, Plaintiffs and Class Members have been irreparably harmed.

49

219.    Accordingly, Plaintiffs, individually and on behalf of the Class, respectfully request this Court award all available damages for Defendant's breach of express contract.

## COUNT V
### Breach of Implied Contract
### (On Behalf of Plaintiffs and the Class)

220.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

221.    Plaintiffs bring this claim on behalf of herself and all members of the Class

222.    Through their course of conduct, Defendant, Plaintiffs, and Class Members entered into implied contracts for the provision of medical care and treatment, as well as implied contracts for the Defendant to retain and protect the privacy of Plaintiffs' and Class Members' Private Health Information.

223.    Specifically, Plaintiffs and the Class Members entered into valid and enforceable implied contracts with Defendant when they first went for medical treatment at one of Defendant's facilities.

224.    The valid and enforceable implied contracts to provide medical healthcare services that Plaintiffs and Class Members entered into with Defendant included Defendant's promise to not disclose nonpublic Private Health Information given to Defendant without their consent. Plaintiffs and Class Members provided this Private Health Information in reliance of that promise.

225.    Defendant solicited and invited Plaintiffs and Class Members to provide their Private Health Information on its website as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Health Information to Defendant as part of acquiring Defendant's medical services.

226.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's complied with relevant laws and regulations, including

50

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

HIPAA, and would not allow third parties to collect or exploit their communications with Defendant without their consent.

227.    Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to obtain operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so.

228.    Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiffs and Class Members; and (b) protect Plaintiffs and the Class Members' Private Health Information provided to obtain such healthcare. In exchange, Plaintiffs and Class Members agreed to pay money for these services, and to turn over their Private Health Information through the use of Defendant's websites.

229.    Both the provision of medical services healthcare and the protection of Plaintiffs and Class Members' Private Health Information were material aspects of these implied contracts.

230.    The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiffs and Class Members' Private Health Information unless they consent—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's published Notice of Privacy Practices.

231.    Defendant's express representations, including, but not limited to the express representations found in its Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Defendant refrain from aiding or allowing third parties to collect or Plaintiffs and Class Members' Private Health Information without consent.

232.    Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private.  To customers such as Plaintiffs and the Class Members, healthcare that allows third parties to secretly

collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiffs and Class Members would not have entrusted their Private Health Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Health Information would be safeguarded and protected or entrusted their Private Health Information to Defendant in the absence of its implied promise to do so.

233.    A meeting of the minds occurred when Plaintiffs and the Class Members agreed to, and did, provide their Private Health Information to Defendant and/or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, (a) the provision of healthcare and medical services and (b) the protection of their Private Health Information.

234.    Plaintiffs and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

235.    Defendant materially breached its contractual obligation to protect the nonpublic Private Health Information Defendant gathered when it allowed third parties to collect and exploit that information without Plaintiffs and Class Members' consent.

236.    As a result of Defendant's failure to fulfill the data privacy promised in these contracts, Plaintiffs and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare with data privacy they paid for and the healthcare they received.

237.    Had Defendant disclosed that it would allow third parties to secretly collect Plaintiffs and Class Members' Private Health Information without consent, neither the Plaintiffs, the Class

Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

238.    As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health Information, the loss of control of their Private Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

239.    Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

240.    Plaintiffs and the Class Members are also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Private Health Information.

## COUNT VI
## Unjust Enrichment
### (On Behalf of Plaintiffs and the Class)

241.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

242.    Plaintiffs hereby plead this Count in the alternative to Counts IV and V.

243.    Plaintiffs bring this claim on behalf of herself and all members of the Class.

244.    Plaintiffs and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiffs and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

53

245.    Plaintiffs and the Class Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

246.    Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

247.    The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

248.    Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, ask for judgment in her favor, and that the Court enter an order as follows:

a.    Certifying the Class and appointing Plaintiffs as the Class's representatives;

b.    Appoint the law firms of Sweeny Merrigan Law, Keller Postman LLC, and Ahmad, Zavitsanos, & Mensing P.C. as proposed interim class counsel;

c.    Finding that Defendant's conduct as alleged herein was unlawful;

d.    Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendant from making any further disclosure of Plaintiffs or Class Members' communications to third parties without the Plaintiffs or Class Members' express, informed, and written consent;

54

: Filed 10/17/2022 2:10 PM
erior Court - Norfolk
ket Number

e.    Awarding statutory damages of $1,000 per Plaintiff and Class Members pursuant to G.L. c. 272, § 99;

f.    Imposing a constructive trust against Defendant through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendant;

g.    Awarding damages for violations of Plaintiffs and Class Members' right to privacy;

h.    Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

i.    Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

j.    Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

k.    Awarding costs of suit; and

l.    Such other and further relief to which Plaintiffs and Class Members may be entitled.

Filed 10/17/2022 2:10 PM
rior Court - Norfolk
et Number

**RESPECTFULLY SUBMITTED,
COUNSEL FOR PLAINTIFFS JOHN DOE
AND JANE DOE, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED**

/s/ Jonathan T. Merrigan
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

I ATTEST THAT THIS DOCUMENT IS A
CERTIFIED PHOTOCOPY OF AN ORIGINAL
ON FILE
Deputy Assistant Clerk
10/27/22

Dated: October 17, 2022

56

| CIVIL ACTION COVER SHEET | DOCKET NUMBER 2282CV00982 | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| | | COUNTY |

| Plaintiff | John and Jane Doe | Defendant: | Atrius Health Group, Inc. |
|---|---|---|---|
| ADDRESS: | c/o Sweeney Merrigan Law | ADDRESS: | 275 Grove Street, Suite 3-300 |
| | 268 Summer St., LL | | Newton, MA 02466 |
| | Boston, MA 02210 | | |
| Plaintiff Attorney: | Jonathan T. Merrigan | Defendant Attorney: | |
| ADDRESS: | Sweeney Merrigan Law | ADDRESS: | |
| | 268 Summer Street, LL | | |
| | Boston, MA 02210 | | |
| BBO: | 681627 | BBO: | |

## TYPE OF ACTION AND TRACK DESIGNATION (see instructions section below)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B99 | Violation of MA Wiretapping Law | F | ☒ YES ☐ NO |

**\*If "Other" please describe:** _____

Is there a claim under G.L. c. 93A?  ☐ YES  ☒ NO        Is there a class action under Mass. R. Civ. P. 23?  ☒ YES  ☐ NO

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

#### TORT CLAIMS

A. Documented medical expenses to date

    1. Total hospital expenses _____

    2. Total doctor expenses _____

    3. Total chiropractic expenses _____

    4. Total physical therapy expenses _____

    5. Total other expenses (describe below) _____

                                               Subtotal (1-5): **$0.00**

B. Documented lost wages and compensation to date _____

C. Documented property damages to date _____

D. Reasonably anticipated future medical and hospital expenses _____

E. Reasonably anticipated lost wages _____

F. Other documented items of damages (describe below) **$50,000,000.00+**

Plaintiffs and Class Members have suffered damages pursuant to G.L. c. 272 §§ 99

                                          TOTAL (A-F): **$50,000,000+**

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

Defendant disclosed Plaintiffs and Class Members' personal health information to third parties in violation of G.L. c. 272 §§ 99.

#### CONTRACT CLAIMS

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | Defendant breached express and implied contractual duties by disclosing Class Members' personal information. | $14,000,000.00+ |
| | Total | $14,000,000.00+ |

Signature of Attorney/Unrepresented Plaintiff: X **/s/ Jonathan T. Merrigan**   Date: **October 17, 2022**

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

#### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney/Unrepresented Plaintiff: X **/s/ Jonathan T. Merrigan**   Date: **October 17, 2022**

_I ATTEST THAT THIS DOCUMENT IS A CERTIFIED PHOTOCOPY OR AN ORIGINAL_ (stamp)  Deputy Assistant Clerk  12/27/22

# CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

### AC Actions Involving the State/Municipality *

AA1 Contract Action involving Commonwealth,
    Municipality, MBTA, etc.     (A)
AB1 Tortious Action involving Commonwealth,
    Municipality, MBTA, etc.     (A)
AC1 Real Property Action involving
    Commonwealth, Municipality, MBTA etc. (A)
AD1 Equity Action involving Commonwealth,
    Municipality, MBTA, etc.     (A)
AE1 Administrative Action involving
    Commonwealth, Municipality, MBTA,etc. (A)

### CN Contract/Business Cases

A01 Services, Labor, and Materials   (F)
A02 Goods Sold and Delivered   (F)
A03 Commercial Paper   (F)
A04 Employment Contract   (F)
A05 Consumer Revolving Credit - M.R.C.P. 8.1   (F)
A06 Insurance Contract   (F)
A08 Sale or Lease of Real Estate   (F)
A12 Construction Dispute   (A)
A14 Interpleader   (F)
BA1 Governance, Conduct, Internal
    Affairs of Entities   (A)
BA3 Liability of Shareholders, Directors,
    Officers, Partners, etc.   (A)
BB1 Shareholder Derivative   (A)
BB2 Securities Transactions   (A)
BC1 Mergers, Consolidations, Sales of
    Assets, Issuance of Debt, Equity, etc.   (A)
BD1 Intellectual Property   (A)
BD2 Proprietary Information or Trade
    Secrets   (A)
BG1 Financial Institutions/Funds   (A)
BH1 Violation of Antitrust or Trade
    Regulation Laws   (A)
A99 Other Contract/Business Action - Specify (F)

\* Choose this case type if ANY party is the
Commonwealth, a municipality, the MBTA, or any
other governmental entity UNLESS your case is a
case type listed under Administrative Civil Actions
(AA).

† Choose this case type if ANY party is an
incarcerated party, UNLESS your case is a case
type listed under Administrative Civil Actions (AA)
or is a Prisoner Habeas Corpus case (E97).

### ER Equitable Remedies

D01 Specific Performance of a Contract   (A)
D02 Reach and Apply   (F)
D03 Injunction   (F)
D04 Reform/ Cancel Instrument   (F)
D05 Equitable Replevin   (F)
D06 Contribution or Indemnification   (F)
D07 Imposition of a Trust   (A)
D08 Minority Shareholder's Suit   (A)
D09 Interference in Contractual Relationship   (F)
D10 Accounting   (A)
D11 Enforcement of Restrictive Covenant   (F)
D12 Dissolution of a Partnership   (F)
D13 Declaratory Judgment, G. L. c. 231A   (A)
D14 Dissolution of a Corporation   (F)
D99 Other Equity Action   (F)

### PA Civil Actions Involving Incarcerated Party †

PA1 Contract Action involving an
    Incarcerated Party   (A)
PB1 Tortious Action involving an
    Incarcerated Party   (A)
PC1 Real Property Action involving an
    Incarcerated Party   (F)
PD1 Equity Action involving an
    Incarcerated Party   (F)
PE1 Administrative Action involving an
    Incarcerated Party   (F)

### TR Torts

B03 Motor Vehicle Negligence - Personal
    Injury/Property Damage   (F)
B04 Other Negligence - Personal
    Injury/ Damage   (F)
B05 Products Liability   (A)
B06 Malpractice - Medical   (A)
B07 Malpractice - Other   (A)
B08 Wrongful Death - Non-medical   (A)
B15 Defamation   (A)
B19 Asbestos   (A)
B20 Personal Injury - Slip & Fall   (F)
B21 Environmental   (F)
B22 Employment Discrimination   (F)
BE1 Fraud, Business Torts, etc.   (A)
B99 Other Tortious Action   (F)

### RP Summary Process (Real Property)

S01 Summary Process - Residential   (X)
S02 Summary Process - Commercial/
    Non-residential   (F)

### RP Real Property

C01 Land Taking   (F)
C02 Zoning Appeal, G.L. c. 40A   (F)
C03 Dispute Concerning Title   (F)
C04 Foreclosure of a Mortgage   (X)
C05 Condominium Lien & Charges   (X)
C99 Other Real Property Action   (F)

### MC Miscellaneous Civil Actions

E18 Foreign Discovery Proceeding   (X)
E97 Prisoner Habeas Corpus   (X)
E22 Lottery Assignment, G.L. c. 10, § 28   (X)

### AB Abuse/Harassment Prevention

E15 Abuse Prevention Petition, G.L. c. 209A   (X)
E21 Protection from Harassment, G.L. c. 258E(X)

### AA Administrative Civil Actions

E02 Appeal from Administrative Agency,
    G.L. c. 30A   (X)
E03 Certiorari Action, G.L. c. 249, § 4   (X)
E05 Confirmation of Arbitration Awards   (X)
E06 Mass Antitrust Act, G.L. c. 93, § 9   (A)
E07 Mass Antitrust Act, G.L. c. 93, § 8   (X)
E08 Appointment of a Receiver   (X)
E09 Construction Surety Bond, G.L. c. 149,
    §§ 29, 29A   (A)
E10 Summary Process Appeal   (X)
E11 Worker's Compensation   (X)
E16 Auto Surcharge Appeal   (X)
E17 Civil Rights Act, G.L. c.12, § 11H   (A)
E24 Appeal from District Court
    Commitment, G.L. c.123, § 9(b)   (X)
E25 Pleural Registry (Asbestos cases)
E94 Forfeiture, G.L. c. 265, § 56   (X)
E95 Forfeiture, G.L. c. 94C, § 47   (F)
E99 Other Administrative Action   (X)
Z01 Medical Malpractice - Tribunal only,
    G.L. c. 231, § 60B   (F)
Z02 Appeal Bond Denial   (X)

### SO Sex Offender Review

E12 SDP Commitment, G.L. c. 123A, § 12   (X)
E14 SDP Petition, G.L. c. 123A, § 9(b)   (X)

### RC Restricted Civil Actions

E19 Sex Offender Registry, G.L. c. 6, § 178M (X)
E27 Minor Seeking Consent, G.L. c.112, § 12S(X)

## TRANSFER YOUR SELECTION TO THE FACE SHEET

**EXAMPLE:**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES    ☐ NO |

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF -** The plaintiff shall set forth, on the face of the civil action cover sheet (or attach additional sheets as necessary), a statement specifying the facts on which the plaintiff relies to determine money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served with the complaint. A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.

**DUTY OF THE DEFENDANT -** If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with his/her answer a statement specifying the potential damages which may result if the plaintiff prevails.

## A CIVIL COVER SHEET MUST BE FILED WITH EACH COMPLAINT.
## FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY
## MAY RESULT IN DISMISSAL OF THIS ACTION.

Date Filed 10/25/2022 1:54 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Docketed 10/28/2022

3

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, S.S.                          SUPERIOR COURT

JOHN DOE AND JANE DOE,              §
INDIVIDUALLY AND ON                 §        C.A. No. 2282CV00982
BEHALF OF ALL OTHERS SIMILARLY      §
SITUATED,                           §
                                    §
            Plaintiffs              §
                                    §
v.                                  §
                                    §
ATRIUS HEALTH, INC.                 §
                                    §
                                    §
            Defendant.              §

## PLAINTIFFS' MOTION FOR IMPOUNDMENT
## OF PERSONAL IDENTIFYING INFORMATION

Now come the Plaintiffs, John Doe and Jane Doe, individually and on behalf of all others

similarly situated, to impound their names and/or other identifying information for the pendency

of this case pursuant to Massachusetts Uniform Rules on Impoundment Procedure ("URIP") Rule

2[1]. The material sought to be impounded are the plaintiffs' names and/or other identifying

information[2] for the pendency of this matter. Impoundment is necessary in this matter because the

facts of the underlying action relate directly and specifically to all plaintiffs' sensitive medical

information. Specifically, the claim arises from Defendant's systematic violation of the medical

privacy rights of its patients, exposing highly sensitive personal information to third parties

without those patients' knowledge or consent. Therefore, in order to protect the medical

---

[1] URIP Rule 2 provides: "The motion shall describe with particularity (i) the material sought to be impounded, (ii) the duration for which impoundment is sought, (iii) the reasons impoundment is necessary, and (iv) the reasons other alternatives to impoundment will not afford adequate protection."
[2] This could include social media handles, IP addresses, etc.

Date Filed 10/25/2022 1:54 PM
Superior Court - Norfolk
Docket Number 2282CV00982

information that will necessarily be disclosed as part of the factual allegations and discovery in this matter, it is necessary to file this Complaint and proceed with the use of a pseudonym.

Alternatives to impoundment would not serve the same function and would not adequately protect the plaintiff, whose personal medical information has already been improperly used by the Defendant. Plaintiffs recognize that Massachusetts adheres to a presumption of openness, but this presumption is offset by the equally if not more important premise that the citizens of Massachusetts have a right to the privacy and confidentiality of their medical information, a right which is protected by statute, including G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

Perhaps as importantly, proceeding with the Plaintiffs' full names would have the unwelcome effect of making impoundment a more laborious, tedious and inefficient task. For each piece of discovery regarding the Plaintiffs' medical information, Plaintiffs would have to seek impoundment of those materials. It would impact the ability to move forward efficiently in both written and oral discovery. An impoundment order (attached at Exhibit B) would serve both purposes of protecting the Plaintiffs' private medical information and also allowing efficient prosecution of this case.

WHEREFORE, Plaintiff respectfully requests this court ALLOW Plaintiffs' Motion for Impoundment of Personal Identifying Information and request a hearing on the same.

Date Filed 10/25/2022 1:54 PM
Superior Court - Norfolk
Docket Number 2282CV00982

**COUNSEL FOR PLAINTIFFS JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

Respectfully submitted,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

I ATTEST THAT THIS DOCUMENT IS A CERTIFIED PHOTOCOPY OF AN ORIGINAL ON FILE

Deputy Assistant Clerk

12/27/22

Dated: October 25, 2022

Date Filed 10/25/2022 1:54 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Docketed 10/28/2022

3.1

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, S.S.                                    SUPERIOR COURT

JOHN DOE AND JANE DOE,                §
INDIVIDUALLY AND ON                   §
BEHALF OF ALL OTHERS SIMILARLY        §          C.A. No. 2282CV00982
SITUATED,                             §
                                      §
            Plaintiffs                §
                                      §
v.                                    §
                                      §
ATRIUS HEALTH, INC.                   §
                                      §
                                      §
            Defendant.                §
                                      §

## AFFIDAVIT OF ATTORNEY J. TUCKER MERRIGAN IN SUPPORT OF PLAINTIFFS' MOTION FOR IMPOUNDMENT OF PERSONAL IDENTIFYING INFORMATION

I, J. Tucker Merrigan, hereby state and depose:

1. I am counsel for the Plaintiffs in the above-captioned case.

2. The information inappropriately obtained by the Defendant in this matter is of a highly sensitive, personal and confidential nature.

3. In order to protect the privacy interests of the Plaintiffs in this case, it is necessary to proceed under a pseudonym so as not to cause further harm by additional, repeated disclosure of highly confidential medical information throughout the course of this litigation.

4. Allowing the plaintiffs to file under a pseudonym also allows for the most efficient disclosure of documents and discovery.

Signed under the pains and penalties of perjury this 25th day of October, 2022.

/s/ Jonathan T. Merrigan
J. Tucker Merrigan, BBO# 681627
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com

I ATTEST THAT THIS DOCUMENT IS A
CERTIFIED PHOTOCOPY OF AN ORIGINAL
ON FILE

Deputy Assistant Clerk

12/27/22

Docketed 12/15/22

(TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED:
TORT - MOTOR VEHICLE TORT - CONTRACT -
EQUITABLE RELIEF - OTHER)

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 2282CV00982

_John Doe and Jane Doe, Individually
and on Behalf of Other Similarly Situated_ ————————————, _Plaintiff(s)_

v.

_Atrius Health, Inc._ ————————————, _Defendant(s)_

### SUMMONS

To the above-named Defendant:

You are hereby summoned and required to serve upon _J. Tucker Merrigan, Esq._
plaintiff's attorney, whose address is _268 Summer St. LL, Boston, MA 02210_
an answer to the complaint which is herewith served upon you, within 20 days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken
against you for the relief demanded in the complaint. You are also required to file your answer to the
complaint in the office of the Clerk of this court at Dedham either before service upon the plaintiff's
attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim
which you may have against the plaintiff which arises out of the transaction or occurrence that is the
subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other
action.

WITNESS, _Heidi E. Brieger_ Esquire }, at ——————————— the ———————————

day of ——————————— in the year of our Lord two thousand and ———————————

_Walter F. Timilty_ Clerk.

NOTES:
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption.
   If a separate summons is used for each such defendant, each should be addressed to the particular defendant.

F-33

I ATTEST THAT THIS DOCUMENT IS A
CERTIFIED PHOTOCOPY OF AN ORIGINAL
ON FILE

Deputy Assistant Clerk    12/07/22

## PROOF OF SERVICE OF PROCESS

**Middlesex Sheriff's Office** • 40 Brick Kiln Rd, Chelmsford, MA 01824 • 617-547-1171

**Middlesex, ss.**

December 7, 2022

I hereby certify and return that on 12/6/2022 at 9:35 AM I served a true and attested copy of the SUMMONS AND COMPLAINT & JURY DEMAND in this action in the following manner: To wit, by delivering in hand to JANICE LUISI, agent, person in charge at the time of service for ATRIUS HEALTH INC., at 275 GROVE Street SUITE -300 NEWTON, MA 02459 . Fees: Attest ($5.00) Basic Service Fee ($30.00) Postage and Handling ($3.00) Travel ($5.12) Conveyance ($4.50) Total: $47.62

Laurie Aufiero

_____
Deputy Sheriff

, 20

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION

NO.

.............., *Plaintiff*

v.

.............., *Defendant*

SUMMONS

(Mass. R. Civ. P.4)

Date Filed 12/27/2022 12:48 PM    Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 70 of 204
Superior Court - Norfolk
Docket Number 2282CV00982    Case 1:22-cv-12196-FDS    Document 1    Filed 12/23/22    Page 1 of 16

Docketed on 12/27/2022                                                                              5

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JOHN DOE and JANE DOE, individually and
on behalf of all others similarly situated,

                        Plaintiffs,

            v.

ATRIUS HEALTH, INC.

                        Defendant.

Civil Action No. _____

[Massachusetts Superior Court Case No. 2282CV00982]

**DEFENDANT'S NOTICE OF REMOVAL UNDER 28 U.S.C. § 1442(a)(1)**

## NOTICE OF REMOVAL

For more than 15 years, the federal government has engaged non-governmental entities to help construct a nationwide health information technology infrastructure designed to improve patient engagement and access to care. Since 2011, Atrius Health, Inc. ("Atrius Health") has been one of those entities. Plaintiffs John Doe and Jane Doe now challenge Atrius Health's efforts to implement the federal government's directives and promote patient engagement and access to care. Atrius Health removes this case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1), and sets forth below a "short and plain statement of the grounds for removal," 28 U.S.C. § 1446(a).

## NATURE OF THE REMOVED ACTION

1.      On October 18, 2022, Plaintiffs filed a Class Action Complaint ("Complaint") against Atrius Health in Norfolk County Superior Court, Case No. 2282CV00982. Atrius Health was served on December 6, 2022.

Certified to be a true and correct copy of the original
Robert M. Farrell, Clerk
U.S. District Court
District of Massachusetts

By: _____
Deputy Clerk

Date: 12/27/2022

1

Date Filed 12/27/2022 12:46 PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 71 of 204
Superior Court - Norfolk
Docket Number 2282CV00982    Case 1:22-cv-12196-FDS    Document 1    Filed 12/23/22    Page 2 of 16

2.      Atrius Health is a non-profit multi-specialty, multi-site medical group practice in Eastern Massachusetts.  An early adopter of electronic health records (EHR) and data analytics, Atrius Health delivers a system of connected care for adult and pediatric patients.

3.      Plaintiffs allege that a tracking "pixel" from Facebook, which is now known as Meta (the "Meta Pixel"), is "[o]ne of the world's most prevalent tracking pixels," Compl. ¶ 31, and is "embedded on millions of websites," including "many of the top hospitals in the United States," *id.* ¶ 77. The Meta Pixel is a snippet of JavaScript code.[1] Plaintiffs allege that "Facebook touted Meta Pixel (which it originally called Facebook Pixel) as 'a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website.'"[2] According to the Complaint, "tracking pixels" facilitate collection of "dozens of data points about individual website users who interact with a website." *Id.* ¶ 31.

4.      The federal government and health care providers across the country use tracking pixels to improve their website functions and user experience.  For example, the Privacy Policy on the website Medicare.gov states: "We use third-party web services to conduct outreach and education through the use of digital advertising for Medicare.gov.  These third-party services may collect information through the use of web beacons (also called pixels) that are located on our pages. A web beacon . . . in combination with a cookie, allows us to collect information regarding the use of the web page that contains the web beacon."[3]

---

[1]  Facebook, *Meta for Developers: Get Started*, available at
https://developers.facebook.com/docs/meta-pixel/get-started.
[2]  Compl. ¶ 54 (quoting Meta, *Announcing Facebook Pixel*, available at
https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/).
[3]  Medicare.gov, *Privacy Policy*, available at https://www.medicare.gov/privacy-policy: *see also*
CMS.gov, *Privacy Policy* (same disclosure in privacy policy), available at
https://www.cms.gov/About-CMS/Agency-Information/Aboutwebsite/Privacy-Policy.

5.      Atrius Health and its vendors operate the website www.atriushealth.org.  That website is "designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues [and] treatment options, and joining support groups." *Id.* ¶ 20.  Plaintiffs' Complaint alleges that Atrius Health is "among" the healthcare providers that "have embedded Meta Pixel." *Id.* ¶ 79.  According to Plaintiffs, when the Meta Pixel code snippet is triggered, a user's browser sends information to Facebook in data packets. *See, e.g., id.* ¶¶ 61, 69.  Plaintiffs do not allege that social security numbers, medical insurance numbers, birth dates, or medical test results were disclosed to third parties like Facebook.  Plaintiffs instead point to internet protocol (IP) addresses, "tracking cookies," "browser-fingerprints," and a user's Facebook ID. *Id.* ¶¶ 33–44.

6.      Plaintiff John Doe is allegedly a Facebook user and patient of Atrius Health, and when he purportedly visited the Atrius Health website in 2022, he alleges that information from his interactions with the website were transmitted to Facebook based on instructions from the Meta Pixel. *Id.* ¶¶ 10, 88–89, 92.  Plaintiff John Doe does not allege whether he was logged into Facebook when he visited the Atrius Health website, what web browser he was using, or how that web browser was configured.  Plaintiff Jane Doe is also allegedly a patient of Atrius Health, and when she purportedly visited the Atrius Health website in 2022, she alleges that information about her interactions was sent to Facebook because of the Meta Pixel. *Id.* ¶¶ 9, 91–92.  Plaintiff Jane Doe does not allege that she has a Facebook account or that she was logged into a Facebook account when she visited the Atrius Health website.  Nor does she allege what browser she was using or how it was configured.

Date Filed 12/27/2022 12:48 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 73 of 204
Case 1:22-cv-12196-FDS    Document 1    Filed 12/23/22    Page 4 of 16

7.      Plaintiffs contend that the information allegedly disclosed is protected under the Health Insurance Portability and Accountability Act of 1996 (HIPAA). *Id.* ¶¶ 35, 38, 42, 44. Plaintiffs further contend that Atrius Health violated HIPAA privacy rules by "allowing Facebook to capture and exploit patients' Protected Health Information" without "express written authorization from patients." *Id.* ¶¶ 99–100 (citing 45 C.F.R. § 164.508).

8.      Based on these allegations, Plaintiffs assert the following claims on behalf of a putative class of Massachusetts residents: (1) interception of wire communications in violation of Mass. G.L. c. 272, § 99, *id.* ¶¶ 166–84; (2) invasion of privacy in violation of Mass. G.L. c. 214, § 1B, *id.* ¶¶ 185–205; (3) "breach of fiduciary duty and/or common law duty of confidentiality," *id.* ¶¶ 206–12; (4) breach of express contract, *id.* ¶¶ 213–19; (5) breach of implied contract, *id.* ¶¶ 220–40; and (6) unjust enrichment, *id.* ¶¶ 241–48.

## BASIS FOR REMOVAL

9.      Pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a), Atrius Health removes this case to federal court. The statute authorizes the removal of state court cases against "any officer (or any person acting under that officer) of the United States or any agency thereof . . . for or relating to any act under color of such office." *Id.* § 1442(a)(1).

10.     There is no presumption against federal officer removal, *Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31, 38 (D. Mass. 2020), and under binding Supreme Court precedent, the federal officer removal statute must be "liberally construed." *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 147 (2007). Private defendants routinely remove state court actions under this statute when acting under color of federal office. *See, e.g., Moore v. Elec. Boat Corp.*, 25 F.4th 30 (1st Cir. 2022).

4

Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 74 of 204
Case 1:22-cv-12196-FDS    Document 1    Filed 12/23/22    Page 5 of 16

11.     To meet the low bar for removal, the defendant must show (1) it is a "person" under the statute and was "acting under a federal officer's authority," (2) that "the charged conduct was carried out 'for or relating to' the asserted official authority," and (3) that the defendant "will assert a colorable federal defense." *Moore*, 25 F.4th at 34 (citation omitted).

12.     Atrius Health meets each of these requirements.  First, companies qualify as "person[s]" under the statute, so Atrius Health clearly meets this threshold element.  In addition, Atrius Health acted under federal officer authority because it developed its website and patient portal in conjunction with a series of federal programs that sought to create a nationwide health information technology infrastructure.  Second, the alleged conduct at issue in Plaintiffs' Complaint was carried out "for or relating to" Atrius Health's authority under federal incentive and interoperability initiatives centered on Medicare and Medicaid, including the Meaningful Use program, Merit-based Incentive Payment System (MIPS), and the Primary Care First  program. Through these initiatives, the federal government provides monetary incentives and guidance to providers, including Atrius Health, to enhance patient engagement and expand online access to their EHR.  Under federal direction, Atrius Health has gathered data demonstrating expanded patient access and improved patient engagement. Third, Atrius Health intends to assert a colorable federal defense to Plaintiffs' claims.

13.     Courts across the country have upheld federal officer removal in similar privacy class actions against healthcare defendants related to their websites. *See Doe I v. UPMC*, 2020 WL 4381675, *7 (W.D. Pa. Jul. 31, 2020), *interlocutory appeal denied*, 2020 WL 5742685 (W.D. Pa. Sept. 25, 2020) ("UPMC has shown that by its participation in the Meaningful Use [p]rogram, it was 'acting under' DHHS when it engaged in the conduct at issue in the Complaint."); *Doe v. ProMedica Health Sys., Inc.*, 2020 WL 7705627, *3 (N.D. Ohio Oct. 30, 2020), *appeal denied*,

5

Date Filed 12/27/2022 12:46 PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 75 of 204
Superior Court - Norfolk
Docket Number 2282CV00982    Case 1:22-cv-12196-FDS    Document 1    Filed 12/23/22    Page 6 of 16

2020 WL 7705713 (N.D. Ohio Dec. 14, 2020) ("Because Defendant's participation assisted the federal government in achieving that goal [creating an interoperable system of patient EHR], Defendant has satisfied the 'acting under' prong."). Removal is proper here as well.

### *Background on Federal Programs*

14.     Stretching back to 2004, the federal government has tried to spur "a nationwide implementation of interoperable health information technology in both the public and private health care sectors."[4] To that end, President George W. Bush signed an Executive Order calling for the establishment of the Office of the National Coordinator for Health Information Technology (ONC) within the Department of Health and Human Services (HHS).

15.     In the Health Information Technology for Economic and Clinical Health Act of 2009, Congress followed up on that Executive action, *see* American Recovery and Investment Act of 2009, 111 P.L. No. 5 § 3001(a)(1), 123 Stat. 115, 230 (2009), and directed billions of dollars of federal funds to the Centers of Medicare and Medicaid Services (CMS) within HHS to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [ONC]." 123 Stat. at 246 (codified at 42 U.S.C. § 300jj-31).

16.     Following that mandate, the ONC enlisted private healthcare providers, including Atrius Health, to help build that nationwide infrastructure. In doing so, the ONC recognized that private healthcare providers are essential to the development of the Congressionally-directed infrastructure precisely because they have direct access to patients. The government has therefore tried to augment "a provider's ability to influence patient engagement by providing a wider range

---

[4] Exec. Order No. 13,335, 69 Fed. Reg. 24,057 (Apr. 27, 2004), available at
https://www.govinfo.gov/content/pkg/WCPD-2004-05-03/pdf/WCPD-2004-05-03-Pg702.pdf.

Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982

of technologies and methods for a patient's use." Medicare and Medicaid Programs; Electronic
Health Record Incentive Program-Stage 3 and Modifications to Meaningful Use in 2015 Through
2017, 80 Fed. Reg. 62,761, 62,848 (Dec. 15, 2015).

17.    In furtherance of its goals, the ONC issues guidance to private providers in the form
of strategic plans. For instance, in the 2015–2020 plan, the ONC required "federal agencies" to
"collaborate with . . . private stakeholders to . . . [b]uild a culture of electronic health information
access and use."[5] The 2020–2025 plan underscores the collaboration that has already occurred:
"The federal government and private sector have worked together to help digitize health
information and healthcare."[6]

18.    Medicare and Medicaid EHR incentive and interoperability initiatives have been at
the center of these federal efforts. For instance, CMS established the Meaningful Use program in
2011, which has been followed by various other initiatives and programs. *See* 42 C.F.R. §§ 495.2–
495.370. The goal of these initiatives has been to increase patients' "meaningful use" and
engagement with their EHR.[7]

19.    Since 2011, federal EHR interoperability initiatives, including the Meaningful Use
program, MIPS, and the Primary Care First program, have offered incentive payments to Medicare
and Medicaid providers when they voluntarily provide program reports and meet specific criteria
for increasing patient engagement.[8]

---

[5] ONC, *Federal Health Information Technology Strategic Plan 2015-2020*, available at
https://dashboard.healthit.gov/strategic-plan/federal-health-it-strategic-plan-2015-2020.php.
[6] ONC, *Federal Health Information Technology Strategic Plan 2020-2025 (2020–2025 Strategic Plan)*, available at https://www.healthit.gov/sites/default/files/page/2020-01/2020-2025FederalHealthIT%20StrategicPlan_0.pdf.
[7] *See* CMS.gov, *Promoting Interoperability Programs*, available at
https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms.
[8] *See id.* (noting history of interoperability programs); CMS.gov, *Traditional MIPS Overview*,
available at https://qpp.cms.gov/mips/traditional-mips (describing promoting interoperability

Date Filed 12/27/2022 12:46 PM    Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 77 of 204
Superior Court - Norfolk
Docket Number 2282CV00982    Case 1:22-cv-12196-FDS    Document 1    Filed 12/23/22    Page 8 of 16

20.    The program requirements for increasing patient engagement include implementing certified EHR technology based on federal standards and technical specifications to facilitate patients viewing their medical records. *See* 45 C.F.R. § 170.315. Once ONC certifies that a particular technology complies with federal standards, the developer can market the product to healthcare providers. To meet the numerous federal requirements, CMS recommends that providers create patient "portals" to facilitate access to providers and EHR. CMS has explained that the portals "must be engaging and user-friendly," and to make that happen, providers should "actively promote and facilitate portal use."[9]

21.    HHS requires program participants to show patients' increased engagement over time. Those providers that voluntarily meet the engagement criteria, qualify for higher federal payments. *See* 42 U.S.C. § 1395w-4.

22.    For instance, one objective of the Meaningful Use program was to "[p]rovide patients the ability to view online, download, and transmit their health information within 4 business days of the information being available to the [provider]." 42 C.F.R. § 495.22(e)(8)(i). To meet that objective, providers had to show that more than fifty (50) percent of Medicaid patients received access to view, download, and transmit their health information to a third party—a percentage that went up over time. *Compare id.* § 495.22(e)(8) (50 percent in 2015), *with id.* § 495.24(d)(5)(i)(B) (80 percent in 2019).

---

component); CMS.gov, *2021 Promoting Interoperability: Traditional MIPS*, available at https://qpp.cms.gov/mips/explore-measures?tab=advancingCareInformation&py=2021#measures (detailing 2021 MIPS requirements for Promoting Interoperability component)

[9] ONC, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (2013), available at https://www.healthit.gov/sites/default/files/nlc_how_to_optimizepatientportals_for_patientengagement.pdf.

Date Filed 12/27/2022 12:46 PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 78 of 204
Superior Court - Norfolk
Docket Number 2282CV00982    Case 1:22-cv-12196-FDS    Document 1    Filed 12/23/22    Page 9 of 16

23.    In addition to the Meaningful Use program and MIPS initiatives promoting interoperability, CMS created another program, the Primary Care First program, that incentivizes physicians who may not participate in the other initiatives.  Under the Primary Care First program, CMS enters into participant agreements with certain providers to, among other things, further incentivize patient access and EHR interoperability.  For instance, participants must ensure that patients receive access to their EHR within one business day and that their EHR technology enables a patient to "[i]dentify, record, and access information directly and electronically shared by a patient." 45 C.F.R. § 170.315(e)(3).

24.    Aside from incentive programs, CMS also provided an example of how to engage with beneficiaries: it created its own portal and promoted patient engagement through the use of third-party services on its websites.  By working with over two dozen third-parties,[10] CMS is able to "collect basic information about visits to Medicare.gov." *See* Ex. A, Medicare.gov, *Privacy Policy,* available at https://www.medicare.gov/privacy-policy.  CMS "use[s] third-party web services to conduct outreach and education through the use of digital advertising for Medicare.gov." *Id.* These services include "the use of web beacons (also called pixels)," which CMS uses "to better target Medicare advertisements." *Id.*

25.    CMS also engaged Facebook to "place[] a cookie or pixel . . . for conversion tracking on certain pages of CMS website.  [This] allows Facebook Ads to measure the

---

[10] *See* Medicare.gov, *Privacy information regarding third-party services,* available at
https://www.medicare.gov/third-party-privacy-policies.

Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982

performance of CMS advertisements based on consumer activity and to report the ad performance to CMS."[11]

### Atrius Health is a "person"

26.    Federal officer removal can be effectuated by "any person acting under" a federal officer. 28 U.S.C. § 1442(a)(1).

27.    Courts have repeatedly held that corporations qualify as "person[s]" under the statute. *See, e.g., Moore,* 25 F.4th at 34–38; *see also Genereux v. Am. Beryllia Corp.,* 577 F.3d 350, 357 & n.9 (1st Cir. 2009).

28.    Atrius Health is a Massachusetts non-profit corporation, Compl. ¶ 8, and thus qualifies as a "person."

### Atrius Health is "acting under" Federal Authority

29.    The "acting under" element for federal officer removal—must be "broad[ly]" and "liberally construe[d]." *See Moore,* 25 F.4th at 34 n.3. This element involves "an effort to *assist,* or to help *carry out,* the duties or tasks of the federal superior." *Watson,* 551 U.S. at 152 (emphasis in original).

30.    Atrius Health readily meets that requirement.  First, on behalf of itself and its providers, Atrius Health has been a longstanding participant in Medicare and Medicaid EHR incentive programs and initiatives, including the Meaningful Use program, MIPS, and the Primary Care First program.  Through its voluntary participation, Atrius Health has assisted and continues to assist the federal government in carrying out its goal of creating a nationwide healthcare information technology infrastructure. *See* ONC, *2020–2025 Strategic Plan.*  This work has

---

[11] *See* HHS, *Third Party Websites and Applications Privacy Impact Assessment –Facebook Ads* (Sept. 4, 2018), available at https://www.hhs.gov/pia/third-party-websites-and-applications-pia-facebook-ads.html.

Date Filed 12/27/2022 12:46 AM Case 1:22-cv-12196-FDS   Document 12   Filed 01/03/23   Page 80 of 204
Superior Court - Norfolk
Docket Number 2282CV00982   Case 1:22-cv-12196-FDS   Document 1   Filed 12/23/22   Page 11 of 16

included development of its patient portal to meet interoperability standards and filing periodic reports attesting to efforts to increase patient engagement.

31.      Second, the government has modeled how to best enhance patient engagement. That includes development of a patient portal and analyzing patient engagement, including with digital marketing tools.  Furthermore, the federal government has shown participants how to enhance patient engagement on its own websites by using third-party services to track users' engagement with those websites, including on the CMS website and the HHS website. *See* Ex. B, CMS.gov, *Privacy Policy*, available at https://www.cms.gov/privacy; Ex. C, HHS.gov, *HHS Privacy Policy Notice*, available at https://www.hhs.gov/web/policies-and-standards/hhs-web-policies/privacy/index.html.

32.      Third, the federal government has created an office devoted to promoting patient engagement with health records and closely monitors private providers' work to achieve that goal. In exchange for carrying out the work of improving patient access and engagement, Atrius Health and other private providers have received payments and direction through various federal programs and initiatives, including the Meaningful Use program, MIPS, and the Primary Care First program.  Such exchanges are akin to a government-contractor relationship. *See Moore*, 25 F.4th at 34 n.3.

33.      Finally, the Primary Care First program includes promoting interoperability and patient access to records as an element of improving patient care.  As part of the program, Atrius Health has entered into Primary Care First participation agreements for almost all of its clinical facilities, ensuring that it attains the interoperability benchmarks that are part of the federal government's efforts to improve primary care and interoperability.  The federal government would

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 81 of 204
Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982    Case 1:22-cv-12196-FDS    Document 1    Filed 12/23/22    Page 12 of 16

not be able to "carry out" these important federal healthcare initiatives without participation by providers like Atrius Health. *See Watson*, 551 U.S. at 152.

### *Atrius Health's Conduct Taken "for or relating to" the Asserted Federal Authority*

34.     The "for or relating to" element means that the Plaintiffs' claims must be "related to" the activity Atrius Health took while "acting under" the federal officer. *See Moore*, 25 F.4th at 35–36. "No causal link is required," and the required nexus "is not to be understood as anything more than a 'related to' nexus." *Id.* The Supreme Court has stated "that the ordinary meaning of the phrase 'relating to' is 'a broad one,' holding that it normally means in 'association with or connection with.'" *Id.* at 35 n.4 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84 (1992)).

35.     As detailed above, the Complaint focuses on Atrius Health's alleged use of a common website analytical tool, the Meta Pixel. *See, e.g.*, Compl. ¶¶ 4–6, 22, 32, 82, 85–92. As Plaintiffs allege, and the government's own use of pixels shows, "[a] third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic." *Id.* ¶ 74. Plaintiffs thus challenge development of Atrius Health's website that helps to promote patient engagement.

36.     "Any single claim is independently sufficient to satisfy the 'for or relating to' requirement under § 1442(a)(1)." *Moore*, 25 F.4th at 35. Whether it is the wiretapping claim or the more general invasion of privacy claim advanced in the Complaint, Plaintiffs target Atrius Health's actions taken in response to federal program incentives.

37.     For instance, Plaintiffs argue that Atrius Health's conduct violated Massachusetts' wiretapping statute, *see* Compl. ¶¶ 165–84, and in support of that claim, Plaintiffs contend that Atrius Health "aided in the interception of 'contents'" of Plaintiffs' communications, including

Date Filed 12/27/2022 12:46 PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 82 of 204
Superior Court - Norfolk
Docket Number 2282CV00982    Case 1:22-cv-12196-FDS    Document 1    Filed 12/23/22    Page 13 of 16

"Log-Ins," to the patient portal, *id.* ¶ 179. Placing log-ins to the patient portal in various places on the website promotes portal engagement and thus helps meet interoperability standards in various federal EHR programs and initiatives. Accordingly, at least one claim "relat[es] to" Atrius Health's role in carrying out the federal government's goal of creating a national healthcare information technology infrastructure.

38.    In a similar case, *UPMC*, the plaintiffs there also asserted state law claims against a defendant healthcare provider based on alleged disclosure of personally identifiable information to third parties for marketing purposes and without the plaintiffs' knowledge or authorization. *UPMC*, 2020 WL 4381675, at *1. The district court for the Western District of Pennsylvania found that as a Meaningful Use participant, "UMPC must, among other things, raise awareness and increase usability of the UPMC website and [its] portal." *Id.* at *6. The court then concluded that targeting disclosure of information to third parties, such as Facebook, "plainly" established "a connection or association between UPMC's website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability." *Id.* The same is true of Plaintiffs' claims here.

### Atrius Health's Colorable Federal Defense

39.    The final element for removal under Section 1442 merely requires that the defendant assert a "colorable federal defense." *See Mesa v. California*, 489 U.S. 121, 129–30 (1989) (colorable federal defense is "defensive" and "based in federal law"). A federal defense is "colorable" as long as it is not "wholly insubstantial and frivolous," even if it is not "clearly sustainable." *Moore*, 25 F.4th at 36 (citations omitted).

40.    Atrius Health intends to argue that the information allegedly disclosed, including information about website interactions and Facebook IDs, was not protected health information

Date Filed 12/27/2022 12:48 PM
Superior Court - Norfolk
Docket Number 2282CV00982

under HIPAA.  Plaintiffs' assertion that the allegedly disclosed information falls under the category of individually identifiable health information, *see* Compl. ¶¶ 42, 44 (citing 45 C.F.R. § 164.514(b)(2)(i)(R)), requires interpretation of federal law.

41.     HIPAA lies at the center of Plaintiffs' claims and whether the information at issue was HIPAA-protected is a question of federal law.  As such, Atrius Health has established a colorable federal defense.  Atrius Health may identify additional defenses that involve federal law as it continues to review Plaintiffs' Complaint.

### PROCEDURAL REQUIREMENTS

42.     All the procedural requirements for removal under 28 U.S.C. § 1446 are satisfied.

43.     Atrius Health is filing this Notice of Removal within thirty (30) days of its receipt of the Complaint by formal "service," which occurred on December 6, 2023.  28 U.S.C. § 1446(b); *see also Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347–48 (1999) ("formal service" required to start 30-day period pursuant to § 1446(b)).

44.     This Court is the corresponding federal court for the Norfolk County Superior Court of the Commonwealth of Massachusetts, where the suit was originally filed.  Venue is therefore proper under 28 U.S.C. §§ 101 and 1441(a).

45.     Atrius Health has attached a copy of the Complaint and all other publicly available filings from the state court docket as Exhibits D–I.

46.     Upon filing this Notice, Atrius Health will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the Norfolk County Superior Court.  28 U.S.C. § 1446.

**WHEREFORE**, Notice is given that this action is removed from the Norfolk County Superior Court of the Commonwealth of Massachusetts to the United States District Court for

14

the District of Massachusetts.


Dated: December 23, 2022

Respectfully submitted,

**HOGAN LOVELLS US LLP**

*/s/ Kayla H. Ghantous*

By:    Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
maria.durant@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (*pro hac vice forthcoming*)
Adam A. Cooke (BBO # 679637)
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

*Counsel for Atrius Health, Inc.*

I ATTEST THAT THIS DOCUMENT IS A
CERTIFIED PHOTOCOPY OF AN ORIGINAL
ON FILE

Deputy Assistant Clerk      12/27/22

15

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2022, copies of the foregoing Notice of Removal and accompanying exhibits were sent via electronic mail and overnight delivery, as indicated below, to:

Sweeney Merrigan Law
J. Tucker Merrigan
Victoria Santoro Mair
Erin E. McHugh
268 Summer St. LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Ahmad, Zavitsanos, & Mensing, P.C.
Foster C. Johnson
David Warden
Nathan Campbell
1221 McKinney Street, Suite 3460
Houston, Texas 77010
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Keller Postman LLC
Seth Meyer
Alex Dravillas
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
sam@kellerpostman.com
adj@kellerpostman.com

*Counsel for Plaintiffs John Doe and Jane Doe, Individually and on Behalf of all Others Similarly Situated*

/s/   *Kayla H. Ghantous*
*Counsel for Atrius Health, Inc.*

16

# Exhibit A

Date Filed 12/27/2022 12:46 PM Case 1:22-cv-12196-FDS  Document 12  Filed 01/03/23  Page 87 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS  Document 1-2 cy.pdf (Sched-12/23/22  Page 2 of 15

🏛️ An official website of the United States government
Here's how you know

Menu

Search Medicare     🔍

# Privacy policy

- Types of information we collect
- How CMS uses information collected on Medicare.gov
- How CMS uses cookies & other technologies on Medicare.gov
- Your choices about tracking & data collection on Medicare.gov
- How CMS uses third-party websites & applications with Medicare.gov
- How CMS protects your personal information
- How long CMS keeps data & how it's accessed
- Children & privacy on Medicare.gov
- Links to other sites
- Additional privacy information

## Medicare.gov privacy policy

Protecting your privacy is very important to us. This privacy policy describes what information we collect, why we collect it, and what we do with it. This privacy notice is for Medicare.gov, es.Medicare.gov, and other Medicare.gov subdirectories, like Medicare.gov/physiciancompare. These websites are referred to as "Medicare.gov" throughout the rest of this notice and are maintained and operated by the Centers for Medicare & Medicaid Services (CMS). This notice of privacy policy aligns with the CMS Website Privacy Policy.

Medicare.gov doesn't collect name, contact information, Medicare Number, or other similar information through these websites unless you choose to provide it. We do collect other, limited, non-personally identifiable information automatically from visitors who read, browse, and/or download information from our website. We do this so we can understand how the website is being used and how we can make it more helpful. For more information, see Types of information we collect.

Personally identifiable information (PII), defined by the Office of Management and Budget (OMB), refers to information that can be used to distinguish or trace an individual's identity, like their name, Medicare Number, biometric records, etc. alone, or when combined with other

personal or identifying information which is linked or linkable to a specific individual, like date and place of birth, mother's maiden name, etc. Medicare Fee-for-Service eligibility and enrollment information and claims data are considered protected health information (PHI) under the Health Insurance Portability and Accountability Act (1996) (HIPAA) regulations. Read more about our privacy practices regarding PHI.

For example, we collect PII/PHI if you elect to create a user account on Medicare.gov, use Medicare.gov to apply for Medicare coverage, enroll in a plan, or use other tools that provide personalized services or information through Medicare.gov. We collect this information to be able to provide you access to the personalized information and services that Medicare.gov is designed to offer you. We don't sell any information you provide when you visit Medicare.gov. For information on how we share information, see How CMS uses information collected on Medicare.gov.

# Types of information we collect

## Information which is automatically collected:

**When you browse:**

Certain information about your visit can be collected when you browse websites. When you browse Medicare.gov, we, and in some cases, our third-party service providers, can collect the following types of information about your visit, including:

- Domain from which you accessed the internet (like Verizon.com if you're using a Verizon account).
- IP address (an IP or internet protocol address is a number that's automatically assigned to a device connected to the internet).
- Approximate geographic location based on the IP address of the user's local system.
- Operating system for the device that you're using and information about the browser you used when visiting the site. The operating system is software that directs a computer's basic functions, like executing programs and managing storage.
- Date and time of your visit.
- Pages you visited.
- Address of the website that connected you to Medicare.gov (like Google.com or Bing.com).
- Device type (like desktop computer, tablet, or type of mobile device).
- Screen resolution.
- Browser language.
- Geographic location.

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 89 of 204

Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982    Case 1:22-cv-12196-FDS    Document 11-2   Filed 12/23/22    Page 4 of 15

- Time spent on page.
- Scroll depth (measures how much of a web page was viewed).
- Your actions on Medicare.gov (like clicking a button).

For more information, see How CMS uses third-party websites & applications with Medicare.gov.

We use this information to:

- Measure the number of visitors to Medicare.gov
- Help make our website more useful for visitors
- Improve our public education and outreach through digital advertising

Also, this information is sometimes used to personalize the content we show you on third-party sites. For more information on our practices, see How CMS uses third-party websites & applications with Medicare.gov.

## Information you may provide:

### When you request information:

We collect information, including your email address or mobile phone number, to deliver alerts or eNewsletters. We use this information to complete the subscription process and provide you with information. You can opt out of these communications at any time by editing your subscription preferences.

### When you submit forms:

We collect PII/PHI on paper or electronic forms, like Medicare coverage enrollment, authorizations to disclose personal health information, medical payment requests or appeals. When you specifically and knowingly provide us PII/PHI, like your name, email address, Social Security Number, or other unique identifier, we only use this information to fulfill the stated purpose on the form. If you choose to provide us with PII/PHI through a paper or electronic form, we'll maintain the information you provide only as long as needed to respond to your question or to fulfill the stated purpose of the communication.

### When you enroll in Medicare:

When you apply for Medicare, you can sign up for Medicare Part A (Hospital Insurance) and Medicare Part B (Medical Insurance) through the Social Security Administration (SSA) website. All PII you provide to the SSA is subject to the SSA's privacy policies. Any PII that you supply to SSA that qualifies as PHI will also be subject to the HIPAA regulations.

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 90 of 204
Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS    Document 12    Filed 01/23/22    Page 5 of 15

For specific details on the data collected by the systems that make up Medicare.gov, visit the Privacy Impact Assessments (PIAs).

# How CMS uses information collected on Medicare.gov

If we maintain your PII/PHI in a system designed to retrieve information about you by personal identifier (name, personal email address, home mailing address, personal or mobile phone number, etc.), we'll protect it in accordance with the Privacy Act of 1974 (5 U.S.C. Section 552a).

Prior to requesting PII/PHI on a form on Medicare.gov, we'll provide you with a Privacy Act Statement.

## Sending you Medicare messages:

We use the email address or the mobile phone number you provide us to send emails or Short Message Service (SMS) messages (text messages) related to Medicare. If you give us permission, we'll send you emails and text messages. We also may use the phone number you provide to call you about Medicare services.

## Responding to you through Live Chat:

We use web chat to collect name, email, phone number, and description of the request from Medicare.gov users who choose to provide this information to request a Medicare Call Center representative contact them.

## Conducting surveys to improve services:

We also use online surveys to collect opinions and feedback. You don't have to answer these questions. If you do answer these questions, don't include any PII/PHI in your answers. We analyze and use the information from these surveys to improve the Medicare.gov websites. The information is available only to CMS managers, members of the CMS communications and web teams, and other designated federal staff and contractors who require this information to perform their duties.

## Using third-party tools for website analytics:

We use a variety of third-party web tools for web analytics. We use these tools to collect basic information about visits to Medicare.gov. This information is then used to maintain the website, including:

Date Filed 12/27/2022 12:48 PM
Superior Court - Norfolk
Docket Number 2282CV00982

- Monitoring website stability
- Measuring website traffic
- Optimizing website content
- Helping make the website more useful to visitors

CMS staff analyzes the data collected from these tools. Reports are available only to CMS managers, teams who implement programs represented on Medicare.gov, members of the CMS communications and web teams, and other designated federal staff and contractors who need this information to perform their jobs.

## Using third-party tools for outreach and education through digital advertising:

We use third-party web services to conduct outreach and education through the use of digital advertising for Medicare.gov. These third-party services may collect information through the use of web beacons (also called pixels) that are located on our pages. A web beacon is a see-through graphic image (usually 1 pixel x 1 pixel) that's placed on a web page and, in combination with a cookie, allows us to collect information regarding the use of the web page that contains the web beacon.

We use web beacons to tell when a user is redirected to Medicare.gov by clicking or otherwise interacting with a Medicare advertisement that we ran on another website. This is known as "click tracking" or "conversion tracking," and we use it to better target Medicare advertisements (known as "retargeting") to inform consumers or people with Medicare about Medicare deadlines and the services available through Medicare.gov. For more information on how these tools work, see How CMS uses third-party websites & applications with Medicare.gov.

We also use third-party tools to help deliver advertising. Vendors that operate the third-party tools may also gather information about your visits to third-party sites outside of Medicare.gov. While we don't track your internet activity outside of Medicare.gov, our vendors may use information collected automatically by visiting Medicare.gov, and combine it with data they collect elsewhere for targeted advertising purposes. You can opt out of this type of data collection via Privacy Manager, Ad Choices, and Do Not Track. For methods to opt out of this type of collection, see Your choices about tracking & data collection on Medicare.gov.

The outreach and education analytics tools provide reports which aggregate data like the number of clicks on advertisements. The reports are available only to CMS managers, teams who implement programs represented on Medicare.gov, members of the Medicare.gov communications and web teams, and other designated federal staff and contractors who need this information to perform their duties.

Date Filed 12/27/2022 12:46 PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 92 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS    Document 1-2    Filed 12/23/22    Page 7 of 15

# How CMS uses cookies & other technologies on Medicare.gov

The Office of Management and Budget Memo M-10-22, Guidance for Online Use of Web Measurement and Customization Technologies, allows federal agencies to use session and persistent cookies to improve the delivery of services.

When you visit a website, its server may generate a piece of text known as a "cookie" to place on your device. The cookie, which is unique to your browser, allows the server to "remember" specific information about your visit while you're connected. The cookie makes it easier for you to use the dynamic features of web pages. Information that you enter into Medicare.gov isn't associated with cookies on Medicare.gov. Depending on the third-party tool's business practices, privacy policies, terms of service, and/or the privacy settings you selected, information you've provided to third parties could be used to identify you when you visit Medicare.gov. These third parties don't/won't share your identity with CMS or the Department of Health and Human Services (HHS).

There are 2 types of cookies - single session (temporary) and multi-session (persistent). Single session cookies last only as long as your internet browser is open. Once you close your browser, the session cookie disappears. Persistent cookies are stored on your device for longer periods. Both types of cookies create an ID that's unique to your device.

- **Session cookies:** We use session cookies for technical purposes, like to allow better navigation through our website. These cookies let our server know that you're continuing a visit to our website. The OMB Memo M-10-22 Guidance defines our use of session cookies as "Usage Tier 1—Single Session." The policy says, "This tier encompasses any use of single session web measurement and customization technologies."
- **Persistent cookies:** We use persistent cookies to understand the differences between new and returning visitors to Medicare.gov. Persistent cookies remain on your device between visits to our website until they expire or are removed by the user. The OMB Memorandum M-10-22 Guidance defines our use of persistent cookies as "Usage Tier 2—Multi-session without personally identifiable information." The policy says, "This tier encompasses any use of multi-session web measurement and customization technologies when no PII is collected." We don't use persistent cookies to collect PII. We don't identify a user by using cookies.

CMS also uses these technologies on Medicare.gov:

- **Persistent cookies for digital advertising:** Similar to persistent cookies identified above, CMS uses persistent cookies for outreach through digital advertising. These cookies can also be created on third-party websites and remain on your device between

Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982

visits to our website until they expire or you remove them. Consistent with OMB guidance for "Usage Tier 2", we don't use persistent cookies for outreach to collect PII. CMS doesn't identify a user by using such technologies.

- **Web beacons for digital advertising** (also called pixels and/or tracking tags): See-through images placed on certain pages of Medicare.gov are typically used in conjunction with cookies and aren't stored on your device. When you access these pages, web beacons generate a notice of your visit. For information on how we use web beacons, see How CMS uses third-party websites & applications with Medicare.gov.
- **Website log files:** These are used as an analysis tool and to tell how visitors use Medicare.gov, how often they return, and how they navigate through the website.
- **Flash:** Flash is used to assess the performance of the site and as a player for selected videos depending on the browser a device is using.
- **Local Storage Objects:** We use Flash Local Storage Objects ("LSOs") to store your preferences and to personalize your visit.

# Your choices about tracking & data collection on Medicare.gov

Medicare.gov offers a Privacy Manager which gives you control over what tracking and data collection takes place during your visit. Third-party tools are enabled by default to provide a quality consumer experience.

The Privacy Manager provides you with the choice to opt in or to opt out of the different categories of third-party tools used by Medicare.gov: Advertising, Analytics, or Social Media. The Privacy Manager prevents cookies, web beacons, and Local Storage Objects from being placed on your device. The Privacy Manager also prevents third-party tools from loading regardless of your cookie settings, which provides you with an additional layer of privacy that prevents the tool from loading at all. Because the Privacy Manager creates a cookie in your browser, the opt in and opt out choices you make through the Privacy Manager will only be effective on the device and browser you used to make your choices, and your choices will expire when the cookie expires. Once the cookie is created, the Privacy Manager will retain your settings for 3 years from the date of your most recent visit. You may revisit the Privacy Manager to change or renew your choices at any time.

Modify privacy options

If you disable cookies in your browser, our Privacy Manager won't be able to store your preferences and won't function properly. If you don't wish to use our Privacy Manager to opt

Date Filed 12/27/2022 12:48 a.m. Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 94 of 204
Superior Court - Norfolk
Docket Number 2282CV00982    Case 1:22-cv-12196-FDS    Document 1-2 Filed 12/23/22    Page 9 of 15

out of the tools used by Medicare.gov, you can opt out of tools individually, or via the Digital Advertising Alliance ("DAA") AdChoices icon, discussed in the next subsection.

If you opt out of the tools used by Medicare.gov via the Privacy Manager or by opting out of the tools directly, you'll still have access to information and resources at Medicare.gov. Or, if you don't want to use the website, you can get Medicare information by calling us at 1-800-MEDICARE (1-800-633-4227). TTY users can call 1-877-486-2048.

**AdChoices:** We include the AdChoices icon on all digital advertising that uses "conversion tracking" or "retargeting." To learn about conversion tracking, targeted advertising, and retargeting, see <u>How CMS uses third-party websites & applications with Medicare.gov</u>. The AdChoices icon is usually at or near the corner of digital ads. When you click on the AdChoices icon, it will provide information on what company served the ad and information on how to opt out. <u>Learn more about AdChoices.</u>

**Do Not Track:** We automatically observe the "Do Not Track" browser setting for digital advertising that uses "conversion tracking" or "retargeting." If "Do Not Track" is set before a device visits Medicare.gov, third-party conversion tracking and retargeting tools won't load on the website. To learn more about conversion tracking and retargeting, see <u>How CMS uses third-party websites & applications with Medicare.gov</u>. <u>Learn more about Do Not Track and how to set the Do Not Track setting in your browser.</u>

# How CMS uses third-party websites & applications with Medicare.gov

Medicare.gov uses a variety of technologies and social media services to communicate and interact with the public. These third-party websites and applications include popular social networking and media websites, open source software communities, and more.

## Third-party websites:

Your activity on the third-party websites that Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites. You should review the privacy policies of all websites before using them so you understand how your information may be used. You may want to adjust your account privacy settings on any third-party website to match your preferences on Medicare.gov.

## Website analytics tools:

Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982

These tools collect basic site usage information, like:

- How many visits Medicare.gov gets
- The pages visited by consumers
- Time spent on Medicare.gov
- The number of return visits to Medicare.gov
- The approximate geographic location of the device used to access Medicare.gov
- Types of devices used

This information is used to maintain the website, including:

- Monitoring website stability
- Measuring website traffic
- Optimizing website content
- Improving your experience

Use the Medicare.gov Privacy Manager to opt out of website analytics tools.

## Digital advertising tools for outreach & education:

We use third-party tools to support our digital advertising outreach and education efforts. These tools enable us to reach new people and provide information to previous visitors. To use these tools, we use these technologies on Medicare.gov:

**Click tracking:** We use click tracking to identify the ads that are most helpful to consumers and efficient for outreach. This enables us to improve the performance of ads that consumers click on. When users click on links from ads, data about what ad was viewed is collected. Reports are generated about ad performance – including the total number of views and clicks an ad received.

**Conversion tracking:** We use conversion tracking to identify ads that are helpful to consumers and efficient for outreach. It enables us to improve the performance of ads viewed by consumers. When a Medicare.gov ad is viewed on a third-party site (like a banner ad), a cookie is placed in the browser of the device the ad was viewed on. If this device later visits Medicare.gov, the visit is linked to the ad viewed on the same device. Use the Medicare.gov Privacy Manager to opt out of advertising tools. Users can click on the "AdChoices" icon in the corner of our ads to opt out of this Ad Targeting. Users who have set their browser to "Do Not Track" will automatically be opted out of conversion tracking. For more information about AdChoices and Do Not Track, see Your choices about tracking & data collection on Medicare.gov.

Date Filed 12/27/2022 12:46 Case 1:22-cv-12196-FDS   Document 12   Filed 01/03/23   Page 96 of 204
Superior Court - Norfolk
Docket Number 2282CV00982   Case 1:22-cv-12196-FDS   Document 4-1   Filed 11/23/22   Page 11 of 15

**Retargeting:** We use retargeting to provide information to consumers who have previously visited Medicare.gov, like reminders about upcoming enrollment deadlines. Retargeting enables us to improve the performance of ads by delivering them to relevant audiences, like recent visitors to Medicare.gov. During a visit to Medicare.gov, a cookie is placed in the browser of the devices used to view the website. When that same device is used to visit third-party websites that are displaying Medicare.gov ads, ads for Medicare.gov may be shown to that device because it had previously visited Medicare.gov. Using these cookies, we don't collect information about the third-party websites visited by a device. Reports are generated about ad performance – including the total number of views and clicks an ad received. Use the Medicare.gov Privacy Manager to opt out of advertising tools. Users can click on the "AdChoices" icon in the corner of our ads to opt out of this Ad Targeting. Users who have set their browser to "Do Not Track" will automatically be opted out of conversion tracking. For more information about AdChoices and Do Not Track, see Your choices about tracking & data collection on Medicare.gov.

**Targeted advertising:** We use third-party vendors to engage in targeted advertising (also called online behavioral or interest-based advertising) to provide information to consumers across their online activities. Targeted advertising involves the collection of data from a particular computer or device. Data regarding web viewing behaviors or application use is gathered to predict user preferences or interests. We can have ads delivered to computers or devices based on the preferences or interests inferred from the web-viewing behaviors or application use.

Third-party vendors engaged by us may also target advertising based on information automatically collected (not information you provide) when you browse our websites or other websites on the internet. You can opt out of this type of data collection via our Privacy Manager, Ad Choices, and Do Not Track. For methods to opt out of this type of collection, see Your choices about tracking & data collection on Medicare.gov.

We may consider new third-party tools or the use of new third-party websites, but we'll first assess the tool or website before it's used in connection with Medicare.gov. We'll provide notice to the public before adding any new tool to Medicare.gov. These assessments include a description about how information will be collected, accessed, secured, and stored. See a list of the third-party tools currently being used on Medicare.gov. See risk assessments for third-party websites and applications.

# How CMS protects your personal information

We're committed to protecting information entrusted with us at Medicare.gov. If you visit Medicare.gov and choose to provide us with PII/PHI, we store your PII/PHI in a record system that can retrieve information about you by personal identifier (like name, personal email

address, home mailing address, or personal or mobile phone number, etc.). We'll protect the information you provide in accordance with applicable law, including the requirements of the Privacy Act of 1974 (5 U.S.C. Section 552a) and the regulations promulgated under HIPAA as amended (45 CFR 160-164). Privacy Act protections include the publication of Privacy Act System of Record Notices (SORN) in the Federal Register, which provide public notice about how we'll use and disclose PII. SORN are also available on CMS.gov.

The original system of records notice entitled, "1-800 Medicare Choice (HELPLINE)" was published in the Federal Register on February 26, 2008. View the system of records and modifications.

For more information about Medicare.gov's privacy policy, email Privacy@cms.hhs.gov.

Third-party services are web-based technologies that aren't exclusively operated or controlled by a government entity, or that involve significant participation of a nongovernment entity. These services may be separate websites or may be applications embedded within our websites. The list of third-party services includes links to relevant third-party privacy policies.

# How long CMS keeps data & how it's accessed

We'll keep data collected long enough to achieve the specified objective for which they were collected. Once the specified objective is achieved, the data will be retired or destroyed in accordance with published draft records schedules of CMS as approved by the National Archives and Records Administration.

We don't store information from cookies on our systems. The persistent cookies used with third-party tools on Medicare.gov can be stored on a user's local system and are set to expire at varying time periods depending upon the cookie. We assess whether the expiration date of a cookie exceeds one year and provides an explanation as to why cookies with a longer life are used on the site in the associated Third-Party Website or Application Privacy Impact Assessment.

# Children & privacy on Medicare.gov

We believe it's important to protect the privacy of children online. The Children's Online Privacy Protection Act (COPPA) governs information gathered online from or about children under the age of 13. Medicare.gov isn't intended to solicit information of any kind from children under age 13. If you believe that we've received information from a child under age 13, call us at 1-800-MEDICARE (1-800-633-4227). TTY users can call 1-877-486-2048.

# Links to other sites

Medicare.gov may link to other HHS websites, other government websites, and/or private organizations (like health care providers). We link to other websites solely for your convenience and education. When you follow a link to an external site, you're leaving Medicare.gov and the external site's privacy and security policies will apply. Non-federal websites don't necessarily operate under the same laws, regulations, and policies as federal websites. Other than third-party websites highlighted in this privacy notice, we aren't responsible for the contents of external web pages and a link to a page doesn't constitute an endorsement.

## Social media & other sites that require registration

We use social media websites (listed below) to:

- Increase government transparency
- Improve information sharing
- Promote public participation
- Encourage partnership with CMS

**Social media websites aren't government websites or applications. They're controlled or operated by the social media website.** We don't own, manage, or control social media websites. In addition, we don't collect, maintain, or disseminate information posted by visitors to those social media websites. If you choose to provide information to a social media website through registration or other interaction with the website, the use of any information you provide is controlled by your relationship with the social media website. For example, any information that you provide to register on Facebook is voluntarily contributed and isn't maintained by us. This information may be available to our social media page administrators in whole or part, based on a user's privacy settings on the social media website. However, we won't use PII, if provided by you to a social media website or other website that requires registration, for targeted advertising or retargeting. Although you may voluntarily contribute to a social media website with the intent to share the information with others on a CMS social media page, to protect your privacy, don't disclose PII about yourself or others.

We don't keep separate records or accounting of any social media website users or their interaction with the Medicare.gov pages on social media websites. We don't store or share this information. User information is retained by social media websites in accordance with the website's policies. See each social media website's privacy policy to see how long user information is retained after an account has been deleted. To learn more about how each social media website uses and maintains information visit their privacy policy, as follows:

Date Filed 12/27/2022 12:45 PM
Superior Court - Norfolk
Docket Number 2282CV00982

- Google Plus
- Facebook
- Twitter
- YouTube

# Additional privacy information

Get more information about CMS privacy policies.

Updated: April 25, 2018

## Site Menu

## Take Action

## CMS & HHS Websites

## Helpful Links

# Signup for email updates

**ENTER YOUR EMAIL ADDRESS**

name@example.com

☐ By checking this box, you consent to our data privacy policy.

Next

Date Filed 12/27/2022 12:48 PM Case 1:22-cv-12196-FDS   Document 12   Filed 01/03/23   Page 100 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS   Document 1-1   Filed 12/22/22   Page 15 of 15



About Medicare  |  Medicare Glossary

Nondiscrimination / Accessibility  |  Privacy Policy  |  Privacy Setting  |  Linking Policy  |

Using this site  |  Plain Writing



A federal government website managed and paid for by the
U.S. Centers for Medicare and Medicaid Services.
7500 Security Boulevard, Baltimore, MD 21244

**Medicare**.gov

Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982

# Exhibit B

An official website of the United States government   Here's how you know ⌄

≡                                                                          🔍

Pages in this section                                                      ⌄

Web Policies & Important Links

CMS Web Archive

CMS.gov Privacy Policy

Centers for Medicare & Medicaid Services (CMS) Website Privacy Policy

CMS.gov Accessibility and Compliance with Section 508

Freedom of Information Act

No Fear Act

CMS Accessibility & Nondiscrimination for Individuals with Disabilities Notice

Link to Us

Policy for Linking to Outside Websites

CMS.gov External Link Disclaimer

CMS/HHS Vulnerability Disclosure Policy

Information Quality Guidelines

CMS/HHS Policy for the Transition to Internet Protocol Version 6 (Ipv6)

Security Protocols to Protect Information

Help

About This Website

CMS Contractor Website Guidelines

CMS.gov Email Updates

Types of information we collect
How CMS uses information collected on CMS.gov
How CMS uses cookies & other technologies on CMS.gov
Your choices about tracking & data collection on CMS.gov
How CMS uses third-party websites & applications with CMS.gov
How CMS protects your personal information
How long CMS keeps data & how it's accessed
Children & privacy on CMS.gov
Links to other sites
Additional privacy information

Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 103 of 204
Case 1:22-cv-12196-FDS    Document 1-2    Filed 12/23/22    Page 3 of 10

## CMS.gov Privacy Policy

Protecting your privacy is very important to us. This privacy policy describes what information we collect, why we collect it, and what we do with it. This privacy notice covers CMS.gov, marketplace.cms.gov, innovation.cms.gov, partnershipforpatients.cms.gov, and hfpp.cms.gov. These websites are referred to as "CMS.gov" throughout the rest of this notice and are maintained and operated by the Centers for Medicare & Medicaid Services (CMS). The privacy notice for other CMS websites not listed above is available at https://www.cms.gov/About-CMS/Agency-Information/Aboutwebsite/Privacy-Policy.html.

CMS.gov doesn't collect name, contact information, or other similar information through these websites unless you choose to provide it. We do collect other, limited, non-personally identifiable information automatically from visitors who read, browse, and/or download information from our website. We do this so we can understand how the website is being used and how we can make it more helpful. For more information, see Types of information we collect.

Personally identifiable information (PII), defined by the Office of Management and Budget (OMB), refers to information that can be used to distinguish or trace an individual's identity, like their name, Medicare Number, biometric records, etc. alone, or when combined with other personal or identifying information which is linked or linkable to a specific individual, like date and place of birth, mother's maiden name, etc. Medicare Fee-for-Service eligibility and enrollment information and claims data are considered protected health information (PHI) under the Health Insurance Portability and Accountability Act (1996) (HIPAA) regulations.

We don't sell any information you provide when you visit CMS.gov. For information on how we share information, see How CMS uses information collected on CMS.gov.

## Types of information we collect

### Information which is automatically collected:

#### When you browse:

Certain information about your visit can be collected when you browse websites. When you browse CMS.gov, we, and in some cases, our third-party service providers, can collect the following types of information about your visit, including:

- Domain from which you accessed the internet (like Verizon.com if you're using a Verizon account).
- IP address (an IP or internet protocol address is a number that's automatically assigned to a device connected to the internet).
- Approximate geographic location based on the IP address of the user's local system.

- Operating system for the device that you're using and information about the browser you used when visiting the site. The operating system is software that directs a computer's basic functions, like executing programs and managing storage.
- Date and time of your visit.
- Pages you visited.
- Address of the website that connected you to CMS.gov (like Google.com or Bing.com).
- Device type (like desktop computer, tablet, or type of mobile device).
- Screen resolution.
- Browser language.
- Geographic location.
- Time spent on page.
- Scroll depth (measures how much of a web page was viewed).

Date Filed 12/27/2022 12:46 Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 104 of 204
Superior Court - Norfolk                   Case 1:22-cv-12196-FDS   Document 1-2   Filed 12/23/22   Page 4 of 10
Docket Number 2282CV00982

- Your actions on CMS.gov (like clicking a button).

For more information, see How CMS uses third-party websites & applications with CMS.gov.

We use this information to:

- Measure the number of visitors to CMS.gov.
- Help make our website more useful for visitors.
- Improve our public education and outreach through digital advertising.

Also, this information is sometimes used to personalize the content we show you on third-party sites. For more information on our practices, see How CMS uses third-party websites & applications with CMS.gov.

## Information you may provide:

### When you request information:

We collect information, including your email address, to deliver alerts or eNewsletters. We use this information to complete the subscription process and provide you with information. You can opt out of these communications at any time by editing your subscription preferences.

# How CMS uses information collected on CMS.gov

## Sending you CMS messages:

We use the email address you provide us to send emails related to CMS.

## Conducting surveys to improve services:

We use online surveys to collect opinions and feedback. You don't have to answer these questions. If you do answer these questions, don't include any PII/PHI in your answers. We analyze and use the information from these surveys to improve the CMS.gov website. The information is available only to CMS managers, members of the CMS communications and web teams, and other designated federal staff and contractors who require this information to perform their duties.

## Using third-party tools for website analytics

We use a variety of third-party web tools for web analytics. We don't collect any PII/PHI with these tools.  We use these tools to collect basic information about visits to CMS.gov. This information is then used to maintain the website, including:

- Monitoring website stability
- Measuring website traffic
- Optimizing website content
- Helping make the website more useful to visitors

CMS staff analyzes the data collected from these tools. Reports are available only to CMS managers, teams who implement programs represented on CMS.gov, members of the CMS communications and web teams, and other designated federal staff and contractors who need this information to perform their jobs.

## Using third-party tools for outreach and education through digital advertising:

We use third-party web services to conduct outreach and education through the use of digital advertising for

Date Filed 12/27/2022 12:46:06 Case 1:22-cv-12196-FDS Document 12 Filed 01/03/23 Page 105 of 204
Superior Court - Norfolk Case 1:22-cv-12196-FDS Document 1-2 Filed 12/23/22 Page 5 of 10
Docket Number 2282CV00589

CMS.gov. These third-party services may collect information through the use of web beacons (also called pixels) that are located on our pages. A web beacon is a see-through graphic image (usually 1 pixel x 1 pixel) that's placed on a web page and, in combination with a cookie, allows us to collect information regarding the use of the web page that contains the web beacon.

We use web beacons to tell when a user is redirected to CMS.gov by clicking or otherwise interacting with a CMS advertisement that we ran on another website. This is known as "click tracking" or "conversion tracking," and we use it to better target CMS advertisements (known as "retargeting") to inform consumers about the services available through CMS.gov. For more information on how these tools work, see How CMS uses third-party websites & applications with CMS.gov.

We also use third-party tools to help deliver advertising. Vendors that operate the third-party tools may also gather information about your visits to third-party sites outside of CMS.gov. While we don't track your internet activity outside of CMS.gov, our vendors may use information collected automatically by visiting CMS.gov, and combine it with data they collect elsewhere for targeted advertising purposes. You can opt out of this type of data collection via Privacy Manager, Ad Choices, and Do Not Track. For methods to opt out of this type of collection, see Your choices about tracking & data collection on CMS.gov.

The outreach and education analytics tools provide reports which aggregate data like the number of clicks on advertisements. The reports are available only to CMS managers, teams who implement programs represented on CMS.gov, members of the CMS.gov communications and web teams, and other designated federal staff and contractors who need this information to perform their duties.

## How CMS uses cookies & other technologies on CMS.gov

The Office of Management and Budget Memo M-10-22, Guidance for Online Use of Web Measurement and Customization Technologies, allows federal agencies to use session and persistent cookies to improve the delivery of services.

When you visit a website, its server may generate a piece of text known as a "cookie" to place on your device. The cookie, which is unique to your browser, allows the server to "remember" specific information about your visit while you're connected. The cookie makes it easier for you to use the dynamic features of web pages. Information that you enter into CMS.gov isn't associated with cookies on CMS.gov. Depending on the third-party tool's business practices, privacy policies, terms of service, and/or the privacy settings you selected, information you've provided to third parties could be used to identify you when you visit CMS.gov. These third parties don't/won't share your identity with CMS or the Department of Health and Human Services (HHS).

There are 2 types of cookies - single session (temporary) and multi-session (persistent). Single session cookies last only as long as your internet browser is open. Once you close your browser, the session cookie disappears. Persistent cookies are stored on your device for longer periods. Both types of cookies create an ID that's unique to your device.

- **Session cookies**: We use session cookies for technical purposes, like to allow better navigation through our website. These cookies let our server know that you're continuing a visit to our website. The OMB Memo M-10-22 Guidance defines our use of session cookies as "Usage Tier 1—Single Session." The policy says, "This tier encompasses any use of single session web measurement and customization technologies."
- **Persistent cookies**: We use persistent cookies to understand the differences between new and returning visitors to CMS.gov. Persistent cookies remain on your device between visits to our website until they expire or are removed by the user. The OMB Memorandum M-10-22 Guidance defines our use of persistent cookies as "Usage Tier 2—Multi-session without personally identifiable information." The policy says, "This tier encompasses any use of multi-session web measurement and customization technologies when no PII is collected." We don't use persistent cookies to collect PII. We don't identify a user by using cookies.

CMS also uses these technologies on CMS.gov:

Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982

- **Persistent cookies for digital advertising:** Similar to persistent cookies identified above, CMS uses persistent cookies for outreach through digital advertising. These cookies can also be created on third-party websites and remain on your device between visits to our website until they expire or you remove them. Consistent with OMB guidance for "Usage Tier 2", we don't use persistent cookies for outreach to collect PII. CMS doesn't identify a user by using such technologies.

- **Web beacons for digital advertising (also called pixels and/or tracking tags):** See-through images placed on certain pages of CMS.gov are typically used in conjunction with cookies and aren't stored on your device. When you access these pages, web beacons generate a notice of your visit. For information on how we use web beacons, see How CMS uses third-party websites & applications with CMS.gov.

- **Website log files:** These are used as an analysis tool and to tell how visitors use CMS.gov, how often they return, and how they navigate through the website.

- **Flash:** Flash is used to assess the performance of the site and as a player for selected videos depending on the browser a device is using.

- **Local Storage Objects:** We use Flash Local Storage Objects ("LSOs") to store your preferences and to personalize your visit.

## Your choices about tracking & data collection on CMS.gov

CMS.gov offers a Privacy Manager which gives you control over what tracking and data collection takes place during your visit. Third-party tools are enabled by default to provide a quality consumer experience.

The Privacy Manager provides you with the choice to opt in or to opt out of the different categories of third-party tools used by CMS.gov: Advertising, Analytics, or Social Media. The Privacy Manager prevents cookies, web beacons, and Local Storage Objects from being placed on your device. The Privacy Manager also prevents third-party tools from loading regardless of your cookie settings, which provides you with an additional layer of privacy that prevents the tool from loading at all. Because the Privacy Manager creates a cookie in your browser, the opt in and opt out choices you make through the Privacy Manager will only be effective on the device and browser you used to make your choices, and your choices will expire when the cookie expires. Once the cookie is created, the Privacy Manager will retain your settings for 3 years from the date of your most recent visit. You may revisit the Privacy Manager to change or renew your choices at any time.

Modify privacy options

If you disable cookies in your browser, our Privacy Manager won't be able to store your preferences and won't function properly. If you don't wish to use our Privacy Manager to opt out of the tools used by CMS.gov, you can opt out of tools individually, or via the Digital Advertising Alliance ("DAA") AdChoices icon, discussed in the next subsection.

If you opt out of the tools used by CMS.gov via the Privacy Manager or by opting out of the tools directly, you'll still have access to information and resources at CMS.gov.

**AdChoices:** We include the AdChoices icon on all digital advertising that uses "conversion tracking" or "retargeting." To learn about conversion tracking, targeted advertising, and retargeting, see How CMS uses third-party websites & applications with CMS.gov. The AdChoices icon is usually at or near the corner of digital ads. When you click on the AdChoices icon, it will provide information on what company served the ad and information on how to opt out. Learn more about AdChoices.

**Do Not Track:** We automatically observe the "Do Not Track" browser setting for digital advertising that uses "conversion tracking" or "retargeting." If "Do Not Track" is set before a device visits CMS.gov, third-party conversion tracking and retargeting tools won't load on the website. To learn more about conversion tracking and retargeting, see How CMS uses third-party websites & applications with CMS.gov. Learn more about Do Not Track and how to set the Do Not Track setting in your browser.

How CMS uses third-party websites & applications with CMS.gov

Date Filed 12/27/2022 12:48 PM
Superior Court - Norfolk
Docket Number 2282CV00982

## How CMS uses third-party websites & applications with CMS.gov

CMS.gov uses a variety of technologies and social media services to communicate and interact with the public. These third-party websites and applications include popular social networking and media websites, open source software communities, and more.

### Third-party websites:

Your activity on the third-party websites that CMS.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites. You should review the privacy policies of all websites before using them so you understand how your information may be used.

### Website analytics tools:

These tools collect basic site usage information, like:

- How many visits CMS.gov gets
- The pages visited
- Time spent on CMS.gov
- The number of return visits to CMS.gov
- The approximate geographic location of the device used to access CMS.gov
- Types of devices used

This information is used to maintain the website, including:

- Monitoring website stability
- Measuring website traffic
- Optimizing website content
- Improving your experience

Use the CMS.gov Privacy Manager to opt out of website analytics tools.

### Digital advertising tools for outreach & education:

We use third-party tools to support our digital advertising outreach and education efforts. These tools enable us to reach new people and provide information to previous visitors. To use these tools, we use these technologies on CMS.gov:

**Click tracking:** We use click tracking to identify the ads that are most helpful to consumers and efficient for outreach. This enables us to improve the performance of ads that consumers click on. When users click on links from ads, data about what ad was viewed is collected. Reports are generated about ad performance – including the total number of views and clicks an ad received.

**Conversion tracking:** We use conversion tracking to identify ads that are helpful to consumers and efficient for outreach. It enables us to improve the performance of ads viewed by consumers. When a CMS.gov ad is viewed on a third-party site (like a banner ad), a cookie is placed in the browser of the device the ad was viewed on. If this device later visits CMS.gov, the visit is linked to the ad viewed on the same device. Use the CMS.gov Privacy Manager to opt out of advertising tools. Users can click on the "AdChoices" icon in the corner of our ads to opt out of this Ad Targeting. Users who have set their browser to "Do Not Track" will automatically be opted out of conversion tracking. For more information about AdChoices and Do Not Track, see Your choices about tracking & data collection on CMS.gov.

**Retargeting:** We use retargeting to provide information to consumers who have previously visited CMS.gov, like reminders about upcoming enrollment deadlines. Retargeting enables us to improve the performance of ads by delivering them to relevant audiences, like recent visitors to CMS.gov. During a visit to CMS.gov, a cookie is placed in the browser of the devices used to view the website. When that same device is used to visit third-party websites that are displaying CMS.gov ads, ads for CMS.gov may be shown to that device because it had previously visited CMS.gov. Using these cookies, we don't collect information about the third-party

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 108 of 204
Case 1:22-cv-12196-FDS   Document 1-2   Filed 12/23/22   Page 8 of 10
Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982

websites visited by a device. Reports are generated about ad performance – including the total number of views and clicks an ad received. Use the CMS.gov Privacy Manager to opt out of advertising tools. Users can click on the "AdChoices" icon in the corner of our ads to opt out of this Ad Targeting. Users who have set their browser to "Do Not Track" will automatically be opted out of conversion tracking. For more information about AdChoices and Do Not Track, see Your choices about tracking & data collection on CMS.gov.

**Targeted advertising:** We use third-party vendors to engage in targeted advertising (also called online behavioral or interest-based advertising) to provide information to consumers across their online activities. Targeted advertising involves the collection of data from a particular computer or device. Data regarding web viewing behaviors or application use is gathered to predict user preferences or interests. We can have ads delivered to computers or devices based on the preferences or interests inferred from the web-viewing behaviors or application use.

Third-party vendors engaged by us may also target advertising based on information automatically collected (not information you provide) when you browse our websites or other websites on the internet. You can opt out of this type of data collection via our Privacy Manager, Ad Choices, and Do Not Track. For methods to opt out of this type of collection, see Your choices about tracking & data collection on CMS.gov.

We may consider new third-party tools or the use of new third-party websites, but we'll first assess the tool or website before it's used in connection with CMS.gov. We'll provide notice to the public before adding any new tool to CMS.gov. These assessments include a description about how information will be collected, accessed, secured, and stored. See a list of the third-party tools currently being used on CMS.gov. See risk assessments for third-party websites and applications.

## How CMS protects your personal information

You don't have to give us personal information when you visit CMS.gov, but if you want to get alerts or e-newsletters, you'll need to give us your email address to subscribe.

If you choose to give us PII in an email, request for information, paper or electronic form, questionnaire, survey, etc., we'll the information you give us only long enough to respond to your question or to fulfill the stated purpose of the communication.

If we need to contact you, we'll save your personal information in a record system designed to retrieve information about you by personal identifier (name, personal email address, home mailing address, personal or mobile phone number, etc.) and keep the information you give us safe according to the Privacy Act of 1974, as amended (5 U.S.C. Section 552a).

If we have a record system to retrieve information about you so we can carry out our mission, a Privacy Act Notification Statement should be prominently displayed out in the open on the public-facing website or form asking you for PII. The statement has to address these 5 criteria:

1. The legal authorization we have to collect information about you
2. Why we're collecting information
3. Routine ways we disclose information outside of our websites
4. Whether or not you legally have to give us the information we're asking for
5. What happens if you choose to not us the information we're asking for

For more information about CMS.gov's privacy policy, email Privacy@cms.hhs.gov.

Third-party services are web-based technologies that aren't exclusively operated or controlled by a government entity, or that involve significant participation of a nongovernment entity. These services may be separate websites or may be applications embedded within our websites. The list of third-party services includes links to relevant third-party privacy policies.

## How long CMS keeps data & how it's accessed

We'll keep data collected long enough to achieve the specified objective for which they were collected. Once the specified objective is achieved, the data will be retired or destroyed in accordance with published draft records schedules of CMS as approved by the National Archives and Records Administration.

We don't store information from cookies on our systems. The persistent cookies used with third-party tools on CMS.gov can be stored on a user's local system and are set to expire at varying time periods depending upon the cookie. We assess whether the expiration date of a cookie exceeds one year and provides an explanation as to why cookies with a longer life are used on the site in the associated Third-Party Website or Application Privacy Impact Assessment.

## Children & privacy on CMS.gov

We believe it's important to protect the privacy of children online. The Children's Online Privacy Protection Act (COPPA) governs information gathered online from or about children under the age of 13. CMS.gov isn't intended to solicit information of any kind from children under age 13.

## Links to other sites

CMS.gov may link to other HHS websites, other government websites, and/or private organizations (like health care providers). We link to other websites solely for your convenience and education. When you follow a link to an external site, you're leaving CMS.gov and the external site's privacy and security policies will apply. Non-federal websites don't necessarily operate under the same laws, regulations, and policies as federal websites. Other than third-party websites highlighted in this privacy notice, we aren't responsible for the contents of external web pages and a link to a page doesn't constitute an endorsement.

### Social media & other sites that require registration

We use social media websites (listed below) to:

- Increase government transparency
- Improve information sharing
- Promote public participation
- Encourage partnership with CMS

**Social media websites aren't government websites or applications. They're controlled or operated by the social media website.** We don't own, manage, or control social media websites. In addition, we don't collect, maintain, or disseminate information posted by visitors to those social media websites. If you choose to provide information to a social media website through registration or other interaction with the website, the use of any information you provide is controlled by your relationship with the social media website. For example, any information that you provide to register on Facebook is voluntarily contributed and isn't maintained by us. This information may be available to our social media page administrators in whole or part, based on a user's privacy settings on the social media website. However, we won't use PII, if provided by you to a social media website or other website that requires registration, for targeted advertising or retargeting. Although you may voluntarily contribute to a social media website with the intent to share the information with others on a CMS social media page, to protect your privacy, don't disclose PII about yourself or others.

We don't keep separate records or accounting of any social media website users or their interaction with the CMS.gov pages on social media websites. We don't store or share this information. User information is retained by social media websites in accordance with the website's policies. See each social media website's privacy policy to see how long user information is retained after an account has been deleted. To learn more about how each social media website uses and maintains information visit their privacy policy, as follows:

- Facebook

- Twitter
- YouTube
- LinkedIn

## Additional privacy information

Get more information about CMS privacy policies.

Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS   Document 12   Filed 01/03/23   Page 111 of 204
Case 1:22-cv-12196-FDS   Document 1-3   Filed 12/23/22   Page 1 of 13

# Exhibit C

# HHS.gov

U.S. Department of Health & Human Services

Home > Digital Communications > Policies & Standards > HHS Web Policies > HHS Privacy Policy Notice

# HHS Privacy Policy Notice

## External Link and Website Disclaimer Policy (https://www.hhs.gov/web/policies-and-standards/hhs-web-policies/disclaimer/index.html)

This privacy policy describes what information HHS collects from you when you visit our websites and how we handle that information. This policy applies to HHS.gov (https://www.hhs.gov/) and a number of other HHS websites with unique domains, such as StopBullying.gov (http://www.stopbullying.gov/) . However, some HHS websites maintain their own privacy policies. You can find links to the applicable privacy policy in the footer of every HHS website.

For HHS.gov and other HHS websites under this privacy policy:

- We do not collect personally identifiable information (PII) about you unless you choose to provide that information to us.

- Any personally identifiable information (PII) you choose to provide is protected by privacy and security practices.

- We may automatically collect and temporarily store information related to your visit to our website that is not personally identifiable information (PII).

- **HHS does not disclose, give, sell, or transfer any personally identifiable information (PII) about our visitors unless required for law enforcement or by federal law.**

See the topics below for detailed information on HHS privacy:

- HHS Privacy Program (#HHS-Privacy-Program)

- What is Personally Identifiable Information (PII)? (#what-is-pii)

- HHS Privacy Officials (#HHS-Privacy-Officials)

- Information Automatically Collected and Stored (#Information-Automatically-Collected)

- Personally Identifiable Information (PII) Voluntarily Submitted to HHS (#Personal-Information-Voluntarily)

- Interaction with Children Online (#Interaction-Children-Online)

Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 113 of 204
Case 1:22-cv-12196-FDS    Document 1-3    Filed 12/23/22    Page 3 of 13

- <u>Cookies</u> <u>(#Cookies)</u>

- <u>Demographic and Interest Data</u> <u>(#Demographic-and-Interest)</u>

- <u>Third-Party Websites and Applications Used by HHS</u> <u>(#Third-Party-Websites)</u>

- <u>Website Security</u> <u>(#Website-Security)</u>

**Health Information Privacy**

For more information on your health information privacy and security rights, or on the HIPAA Privacy and Security Rules, visit the <u>HHS Office for Civil Rights</u> <u>(https://www.hhs.gov/ocr/privacy/index.html)</u> website.

## HHS Privacy Program

It is the mission of HHS to enhance and protect the health and well-being of all Americans. HHS fulfills that mission by providing effective health and human services and fostering advances in medicine, public health, and social services. HHS recognizes the importance of protecting the personally identifiable information (PII) entrusted to us by millions of members of public and employees alike, and has built a robust privacy program to safeguard this information and ensure that HHS upholds Americans' privacy rights.

**Privacy Impact Assessments (PIAs)**

The list of PIAs and Third-Party Websites and Applications (TWPA) PIAs is available at <u>HHS Privacy Impact Assessments</u> <u>(https://www.hhs.gov/pia/)</u> .

**Publicly Available Agency Policies on Privacy**

For a list of all publicly available HHS privacy policies, including any directives, instructions, handbooks, manuals, or other guidance, visit:

- <u>HHS OCIO Cybersecurity Policies, Standards and Charters</u> <u>(https://www.hhs.gov/about/agencies/asa/ocio/cybersecurity/index.html)</u>

- <u>HHS Information Security and Privacy Program</u> <u>(https://www.hhs.gov/ocio/securityprivacy/index.html)</u>

- <u>HHS Privacy Impact Assessments (PIAs) & Resources</u> <u>(https://www.hhs.gov/ocio/securityprivacy/privacyresources/pias.html)</u>

**Publicly Available Agency Reports on Privacy**

For a list of the Department's publicly available privacy reports, see <u>HHS Plans & Reports</u> <u>(https://www.hhs.gov/ocio/plans/index.html)</u> .

**Privacy Act Information**

To learn more about what is covered under the Privacy Act, please read information about the <u>Privacy Act at HHS</u> <u>(https://www.hhs.gov/foia/privacy/index.html)</u>. If you have privacy questions or issues regarding the Privacy Act,

contact an <u>HHS Privacy Act Contact</u> (https://www.hhs.gov/foia/contacts/index.html#privacy). Also see the <u>Privacy Act of 1974</u> (http://www.justice.gov/opcl/privacyact1974.htm) (Department of Justice).

- **System of Records Notices (SORNs)**
  HHS publishes SORNs to provide public notice of the records it maintains about individuals which are retrieved by personal identifier. For a list of all of the Department's systems of records see <u>HHS SORNs</u> (https://www.hhs.gov/foia/privacy/sorns/index.html).

- **Computer Matching Notices and Agreements (CMAs)**
  For the complete list of the HHS matching programs currently in effect including the matching agreements and public notice describing each program, see <u>HHS Computer Matching Agreements</u> (https://www.hhs.gov/foia/privacy/cmas/index.html).

- **Exemptions to the Privacy Act**.
  For more information on the Department's final rules published in the *Federal Register* that promulgate Privacy Act exemptions claimed for HHS's systems of records, see the <u>HHS Privacy Act</u> (https://www.hhs.gov/foia/privacy/sorns/hhs-exempt-systems/index.html).

- **Privacy Act Implementation Rules**
  For a list of Privacy Act implementation rules promulgated pursuant to 5 U.S.C. § 552a(f), see the <u>HHS Privacy Act</u> (https://www.hhs.gov/foia/privacy/index.html).

- **Instructions for Submitting a Privacy Act Request**
  For instructions for individuals who wish to request access to or amendment of their records pursuant to 5 U.S.C. § 552a(d), see <u>How to Make a Privacy Request</u> (https://www.hhs.gov/foia/privacy/how-make-privacy-act-request.html).

**Contact Information for Submitting a Privacy Question or Complaint**
Individuals who wish to submit a privacy question or complaint should submit it to one of these contacts:

- <u>HHS Office for Civil Rights (OCR) Contacts</u> (https://www.hhs.gov/ocr/about-us/contact-us/index.html), if the question or complaint involves health information or HIPAA.

- <u>HHS Privacy Act Contacts</u> (https://www.hhs.gov/foia/contacts/index.html#privacy), if the question or complaint concerns federal agency records about individuals retrieved by personal identifier.

- For all other privacy questions and complaints, contact <u>HHS Privacy Officials</u> (#HHS-Privacy-Officials).

## What is Personally Identifiable Information (PII)?

PII is information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual.

Date Filed 12/27/2022 12:36 PM Case 1:22-cv-12196-FDS   Document 12   Filed 01/03/23   Page 115 of 204
Superior Court- Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS   Document 1-3 Filed 12/28/22   Page 5 of 13

PII can include:

- Sensitive data, such as medical, financial, or legal information;

- "Neutral" information, such as name, facial photos, or work address; and

- Contextual information, such as a file for a specific health condition that contains a list of treated patients.

## HHS Privacy Officials

Contact Information for the Senior Agency Official for Privacy

The HHS Chief Information Officer (CIO) also holds the position of Senior Agency Official for Privacy (SAOP), ensuring privacy receives senior-level recognition and has visibility across the Department.

For HHS SAOP please email:

**Chief Information Officer**
**Senior Agency Official for Privacy**
Email: PrivacyProgramMailbox@hhs.gov (mailto:PrivacyProgramMailbox@hhs.gov)

Contact Information for the HHS Operating Divisions Senior Officials for Privacy

Each Operating Division has, at a minimum, a Senior Official for Privacy (SOP) to oversee privacy compliance activities. The SOP contact information is included below:

**Administration for Children and Families (ACF)**
Anita Alford
OCIO.Privacy@acf.hhs.gov (mailto:OCIO.Privacy@acf.hhs.gov)

**Administration of Community Living (ACL)**
Jacques Newgen
Jacques.Newgen@acl.hhs.gov (mailto:Jacques.Newgen@acl.hhs.gov)

**Agency for Healthcare Research and Quality (AHRQ)**
Mark Yu
AHRQSecureAHRQ@ahrq.hhs.gov (mailto:AHRQSecureAHRQ@ahrq.hhs.gov)

**Centers for Disease Control and Prevention (CDC)**
Beverly Walker
BEWalker@cdc.gov (mailto:BEWalker@cdc.gov)

Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 116 of 204
Case 1:22-cv-12196-FDS    Document 2-3 Policies Filed 12/28/22    Page 6 of 13

**Centers for Medicare and Medicaid Services (CMS)**

Michael Pagels

privacy@cms.hhs.gov (mailto:privacy@cms.hhs.gov)

**Food and Drug Administration (FDA)**

Cullen Cowley

FDAPrivacyOffice@fda.hhs.gov (mailto:FDAPrivacyOffice@fda.hhs.gov) .

**Health Resources and Services Administration (HRSA)**

Brent Kopp

hrsaprivacy@hrsa.gov (mailto:hrsaprivacy@hrsa.gov)

**Indian Health Service (IHS)**

Heather H. McClane

Heather.McClane@ihs.gov (mailto:Heather.McClane@ihs.gov)

**National Institutes of Health (NIH)**

Celeste Dade-Vinson

privacy@mail.nih.gov (mailto:privacy@mail.nih.gov)

**Office of Inspector General (OIG)**

OIG Senior Official for Privacy

SOP@oig.hhs.gov (mailto:SOP@oig.hhs.gov)

**Office of the Secretary (OS) and Program Support Center (PSC)**

Vanessa Baur

OSPrivacyMailbox@hhs.gov (mailto:OSPrivacyMailbox@hhs.gov)

**Substance Abuse and Mental Health Services Administration (SAMHSA)**

Michael Hodnett

Info.Privacy@samhsa.hhs.gov (mailto:Info.Privacy@samhsa.hhs.gov)

## Information Automatically Collected and Stored

When you visit our websites, we use Google's Universal Analytics (UA) software to automatically gather and temporarily store a variety of information about your visit. The basic information we collect during your visit includes:

- The name of the domain you use to access the Internet (for example, Verizon.com if you are using a Verizon online account or stanford.edu if you are connecting from Stanford University's domain);

- The date and time of your visit to our website;

Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982

- The pages and documents you viewed on our website;

- The URL of the website you visited prior to ours;

- The type and version of your Web browser and operating system; and

- Your location at the time of your visit, down to the city-level.

We do not associate any of the data we automatically collect with your personally identifiable information (PII). Instead, we aggregate this data from all users' visits in order to improve our website and provide a better user experience to our visitors. The aggregate data is available only to Web managers and other designated staff who require this information to perform their duties. We retain this information only for as long as needed for proper analysis. The Google Analytics Privacy Policy is available at https://www.google.com/intl/en/policies/privacy/ (https://www.google.com/intl/en/policies/privacy/)

## Personally Identifiable Information (PII) Voluntarily Submitted to HHS

If you choose to provide HHS with your personally identifiable information (PII) —for example, by completing a "Contact Us" form, leaving a comment, sending an email, or completing a survey—we may use that information to respond to your message and/or help us get you the information or services you requested. Submitting personally identifiable information (PII) such as name, address, telephone number, email address, etc. is voluntary and is not required to access information on our website.

We retain the information only for as long as necessary to respond to your question or request, in most cases no longer than three months. We maintain and destroy information submitted electronically as required by the Federal Records Act and the National Archives and Records Administration's (NARA) records schedules. It may be subject to disclosure in certain cases (for example, if required by a Freedom of Information Act (FOIA) request, court order, or Congressional access request, or if authorized by a Privacy Act SORN). The information is subject to the Privacy Act if maintained in a Privacy Act system.

HHS also automatically receives information when you visit our websites that is not personally identifiable information (PII). For more information, see Information Automatically Collected and Stored (#Information-Automatically-Collected) .

For more information, see:

- HHS FOIA and Privacy Act Statutes and Resources (https://www.hhs.gov/foia/statutes-and-resources/index.html)

- HHS System of Records Notices (https://www.hhs.gov/foia/privacy/sorns.html)

## Interaction with Children Online

Date Filed 12/27/2022 12:58 PM Case 1:22-cv-12196-FDS   Document 12   Filed 01/03/23   Page 118 of 204
Superior Court- Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS   Document 2-3 Filed 12/28/22   Page 8 of 13

The Department will take all reasonable steps necessary to protect the privacy and safety of any child from whom we collect information, as required by the <u>Children's Online Privacy Protection Act (COPPA)</u> <u>(https://www.ftc.gov/enforcement/rules/rulemaking-regulatory-reform-proceedings/childrens-online-privacy-protection-rule)</u>. A child's parent or guardian is required to provide consent before HHS collects, uses, or shares personally identifiable information (PII) from a child under age 13.

Specific HHS websites will provide information and instructions for how we obtain consent when collecting information about a child. The website will specify exactly what how the information is used, who sees it, and how long it is kept.

If you are under 13 and visit any websites, the law says that you and your parents are in charge of what personally identifiable information (PII) the websites can know about you. Some examples of personally identifiable information (PII) are your full name, home address, email address, phone number, age, and gender.

## Cookies

Websites can automatically place small text files, known as "cookies," on their visitors' computers. Cookies identify the unique browser used by the visitor unless you delete them or they expire. On each subsequent visit to the website, the visitor's browser will retrieve the cookie, allowing HHS to aggregate the number of return visitors. HHS uses "cookies" to test and optimize our websites' design and content. We use two types of cookies on HHS websites:

- We use **session cookies** to gather data for technical purposes, such as improving navigation through our website and generating statistics about how the website is used. Session cookies are temporary text files that expire when you leave our website. Cookies delete automatically from your computer as soon as they expire. **We do not use session cookies to collect personally identifiable information (PII), and we do not share data collected from session cookies.**

- We use **multi-session cookies**, or persistent cookies, to customize our website for frequent visitors and to test variations of website design and content. Multi-session cookies are cookies that are stored over more than a single session on your computer. **We do not use multi-session cookies to collect personally identifiable information (PII), and we do not share data collected from multi-session cookies.** Our multi-session cookies expire two years after your last visit to our website. These cookies delete automatically from your computer as soon as they expire.

You can block cookies from your computer by <u>opting out</u> <u>(http://www.usa.gov/optout_instructions.shtml)</u>. Blocking session cookies from your computer will not affect your access to the content and tools on our websites. Blocking multi-session or persistent cookies may affect the personalization of the information on these websites.

## Demographic and Interest Data

Date Filed 12/27/2022 12:48 PM  Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 119 of 204
Superior Court - Norfolk
Docket Number 2282CV00982  Case 1:22-cv-12196-FDS   Document 1-2 Filed 12/28/22  Page 9 of 13

On some portions of our website, we have enabled Google's Universal Analytics (UA) and other third-party software (listed below) to provide aggregate demographic and interest data of our visitors. **While some websites use these tools to present you with advertisements, HHS only uses them to measure demographic data. HHS has no control over advertisements presented to you on other websites.** This means that third-party vendors, including Google, **may show you public health campaign advertisements created by HHS and its agencies on non-government websites based on your visits to HHS websites.** For the software listed below, we have included links to the company's websites where you can opt-out of having these tools collect data and/or serve you interest-based advertising.

**DoubleClick**: HHS uses DoubleClick to understand the characteristics and demographics of the people who visit HHS websites. HHS staff only conducts analyses on the aggregated data from DoubleClick. DoubleClick does not collect personally identifiable information (PII) from HHS websites. The DoubleClick Privacy Policy is available at https://www.google.com/intl/en/policies/privacy/ (https://www.google.com/intl/en/policies/privacy/)
.

You can opt-out of receiving DoubleClick advertising at https://support.google.com/ads/answer/2662922?hl=en (https://support.google.com/ads/answer/2662922?hl=en) .

**Quantcast**: HHS uses Quantcast to understand the characteristics and demographics of the people who visit HHS websites. HHS staff only conducts analyses on the aggregated data from Quantcast. Quantcast does not collect personally identifiable information (PII) from HHS websites. The Quantcast Privacy Policy is available at https://www.quantcast.com/how-we-do-it/consumer-choice/privacy-policy/ (https://www.quantcast.com/how-we-do-it/consumer-choice/privacy-policy/) .

You can opt-out of Quantcast at https://www.quantcast.com/opt-out/ (https://www.quantcast.com/opt-out/) .

## Third-Party Websites and Applications Used by HHS

HHS maintains official pages or accounts on third-party websites in order to better engage and communicate with the public. Third-party websites are websites that we do not maintain or control. We have accounts on some third-party websites so we can connect with people interested in health and human services information. Examples of third-party websites that HHS uses include YouTube, Facebook, Instagram, and Twitter.

All official HHS information available on third-party websites is also available on HHS websites. The third-party website's security and privacy policies govern your activity on their website. Users of third-party websites often share information with the public, user communities, and/or the third-party organization

Date Filed 12/27/2022 12:56 PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 120 of 204
Superior Court - Norfolk    Case 1:22-cv-12196-FDS    Document 1-3    Filed 12/08/22    Page 10 of 13
Docket Number 2282CV00982

operating the website. It is important for you to review the privacy policies of third-party websites so you understand how they use and share your information. You should also adjust the privacy settings of your account on any third-party website to match your preferences.

If you have an account or profile with a third-party website and choose to follow, like, friend, or comment on a third-party website managed by HHS, certain personally identifiable information (PII) associated with your account may be available to us based on the privacy policies of the third-party website and your privacy settings within that website. **We do not share personally identifiable information available through these websites.**

HHS conducts and publishes a Privacy Impact Assessment (PIA) (https://www.hhs.gov/pia/index.html) for each use of a third-party website. Each use of a third-party website may have unique features or practices. HHS sometimes collects and uses the information made available through third-party websites.

In order to comply with the Federal Records Act (https://www.archives.gov/records-mgmt) , HHS archives some information that users submit or publish when engaging with the HHS through official HHS pages or accounts on third-party websites (e.g., by sending a message, posting a comment, "following," "friending," or taking similar actions). This information may contain personally identifiable information (PII), such as an individual's username, other public account information, and any information provided in a message or comment, when such information is available based on the user's privacy settings and the terms of the site. For example:

- On Facebook, HHS may automatically archive posts, messages, replies and comments sent to or from official HHS.gov accounts in the following sections: 'About,' 'Albums,' 'Event details,' 'Event discussions,' 'Photo activity,' 'Private messages,' 'Reviews' and 'Timeline activity'.

HHS uses the following third-party websites and applications.

**AddThis**: HHS offers AddThis on its websites, giving visitors the option to bookmark and share HHS website content on certain social media websites. Using AddThis on HHS websites does not require registration or personally identifiable information (PII). The AddThis Privacy Policy is available at http://www.addthis.com/privacy (http://www.addthis.com/privacy) .

**ArchiveSocial:** HHS uses ArchiveSocial to interface directly with each social network to capture and preserve data in its native form. The ArchiveSocial Privacy Policy is available at https://archivesocial.com/privacy/ (https://archivesocial.com/privacy/) .

**Bit.ly**: HHS uses Bit.ly to shorten long URLs for use in email and social media messages. Bit.ly provides analytics on how many people clicked on the URLs distributed by HHS. Bit.ly analytics do not provide any personally identifiable information (PII) about the visitors who click the shortened links. The Bit.ly Privacy

Date Filed 12/27/2022 12:48 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 121 of 204
Case 1:22-cv-12196-FDS    Document 1-3    Filed 12/28/22    Page 11 of 13

Policy is available at http://bit.ly/pages/privacy (http://bit.ly/pages/privacy) .

**CrazyEgg**: HHS uses CrazyEgg to obtain information on how visitors are interacting with specific pages on HHS.gov websites. This allows HHS to evaluate and, if necessary or beneficial, to modify its websites to improve value and usability. The data CrazyEgg collects includes information about how visitors navigate around a website and the most commonly clicked links on a specific page. CrazyEgg does not collect personally identifiable information (PII). The Crazy Egg Privacy Policy is available at http://www.crazyegg.com/privacy (http://www.crazyegg.com/privacy) .

**Google AdWords**: HHS occasionally uses Google AdWords to provide online advertisement delivery and tracking. HHS may employ tools provided by Google AdWords to support Display Advertising, including Remarketing, Google Display Network Impression Reporting, data collection via advertising cookies and anonymous identifiers, the DoubleClick Campaign Manager integration, and Google Analytics Demographics and Interest Reporting. This means that third-party vendors, including Google**, may show you public health campaign advertisements created by HHS and its agencies on non-government websites based on your visits to HHS websites.** To implement these tools, HHS and third-party vendors, including Google, use first-party cookies and third-party cookies together to inform, optimize, and serve ads based on past visits to HHS websites. These cookies collect information about visits to HHS websites, but do not collect personally identifiable information (PII). The Google AdWords Privacy Policy is available at https://www.google.com/intl/en/policies/privacy/ (https://www.google.com/intl/en/policies/privacy/) .

**Google Analytics**: HHS may employ tools provided by Google Analytics to support Display Advertising, including Remarketing, Google Display Network Impression Reporting, data collection via advertising cookies and anonymous identifiers, the DoubleClick Campaign Manager integration and/or Google Analytics Demographics and Interest Reporting. This means that third-party vendors, including Google, may show you public health campaign advertisements created by HHS and its agencies on non-government websites based on your visits to HHS websites. To implement these tools, HHS and third-party vendors, including Google, use first-party cookies and third-party cookies together to inform, optimize, and serve ads based on past visits to HHS websites. These cookies collect information about visits to HHS websites, but do not collect personally identifiable information (PII). The Google Analytics Privacy Policy is available at https://www.google.com/intl/en/policies/privacy/ (https://www.google.com/intl/en/policies/privacy/) .

**Pagefreezer:** HHS uses Pagefreezer archiving software to archive content from the HHS.gov website and five topical websites. This software does not require users to submit personally identifiable information (PII), nor does HHS ask for this information. Pagefreezer Privacy Policy is available at https://www.pagefreezer.com/privacy-policy/ (https://www.pagefreezer.com/privacy-policy/) .

Date Filed 12/27/2022 12:43 PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 122 of 204
Superior Court- Norfolk
Docket Number 2282CV00982    Case 1:22-cv-12196-FDS    Document 1-3    Filed 12/08/22    Page 12 of 13

**Qualtrics**: HHS uses Qualtrics survey software approved by the Federal Risk and Authorization Management Program (FEDRamp) to collect feedback from HHS website visitors. Qualtrics is implemented on HHS websites both as on-page and pop-up surveys. HHS uses survey results to measure visitor satisfaction with HHS websites. This survey software does not require users to submit personally identifiable information (PII), nor does HHS ask for this information in its surveys. The survey reports are available only to HHS managers, members of the HHS Communications and Web Teams, and other designated HHS staff who require this information to perform their job duties. The Qualtrics Privacy Policy is available at https://www.qualtrics.com/privacy-statement/ (https://www.qualtrics.com/privacy-statement/) .

**Salesforce**: HHS uses Salesforce to email newsletters and other messages to visitors who subscribe to them on HHS websites. Only HHS staff and managers who email newsletters using Salesforce or monitor the results of email initiatives have access to the subscriber lists. Salesforce never allows access to the subscriber lists to anyone outside of HHS for any purpose. Salesforce also provides aggregate data, such as email open rates and total clicks on links. The Salesforce Privacy Policy is available at https://www.salesforce.com/company/privacy/full_privacy/ (https://www.salesforce.com/company/privacy/full_privacy/) .

**Siteimprove**: HHS uses Siteimprove to manage our website. It provides the ASPA Digital team with information allowing them to make incremental changes to the sites managed by this team. Areas that Siteimprove provides information includes broken links, misspellings, accessibility, analytics, etc. Only HHS staff and managers who manage the ASPA managed websites have access to the Siteimprove information. The Siteimprove Privacy Policy is available at https://siteimprove.com/en/privacy/privacy-policy/ (https://siteimprove.com/en/privacy/privacy-policy/) .

**Widgets**: HHS offers widgets that provide specific HHS site content to any website that includes the widget code. You can install an HHS widget on any website simply by adding the HHS-provided code to a website's source HTML code. If you choose to install HHS widgets, they will not collect any type of personally identifiable information (PII) from your websites visitors.

## Website Security

In order to maintain website security and ensure HHS websites are available to the public, we use software programs to monitor traffic and identify unauthorized attempts to upload or change information or otherwise cause damage to HHS websites. Law enforcement may use information from these tools to help identify an individual in the event of investigations and as part of any required legal process.

The U.S. Government maintains this website and there are federal laws that protect it. The government can arrest and prosecute individuals for illegal activity if they violate these laws.

Date Filed 12/27/2022 12:46:48V 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 123 of 204
Superior Court - Norfolk         Case 1:22-cv-12196-FDS    Document 3  Filed 12/08/22   Page 13 of 13
Docket Number 2282CV00982

**HHS Headquarters**

U.S. Department of Health & Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201
Toll Free Call Center: 1-877-696-6775

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 124 of 204

Date Filed 12/27/2022 12:48 PM
Superior Court - Norfolk
Docket Number 2282CV00982    Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 1 of 57

# Exhibit D

Date Filed 10/27/2022 22:05 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Docketed on 10/18/2022

1

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, S.S.                                    SUPERIOR COURT

JOHN DOE AND JANE DOE,              §
INDIVIDUALLY AND ON                 §          C.A. No.  2282CV00982
BEHALF OF ALL OTHERS SIMILARLY      §
SITUATED,                           §
                                    §
            Plaintiffs              §
                                    §
v.                                  §
                                    §
ATRIUS HEALTH, INC.                 §
                                    §
                                    §
            Defendant.              §

---

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

---

Plaintiffs John Doe and Jane Doe ("Plaintiffs"), individually and on behalf of all other

persons similarly situated, bring suit against Defendant Atrius Health, Inc. ("Defendant"), and

upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all

other matters based upon investigation by counsel, allege as follows:

### NATURE OF ACTION AND ALLEGATIONS

1.    This case arises from Defendant's systematic violation of the medical privacy

rights of its patients, exposing highly sensitive personal information to third parties without those

patients' knowledge or consent.

2.    As Defendant's Medical Information Privacy Notice explains to patients,

Defendant is prohibited by law from "selling your health information to others" or "using or

disclosing your health information" for "promotional communications" without patients'

"written authorization."[1]  Defendant's Privacy Notice further notes that Defendant is "required by law to protect the privacy of your health information."[2]

3.     Contrary to these assurances, Defendant does not follow this policy, nor the law prohibiting such disclosures.

4.     At all relevant times, Defendant disclosed information about its patients— including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook and other third parties without their patients' knowledge, authorization, or consent.

5.     Defendant discloses this protected health information through the deployment of various digital marketing and automatic rerouting tools embedded on its websites that purposefully and intentionally redirect patients' personal health information to third parties who exploit that information for advertising purposes.  Defendant's use of these rerouting tools causes its patients' personally identifiable information and the contents of its patients' communications exchanged with Defendant to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of Massachusetts, and both the express and implied promises of Defendant.

6.     Defendant's conduct in disclosing such protected health information about its patients to Facebook and other third parties violates Massachusetts law, including G.L. c. 272,

---

[1] https://www.atriushealth.org/patient-information/privacy-practices.  Defendant's current Privacy Notice went into effect on September 30, 2022.   Defendant's prior "Notice of Privacy Practices" may be found at https://web.archive.org/web/20220713190254/https://www.atriushealth.org/patient-information/privacy-practices. That Privacy Notice informed patients that "Access" to patients' medical records and other information maintained by Atrius Health "is restricted to clinicians and staff who need the information for treatment, payment, or health care operations purposes."  Defendant's prior Privacy Notice further promised patients that "We will not use or share your information other than as described here unless you tell us we can in writing."  Defendant's prior Privacy Notice also promised that Defendant would "never share your information" for "Marketing Purposes" or "Sale of your information" unless "you give written permission."

[2] https://www.atriushealth.org/patient-information/privacy-practices

Date Filed 10/27/2022 22:06 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 127 of 204
Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 4 of 57

§ 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

7.     On behalf of themselves and all similarly situated persons, Plaintiffs seek an order enjoining Defendant from further unauthorized disclosures of their personal information; awarding liquidated damages in the amount of $1,000 per violation, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

## PARTIES TO THE ACTION

8.     Defendant Atrius Health, Inc. is a Massachusetts corporation with its principal office at 275 Grove St., Suite 3-300, Newton, Massachusetts, 02466. Defendant is the parent company for more than 30 medical practice locations in Massachusetts, including Harvard Vanguard Copley, Harvard Vanguard Chestnut-Hill Roxbury, Harvard Vanguard Beverly, Harvard Vanguard Braintree, Harvard Vanguard Burlington, Harvard Vanguard Cambridge, Harvard Vanguard Chelmsford, Harvard Vanguard Quincy, Harvard Vanguard Concord, Duxbury-PMG, Bourne-PMG, and Dedham Medical Associates.[3]

9.     Plaintiff, Jane Doe, is an individual living in Norfolk County, Massachusetts, has been treated by Defendant's physicians, and has been a patient at Harvard Vanguard Quincy, one of Defendant's facilities,[4] and thus also a patient of Defendant.

10.     Plaintiff, John Doe, is an individual living in Middlesex County, Massachusetts, has been treated by Defendant's physicians, a patient at Harvard Vanguard Chelmsford, one of Defendant's facilities,[5] and thus also a patient of Defendant.

---

[3] https://www.atriushealth.org/locations; *see also* https://www.atriushealth.org/about-us
[4] https://www.atriushealth.org/locations/quincy-harvard-vanguard
[5] https://www.atriushealth.org/locations/chelmsford-harvard-vanguard

Date Filed 10/27/2022 12:06 PM Case 1:22-cv-12196-FDS     Document 12     Filed 01/03/23     Page 128 of 204
Superior Court - Norfolk     Case 1:22-cv-12196-FDS     Document 1-4     Filed 12/23/22     Page 5 of 57
Docket Number 2282CV00982

## JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Massachusetts and has its principal place of business at 363 Highland Avenue, Fall River, Massachusetts, 02720.  G.L. c. 223A, § 2; G.L. c. 223A, § 3.

12.     Venue is appropriate in this Court because Plaintiff, Jane Doe, resides in Norfolk County and the acts or conduct giving rise to the cause of action took place in Norfolk.  G.L. c. 223, § 8(4).

## FACTUAL BACKGROUND

**A.     Defendant routinely discloses the protected health information of its patients to third parties including Facebook.**

13.     Plaintiff Jane Doe is a patient of Defendant who receives treatment at Harvard Vanguard Quincy.[6]

14.     Plaintiff John Doe is a patient of Defendant who receives treatment at, among other of Defendant's facilities, Harvard Vanguard Chelmsford.[7]

15.     Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

16.     Medical patients in Massachusetts such as John Doe and Jane Doe have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

17.     As a health care provider, Defendant has fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

---

[6] https://www.atriushealth.org/locations/quincy-harvard-vanguard
[7] https://www.atriushealth.org/locations/chelmsford-harvard-vanguard

Date Filed 10/27/2022 22:03:06 Case 1:22-cv-12196-FDS   Document 12   Filed 01/03/23   Page 129 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS   Document 1-4   Filed 12/23/22   Page 6 of 57

18.     Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of personally identifiable patient information and communications.

19.     Defendant operates websites for patients, including www.atriushealth.org.

20.     Defendant's websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues treatment options, and joining support groups.

21.     Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant discloses the contents of patients' communications and protected healthcare information via automatic re-routing mechanisms embedded in the websites operated by Defendant without patients' knowledge, authorization, or consent.

**B.     The nature of Defendant's unauthorized disclosure of patients' health care information.**

22.     Defendant's disclosures of patients' personal healthcare information occurs because Defendant intentionally deploys source code on the websites it operates, including www.southcoast.org, that causes patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

23.     By design, third parties receive and record the exact contents of a patient communications before the full response from Defendant to patients has been rendered on the screen of the patient's computer device and while the communication between Defendant and the patient remains ongoing.

24.     Websites like those maintained by Defendant are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

Date Filed 10/27/2022 22:00 PM
Superior Court - Norfolk
Docket Number 2282CV00982

25.     The  basic  command  that  web  browsers  use  to  exchange  data  and  user communications is called a GET request.[8]  For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

26.     The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button.  POST sends the data entered in the form to the server hosting the website that the user is visiting.

27.     In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

28.     Unbeknownst to most users, however, the website's server may also redirect the user's communications to third parties.  Typically, users are provided no notice that these disclosures are being made.  Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

29.     In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon.  These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

---

[8] https://www.w3schools.com/tags/ref_httpmethods.asp

Date Filed 10/27/2022 22:00 AM
Superior Court - Norfolk
Docket Number 2282CV00982

30.     Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the third parties to whom user data is transmitted.

31.     These tracking pixels can collect dozens of data points about individual website users who interact with a website. One of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

32.     A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

**C.    Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.**

33.     Tracking pixels are lines of source code embedded in websites such as Defendant's. Tracking pixels are particularly pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal identities of website visitors. While most users believe that the internet provides them with anonymity when, for example, they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third party tracking devices, as Defendant has.

34.     For example, an IP address is a number that identifies a computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 132 of 204
Date Filed 10/27/2022 22:05 PM
Superior Court - Norfolk                Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 9 of 57
Docket Number 2282CV00982

advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[9]

35.    Because of their uniquely identifying character, IP address are considered protected personally identifiable information by HIPAA.  *See* 45 C.F.R. § 164.514(b)(2)(i)(O). Tracking pixels can (and typically do) collect website visitors' IP addresses.

36.    Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server.  Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

37.    Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies.  These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history.  To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

38.    Cookies fall within the personal identifiers protected by HIPAA. *See* 45 C.F.R. § 164.51(b)(2)(i)(H), (J), (M), and (R), and tracking pixels can collect cookies from website visitors.

39.    A third type of personally identifying information is what data companies refer to as a "browser-fingerprint."  A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

---

[9] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

Date Filed 10/27/2022 22:00 PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 133 of 204
Superior Court - Norfolk        Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 10 of 57
Docket Number 2282CV00982

40.     These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[10]   The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[11]   Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[12]

41.     In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[13]

42.     Browser-fingerprints are considered protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(M), (R), and tracking pixels can collect browser-fingerprints from website visitors.

43.     A fourth kind of personally identifying information is the unique user identifier (such as Facebook's "Facebook ID") that permits companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered.   A Facebook ID is a number string that is connected to a user's Facebook profile.[14]   Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[15]

---

[10] https://www.blog.google/products/chrome/building-a-more-private-web/
[11] https://pixelprivacy.com/resources/browser-fingerprinting/
[12] https://www.blog.google/products/chrome/building-a-more-private-web/
[13] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/
[14] https://www.facebook.com/help/211813265517027
[15] https://smallseotools.com/find-facebook-id/

9

Date Filed 10/27/2022 22:06 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 134 of 204
Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 11 of 57

44.    Unique personal identifiers such as a person's Facebook ID are protected by

HIPAA, 45 C.F.R. § 164.514(2)(i)(R), and are likewise capable of collection through pixel

trackers.

**D.    Facebook**

45.    Facebook, a social media platform founded in 2004 and today operated by Meta

Platforms, Inc., was originally designed as a social networking website for college students.

46.    Facebook describes itself as a "real identity" platform.[16] This means that users

are permitted only one account and must share "the name they go by in everyday life."[17] To that

end, Facebook requires users to provide their first and last name, along with their birthday,

telephone number and/or email address, and gender, when creating an account.[18]

47.    In 2007, realizing the value of having direct access to millions of consumers,

Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service

to be a "completely new way of advertising online," that would allow "advertisers to deliver

more tailored and relevant ads."[19] Facebook has since evolved into one of the largest advertising

companies in the world.[20] Facebook can target users so effectively because it surveils user

activity both on and off its website through the use of tracking pixels.[21] This allows Facebook to

make inferences about users based on their interests, behavior, and connections.[22]

48.    Today, Facebook provides advertising on its own social media platforms, as well

as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion

---

[16] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[17] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/
[18] https://www.facebook.com/help/406644739431633
[19] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[20] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[21] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[22] https://www.facebook.com/business/ads/ad-targeting

10

users.[23]

49.     Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code.

50.     Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

51.     Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[24] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

---

[23] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/
[24] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

11

Date Filed 12/27/2022 22:03 PM
Superior Court - Norfolk
Docket Number 2282CV00982

**E.**   **Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

52.    To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

53.    One of Facebook's most powerful tools is called the "Meta Pixel."

54.    The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[25] Once activated, the Meta Pixel "tracks the people and type of actions they take."[26] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[27]

55.    For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook collects identifying information like IP addresses, Facebook IDs, and other data that allow Facebook to identify the user. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences.

56.    Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

---

[25] https://developers.facebook.com/docs/meta-pixel/
[26] https://www.facebook.com/business/goals/retargeting
[27] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

Date Filed 10/27/2022 22:07 PM
Superior Court - Norfolk
Docket Number 2282CV00982

57.     Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[28]   According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[29]

58.     Facebook warns web developers that its Pixel is a personal identifier because it enables Facebook "to match your website visitors to their respective Facebook User accounts."[30]

59.     Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[31]

60.     Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website.[32]   Meta Pixel tracks this data regardless of whether a user is logged into Facebook.[33]

61.     For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information. The information is sent in data packets, which include personally identifying data such as a user's IP address.

---

[28] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[29] https://www.oviond.com/understanding-the-facebook-pixel
[30] https://developers.facebook.com/docs/meta-pixel/get-started
[31] https://developers.facebook.com/docs/meta-pixel/get-started
[32] https://developers.facebook.com/docs/meta-pixel/
[33] https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients

Date Filed 12/27/2022 22:06 PM
Superior Court - Norfolk
Docket Number 2282CV00982

62.    For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[34]    HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[35]    Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[36]

63.    Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID, which identifies an individual's Facebook user account.    Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile.    Facebook stores this information on its servers, and, in some instances, maintains this information for years.[37]

64.    Facebook has a number of ways to uniquely identify the individuals whose data is being forwarded from third-party websites through the Meta Pixel.

65.    If a user has a Facebook account, the user data collected is linked to the individual user's Facebook account.    For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

66.    Alternatively, Facebook can link the data to a user's Facebook account through the "Facebook Cookie."[38]    The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[39]

---

[34] https://developers.facebook.com/docs/meta-pixel/
[35] https://developers.facebook.com/docs/meta-pixel/
[36] https://developers.facebook.com/docs/meta-pixel/
[37] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[38] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/
[39] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/

Date Filed 10/27/2022 22:06:09 Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 139 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 16 of 57

67.    Facebook can also link user data to Facebook accounts through identifying information collected through Meta Pixel through what Facebook calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching.[40] Manual matching requires the website developer to manually send data to Facebook so that users can be linked to data.  Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

68.    While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from using the data.[41]  In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[42]

69.    Facebook also receives personally identifying information in the form of user's unique IP addresses that stay the same as users visit multiple websites.  When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets.  The IP address enables Facebook to keep track of the website page visits associated with that address.

70.    Facebook also places cookies on visitors' computers.  It then uses these cookies to store information about each user.  For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID.  The c_user cookie value is the Facebook equivalent of a user identification number.  Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

---

[40] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[41] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[42]https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

Date Filed 12/27/2022 22:06:00 Case 1:22-cv-12196-FDS   Document 12   Filed 01/03/23   Page 140 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS   Document 1-4   Filed 12/23/22   Page 17 of 57

71.     The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie.  One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#."  For example, the c_user cookie for Mark Zuckerberg is 4.  Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

72.     Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers.  Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[43] These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[44]

73.     Facebook also uses browser fingerprinting to uniquely identify individuals.  Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more.  Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like www.southcoast.org, and target users with advertising based on their web activity.

---

[43] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.
[44] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

**D.    Defendant has discretely embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of patients' protected health information to Facebook.**

74.    A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic.  The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertisement efforts.

75.    Facebook's intrusion into the personal data of the visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented.  When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[45]  Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

76.    Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads.[46]  For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[47]  Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

---

[45] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[46] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[47] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/

Date Filed 10/27/2022 22:00:00 Case 1:22-cv-12196-FDS   Document 12   Filed 01/03/23   Page 142 of 204
Superior Court - Norfolk
Docket Number 2282CV00982   Case 1:22-cv-12196-FDS   Document 1-4   Filed 12/23/22   Page 19 of 57

77.     Meta Pixel is wildly popular and embedded on millions of websites.  Shockingly, Meta Pixel is incorporated on many websites that are used to store and convey sensitive medical information, that by law must be kept private.   Recently, investigative journalists have determined that Meta Pixel is embedded on the websites of many of the top hospitals in the United States and on the password-protected patient portals of many healthcare systems. [48]  This results in sensitive medical information being collected and then sent to Facebook when a user interacts with these hospital websites.  For example, when a user on many of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook.  If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

78.     Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time.  Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or logout of a patient portal or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

79.     Defendant is among the hospital systems who have embedded Meta Pixel on their websites.  When a patient enters their personal information through Defendant's websites that incorporate Meta Pixel, such as to locate a doctor or make an appointment, this information, including what the patient is being treated for, is transmitted to Facebook via the Meta Pixel.

---

[48] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

18

Date Filed 10/27/2022 22:00 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 143 of 204
Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 20 of 57

The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

80.    This data, which can include health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, and other personally identifying information ("Personal Health Information"), is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.

81.    For example, a patient searching for a doctor on Defendant's website is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the patient's condition, the patient's hometown, the patient's language preference, and other information that the patient provides.

82.    All this data is disclosed to Facebook in real time as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts.  Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

83.    Defendant discloses such Personal Health Information even when patients are searching for doctors to assist with them conditions such as HIV:



Date Filed 12/27/2022 22:03 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS   Document 12   Filed 01/03/23   Page 145 of 204
Case 1:22-cv-12196-FDS   Document 1-4   Filed 12/23/22   Page 22 of 57

84.     Unbeknownst to patients, even their searches across Defendant's website for information about the most sensitive medical conditions imaginable, including HIV, psychotherapy, and addiction treatment are automatically sent to Facebook, along with patients' personally identifying information:



Date Filed 12/27/2022 22:00 PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 146 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 23 of 57

85.     Defendant also discloses patient information from other sections of its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Defendant, and communications made when patients are researching specific medical conditions such as COVID-19.

86.     By compelling visitors to its websites to disclose personally identifying data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients Personal Health Information to their private identities and target them with advertising.

87.     Defendant facilitated the disclosure of Plaintiff John Doe's Personal Health information, including sensitive medical information, to Facebook without his consent or authorization when he entered information on the website that Defendant maintains at www.atriushealth.org.    Plaintiff continued to have his privacy violated when Defendant permitted Facebook and other companies to send him targeted advertising related to his medical condition.

88.     For example, Plaintiff John Doe visited Defendant's website in 2022 at www.atriushealth.org and entered data, including sensitive medical information, such as details about his medical condition and doctor.    The information that Plaintiff John Doe transmitted included queries about treatment for shoulder injuries.

89.     After entering his medical information on Defendant's website, Plaintiff John Doe began receiving ads on his Facebook page related to his medical condition, including advertisements for shoulder braces.

22

Date Filed 12/27/2022 22:06 PM
Superior Court - Norfolk
Docket Number 2282CV00982
Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 147 of 204
Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 24 of 57

90.    As a result of Defendant's compliance and aid in the illegal interception and disclosure of John Doe's Personal Health Information, Plaintiff received advertisements that were specifically tailored to his Personal Health Information, including sensitive medical information, that Plaintiff entered on Defendant's website. These advertisements were tailored and directed to Plaintiff by Facebook as part of Facebook's advertising business in which Facebook profits from providing third parties with access to those individuals most likely to be interested in their products or services, otherwise known as the "target audience."[49]

91.    Plaintiff Jane Doe also visited Defendant's website at www.atriushealth.org in 2022 and entered data, including sensitive medical information, such as details about her medical condition and doctor. Defendant facilitated the disclosure of Plaintiff Jane Doe's Personal Health Information, including sensitive medical information, to Facebook without her consent or authorization when she entered information on the website that Defendant maintains at www.artriushealth.org.

92.    Defendant knew that by embedding Meta Pixel—a Facebook advertising tool—it was permitting Facebook to collect, use, and share Plaintiffs' and the Class Members' Personal Health Information, including sensitive medical information and personally identifying data.

**F.    Plaintiffs and the Class Members did not consent to the interception and disclosure of their protected health information.**

93.    Plaintiffs and Class Members had no idea when they interacted with Defendant's websites that their personal data, including sensitive medical data, was being collected and transmitted to Facebook. That is because, among other things, Meta Pixel is seamlessly integrated into Defendant's websites and is invisible to patients visiting those websites.

---

[49] https://www.facebook.com/business/ads/ad-targeting?content

23

Date Filed 10/27/2022 2:26 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 148 of 204
Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 25 of 57

94.    For example, when Plaintiff Jane Doe visited Defendant's website in 2022 at www.southcoast.org, there was no indication that Meta Pixel was embedded on that website or that it would collect and transmit her sensitive medical data to Facebook.

95.    Plaintiffs and their fellow Class Members could not consent to Defendant's conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

96.    While Defendant purports to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Notice of Privacy Practices" that is concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:



97.    Defendant's current "Notice of Privacy Practices," which went into effect on September 30, 2022, gives no indication to patients that Defendant routinely allows Facebook to capture and exploit patients' Personal Health Information.    Indeed, Defendant expressly promises in its "Notice of Privacy Practices" that it would never share patient's medical information with marketing companies without express written authorization from patients:

> [W]e will use and disclose your health information only with a
> written authorization from you.  This includes, except for limited

24

Date Filed 10/27/2022 22:06 PM Case 1:22-cv-12196-FDS   Document 12   Filed 01/03/23   Page 149 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS   Document 1-4   Filed 12/23/22   Page 26 of 57

> circumstances allowed by federal privacy law, not using or disclosing psychotherapy notes about you, selling your health information to others, or using or disclosing your health information for certain promotional communications that are prohibited marketing communications under federal law, without your written authorization.[50]

98.    Defendant's prior "Notice of Privacy Practices" likewise not only assured patients that Atrius would protect their Personal Health Information, but also expressly promised that Defendant would *never* sell or share patients' health information for marketing purposes without patients' written consent:

> Protecting patient privacy is an important element of the trust between our caregivers and their patients, and an important legal and ethical obligation. Atrius Health is deeply committed to protecting our patients' rights to privacy, and to safeguarding patient information....[51]

> In these cases we never share your information unless you give us written permission:

> - Marketing purposes
> - Sale of your information

99.    Even if a patient stumbled upon Defendant's carefully concealed "Notice of Privacy Practices," nothing in Defendant's various privacy notices would be understood by any reasonable patient to mean that Defendant is routinely allowing Facebook to capture and exploit patients' Personal Health Information.

100.    Defendant does not have a legal right to share Plaintiffs and Class Members' Protected Health Information with Facebook, because this information is protected from such disclosure by laws by the Health Insurance Portability and Accountability Act of 1996's ("HIPAA") privacy rules, which protect all electronically protected health information a covered entity like Defendant "creates, receives, maintains, or transmits" in electronic form.  45 C.F.R.

---

[50] https://www.atriushealth.org/patient-information/privacy-practices
[51] https://web.archive.org/web/20220517025937/https://www.atriushealth.org/patient-information/privacy-practices

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 150 of 204
Date Filed 10/27/2022 22:06 PM
Superior Court - Norfolk      Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 27 of 57
Docket Number 2282CV00982

§ 160.103. HIPAA's privacy rules do not permit Defendant to sell patient information to Facebook in return for access to Meta Pixel. Further, HIPAA does not permit Defendant to disclose patients' Protected Health Information to an advertising and marketing company like Facebook without express written authorization from patients. 45 C.F.R. § 164.508.

101. Defendant failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications for marketing purposes.

102. A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Such "Browser-Wrap" statements do not create an enforceable contract against consumers. Further, Defendant expressly promised its patients that it would never sell or use their Personal Health Information for marketing purposes without express authorization.

103. Accordingly, Defendant lacked authorization to intercept, collect, and disclose Plaintiffs and Class Members' Personal Health Information to Facebook or aid in the same.

**G.      The disclosures of personal patient data to Facebook are unnecessary.**

104. There is no information anywhere on the websites operated by Defendant that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are any of the disclosures of patient Personal Health Information to Facebook necessary for Defendant to maintain its healthcare website.

105. For example, it possible for a health care website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without

Date Filed 10/27/2022 2:08 PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 151 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 28 of 57

allowing disclosure of patients' Personal Healthcare Information to companies like Facebook.

106.    Despite these possibilities, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third-parties, including Facebook.

**H.    Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

107.    Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information.    Defendant's surreptitious interception, collection, and disclosure of patients' Personal Health Information to Facebook violated Plaintiffs and Class Member's privacy interests.

108.    Patient health information is specifically protected under federal law by HIPAA.

109.    HIPAA sets national standards for safeguarding protected health information.    For example, HIPAA limits the permissible uses of health information and prohibits disclosure of this information without express written authorization from patients.    45 C.F.R. § 164.502. These prohibitions include prohibitions against disclosing personally identifying data such patient names, IP addresses, and other unique characteristics or codes.    45 C.F.R. § 164.514(b)(2)(i).    HIPAA also requires that covered entities like Defendant implement appropriate safeguards to protect this information. 45 C.F.R. § 164.530(c)(1).  And both HIPAA and Massachusetts law subject medical providers who treat conditions such as substance abuse to heightened duties of confidentiality.  42 C.F.R. § 2.12(a)(1)(i); M.G.L. c. 111B, § 11.  This legal framework applies to health care providers, such as Defendant.

Date Filed 12/27/2022 22:06:36 Case 1:22-cv-12196-FDS   Document 12   Filed 01/03/23   Page 152 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS   Document 1-4   Filed 12/23/22   Page 29 of 57

110.    Given the application of HIPAA and state law to Defendant, Plaintiffs and the Members of the Class had a reasonable expectation of privacy in their protected health information.

111.    Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

112.    Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

113.    For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[52]

114.    Users act consistently with these preferences.  For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[53]

115.    The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable.  Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born.  As one recent article noted, "What is particularly

[52] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[53] https://www.wired.co.uk/article/apple-ios14-facebook

28

Date Filed 10/27/2022 22:03 PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 153 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 30 of 57

worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[54]

116.    Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**I.    Plaintiffs' Personal Health Data that Defendant collected, disclosed, and used is Plaintiffs' property, has economic value, and its illicit disclosure has caused Plaintiffs harm.**

117.    It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiffs and Class Members.

118.    In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[55]

119.    In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[56] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data

---

[54] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/
[55] https://ig.ft.com/how-much-is-your-personal-data-worth/
[56] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

Date Filed 10/27/2022 2:06 PM Case 1:22-cv-12196-FDS   Document 12   Filed 01/03/23   Page 154 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS   Document 1-4   Filed 12/23/22   Page 31 of 57

can vary from $15 to more than $40 per user.[57]

120.    In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[58]   This price is only increasing.   According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[59]

121.    Despite the protections afforded by HIPAA, there is an active market for health information.   Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by HIPAA, state laws, and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[60]

122.    Further, individuals can sell or monetize their own data if they so choose.   For example, Facebook has offered to pay individuals for their voice recordings,[61] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[62]

123.    A myriad of other companies and apps such as DataCoup, Nielsen Computer,

---

[57] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[58] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[59] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[60] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also*
*https://slate.com/technology/2022/06/health-data-brokers-privacy.html*
[61] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-proununcitations-app
[62] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

Date Filed 10/27/2022 22:06 PM Case 1:22-cv-12196-FDS Document 12 Filed 01/03/23 Page 155 of 204
Superior Court - Norfolk Case 1:22-cv-12196-FDS Document 1-4 Filed 12/23/22 Page 32 of 57
Docket Number 2282CV00982

Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[63]

124. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiffs and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiffs and the Class Member's property.

**J.      Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' protected health information.**

125. In exchange for disclosing Personal Health Information about its patients, Defendant is compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

126. Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

127. For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

128. Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant loses the ability to control how that

---

[63] https://www.creditdonkey.com/best-apps-data-collection.html; *see also*
*https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

Date Filed 10/27/2022 22:06 PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 156 of 204
Superior Court - Norfolk    Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 33 of 57
Docket Number 2282CV00982

information is subsequently disseminated and exploited.

129.    The monetization of the data being disclosed by Defendant, both by Defendant and Facebook, demonstrates the inherent value of the information being collected.

**K.    Facebook's history of egregious privacy violations.**

130.    Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information.

131.    Due to its ability to target individuals based on granular data, Facebook's ad-targeting capabilities have frequently come under scrutiny.  For example, in June 2022, Facebook entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics in a discriminatory manner.  That settlement, however, reflected only the latest in a long history of egregious privacy violations by Facebook.

132.    In 2007, when Facebook launched "Facebook Beacon," users were unaware that their online activity was tracked, and that the privacy settings originally did not allow users to opt-out.  As a result of widespread criticism, Facebook Beacon was eventually shut down.

133.    Two years later, Facebook made modifications to its Terms of Service, which allowed Facebook to use anything a user uploaded to its site for any purpose, at any time, even after the user ceased using Facebook.  The Terms of Service also failed to provide for any way for users to completely delete their accounts.  Under immense public pressure, Facebook eventually returned to its prior Terms of Service.

134.    In 2011, Facebook settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third-party apps were able to access only the data they needed to operate when—in fact—the apps

Date Filed 10/27/2022 22:06 PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 157 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 34 of 57

could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[64]

135.    That same year, Facebook was sued in the Northern District of California after it was discovered that Facebook had been tracking users across other websites, even after they had logged out of their Facebook accounts, by installing cookies on users' computers.[65] The class action suit, which alleged that Facebook had violated numerous privacy, communications, and wiretapping laws eventually settled for $90 million.[66]

136.    Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously downloaded Facebook user data. That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking for their consent or providing notice. Facebook ultimately settled claims related to this unlawful act for $650 million.[67]

137.    In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytics may have harvested the data of up to 87 million users in connection with the 2016 election. This led to another FTC investigation in 2019 into Facebook's data collection and privacy practices, resulting in a record-breaking five-billion-dollar settlement.

---

[64] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter
[65] https://www.cnet.com/personal-finance/facebooks-90-million-data-tracking-settlement-tomorrow-is-the-deadline-to-file-claim/
[66] https://www.cnet.com/personal-finance/facebooks-90-million-data-tracking-settlement-tomorrow-is-the-deadline-to-file-claim/
[67] A similar case is pending in Texas.

Date Filed 12/27/2022 22:06 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 158 of 204
Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 35 of 57

138.    Likewise, a different 2018 report revealed that Facebook had violated users' privacy by granting access to user information to over 150 companies.[68] Some companies were even able to read users' private messages.

139.    In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[69] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

140.    On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data.  The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway.  The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective ... at preventing the receipt of sensitive data."[70]

141.    The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data is not misplaced.  In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data.  In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling:  the company was sharing their data with Facebook.[71] When a user was having her

---

[68] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html
[69] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/
[70] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf
[71] https://slate.com/technology/2022/06/health-data-brokers-privacy.html

34

Date Filed 12/27/2022 22:03 PM
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 159 of 204
Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 36 of 57

period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[72]

142.    More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose."[73]

143.    These revelations were confirmed by an article published by the Markup in 2022, which found during the course of its investigation that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[74]

144.    Despite knowing that the Meta Pixel code embedded in its websites was sending patients' Personal Health Information to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients'

---

[72] https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[73] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes
[74] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

Date Filed 10/27/2022 22:03 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS   Document 12   Filed 01/03/23   Page 160 of 204
Case 1:22-cv-12196-FDS   Document 1-4   Filed 12/23/22   Page 37 of 57

expense.

## TOLLING, CONCEALMENT, AND ESTOPPEL

145.   The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

146.   Defendant seamlessly incorporated Meta Pixel and other trackers into its websites, providing no indication to users that they were interacting with a website enabled by Meta Pixel. Defendant had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites that Plaintiffs and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

147.   Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

148.   The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

149.   All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort.   Defendant's illegal interception and disclosure of patients' Personal Health Information has continued unabated through the date of the filing of Plaintiffs' Original Complaint.   What's more, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

Date Filed 10/27/2022 22:06 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 161 of 204
Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 38 of 57

150.    Defendant's conduct violates the law and breaches its express and implied privacy promises.

151.    Defendant's unlawful conduct has injured Plaintiffs and Class Members.

152.    Defendant's conduct is ongoing.

153.    Plaintiffs bring this action individually and as a class action against Defendant.

154.    Plaintiffs seek class certification for the following proposed Class:

> **The Atrius Health Class:** During the fullest period allowed by law, all Massachusetts residents who are, or were, patients of Atrius Health, Inc. or any of its affiliates and who exchanged communications at Atrius Health, Inc's websites, including www.atriushealth.org, and any other Atrius Health, Inc. affiliated website that caused disclosures of patient personally identifiable information and communications to third parties, including (but not limited to) Facebook.

155.    Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

156.    Plaintiffs reserve the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

157.    This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

158.    **Numerosity:** While the exact number of Class Members is unknown to Plaintiffs at this time, the Class, based on information and belief, consists of thousands of people dispersed throughout the Commonwealth of Massachusetts, such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information

Case 1:22-cv-12196-FDS   Document 12   Filed 01/03/23   Page 162 of 204
Date Filed 12/27/2022 22:06 AM   Case 1:22-cv-12196-FDS   Document 1-4   Filed 12/23/22   Page 39 of 57
Superior Court - Norfolk
Docket Number 2282CV00982

maintained by Defendants.

159.   **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

   a.   Whether Defendant's acts and practices violated Plaintiffs and Class Members' privacy rights;

   b.   Whether Defendant's acts and practices violate G.L. c. 272, § 99;

   c.   Whether Defendant's acts and practices violate G.L. c. 214, § 1B;

   d.   Whether Defendant's acts and practices violate G.L. c. 111, § 70E;

   e.   Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiffs and Class Members' Personal Health Information to Facebook;

   f.   Whether Defendant's acts and practices constitute a breach of fiduciary duty;

   g.   Whether Defendant profited from disclosures of patient Personal Health Information to third parties including Facebook;

   h.   Whether Defendant was unjustly enriched;

   i.   Whether Defendant's acts and practices harmed and continue to harm Plaintiffs and Class Members and, if so, the extent of that injury;

   j.   Whether Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

   k.   Whether Plaintiffs and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

160.   These common questions of law and fact predominate over any questions affecting only the individual Class Members.

161.   **Typicality:** Plaintiffs' claims are typical of the claims of other Class Members and Plaintiffs have substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonist to, or in conflict with, the interests of other

Date Filed 10/27/2022 22:06:36 Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 163 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 40 of 57

members of the Class. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and all Class Members are patients of Defendant who used the websites set up by Defendant for patients and are victims of Defendant's respective unauthorized disclosures to third parties including Facebook. All claims of Plaintiffs and Class Members are based on Defendant's wrongful conduct and unauthorized disclosures.

162. **Adequacy of Representation:** Plaintiffs are committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are coincident with, and not antagonistic to, those of other Class Members they seek to represent. Plaintiffs have no disabling conflicts with Class Members. Accordingly, Plaintiffs are adequate representatives of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

163. **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Defendant, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Cass, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. If a class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

164.    Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

165.    For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of
### G.L. c. 272, § 99
### (On Behalf of Plaintiffs and the Class)

166.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

167.    Plaintiffs bring this claim on behalf of themselves and all members of the Class.

168.    All conditions precedent to this action have been performed or have occurred.

169.    G.L. c. 272, § 99 prohibits any person from willfully and secretly intercepting the contents of any wire communications through the use of any intercepting device unless given prior authority by all parties to a communication to do so.

170.    Any person aggrieved by a violation G.L. c. 272, § 99 "shall have a civil cause of action against any person who so intercepts, discloses, or uses such communications or who so violates his personal, property, or privacy interest."

171.    Defendant qualifies as a person under the statute.

172.    All alleged communications between Plaintiffs or Class Members and Defendant qualify as wire communications under Massachusetts law because each communication is made using personal computing devices (e.g., computers, smartphones,

40

Date Filed 10/27/2022 22:06 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 165 of 204
Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 42 of 57

tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

173.    An "interception" under the statute means "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire ... communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99B(4).

174.    Defendant engaged in and continues to engage in an "interception" by aiding others (including Facebook) to secretly record the contents of Plaintiffs' and Class Members' wire communications.

175.    An "intercepting device" is "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire ... communication." G.L. c. 272, § 99B(3).

176.    The "intercepting devices" used in this case include, but are not limited to:

a.  Plaintiffs and Class Members' personal computing devices;

b.  Plaintiffs and Class Members' web browsers;

c.  Plaintiffs and Class Members' browser-managed files;

d.  Facebook's Meta Pixel;

e.  Internet cookies;

f.  Defendant's computer servers;

g.  Third-party source code utilized by Defendant; and

h.  Computer servers of third parties (including Facebook) to which Plaintiffs and Class Members' communications were disclosed.

177.   Under the statute, "contents" are defined to mean "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." G.L. c. 272, § 99B(5).

178.   Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiffs and/or Class Members and Defendant that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

179.   Defendant aided in the interception of "contents" in at least the following forms:

a.   The parties to the communications;

b.   The precise text of patient search queries;

c.   Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d.   The precise text of patient communications about specific doctors;

e.   The precise text of patient communications about specific medical conditions;

f.   The precise text of patient communications about specific treatments;

g.   The precise text of patient communications about scheduling appointments with medical providers;

h.   The precise text of patient communications about billing and payment;

i.   The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j.   The precise dates and times when patients click to Log-In on Defendant's website(s);

42

Date Filed 10/27/2022 22:06 PM  Case 1:22-cv-12196-FDS   Document 12   Filed 01/03/23   Page 167 of 204
Superior Court - Norfolk
Docket Number 2282CV00982  Case 1:22-cv-12196-FDS   Document 1-4   Filed 12/23/22   Page 44 of 57

     k. Information that is a general summary or informs third parties of the general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

     l. Any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

180. Plaintiffs and Class Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook and other third parties.

181. Neither Plaintiffs nor Class Members consented to the disclosure of their Personal Health Information by Defendant to Facebook and other third parties. Nor could they have consented, given that Defendant never sought Plaintiffs or Class Members' consent.

182. Plaintiffs and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal Health Information, including using their sensitive medical information to develop marketing and advertising strategies.

183. Under the statute, aggrieved persons are entitled to recover appropriate injunctive relief and "(1) actual damages but not less than liquidated damages computed at the rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) a reasonable attorney's fee and other litigation disbursements reasonably incurred."

184. In addition to statutory damages, Defendant's breach caused Plaintiffs and Class Members the following damages:

43

Date Filed 10/27/2022 22:06 PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 168 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 45 of 57

a.  Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b.  Defendant eroded the essential confidential nature of the doctor-patient relationship;

c.  Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d.  Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

e.  Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

## COUNT II
### Invasion of Privacy in Violation of G.L. c. 214, § 1B
### (On Behalf of Plaintiffs and the Class)

185.  Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

186.  Plaintiffs bring this claim on behalf of herself and all members of the Class.

187.  G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

188.  All health care providers owe their patients a duty not to disclose medical information about a patient without a patient's informed consent.

189.  G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

44

Date Filed 10/27/2022 22:06:PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 169 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 46 of 57

190.    Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

191.    Plaintiffs and Class Members are patients of Defendant.

192.    Defendant owes Plaintiffs and Class Members a duty of confidentiality.

193.    Despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiffs and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

194.    The information disclosed included personally identifiable information, Plaintiffs and Class Members' statues as patients of Defendant, and the exact contents of communications exchanged between Plaintiffs and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

195.    The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiffs and Class Members' rights to privacy.

196.    Plaintiffs and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook and other third parties at the time it occurred. Plaintiffs and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

197.    Defendant's intentional disclosure of patients' Personal Health Information to a third-party advertising company like Facebook without consent would be highly offensive to a

45

Date Filed 10/27/2022 22:03 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 170 of 204
Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 47 of 57

reasonable person. Plaintiffs and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third party advertising companies.

198.    Defendant's disclosure of Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

199.    Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e. "Alzheimer's"), the condition selected from dropdown menus (i.e. "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

200.    Defendant's breach caused Plaintiffs and Class Members, at minimum, the following damages:

a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b.    Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c.    Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

      d.      Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

      e.      Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

201.    Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

202.    Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

203.    Plaintiffs and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiffs and Class Members' privacy.

204.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which caused injury to Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

205.    Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

### COUNT III
**Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality**
**(On Behalf of Plaintiffs and the Class)**

47

Date Filed 10/27/2022 2:06 PM
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 172 of 204
Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 49 of 57

206.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

207.    Plaintiffs bring this claim on behalf of themselves and all members of the Class

208.    All conditions precedent to this action have been performed or occurred.

209.    In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

210.    As medical provider for Plaintiffs and Class Members, Defendant owes Plaintiffs and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendant and Plaintiffs or Class Members.

211.    Defendant breached its duty of confidentiality by disclosing Personal Health Information about Plaintiffs and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

212.    Defendant's breach caused Plaintiffs and Class Members the following damages:

a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b.    Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c.    Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

48

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 173 of 204

Date Filed 10/27/2022 22:05 PM
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 50 of 57

d.    Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e.    Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

## COUNT IV
### Breach of Express Contract
### (On Behalf of Plaintiffs and the Class)

213.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

214.    Plaintiffs bring this claim on behalf of herself and all members of the Class.

215.    Plaintiffs and Class Members entered into written agreements with Defendant as part of the medical services Defendant provided to Plaintiffs and Class Members.    The agreements involved a mutual exchange of consideration whereby Defendant provided these services in exchange for payment from Class Members, Class Members' insurance carriers, and/or government programs remitting payment on Class Members' behalf.

216.    Plaintiffs and Class Members and/or their insurance carriers paid Defendant for its services and performed under these agreements.

217.    Defendant's disclosure of Plaintiffs and Class Members' Private Health Information without their consent constitutes a material breach of the terms of these agreements by Defendant.

218.    As a direct and proximate result of Defendant's breach of contract with Plaintiffs and Class Members, Plaintiffs and Class Members have been irreparably harmed.

49

Date Filed 10/27/2022 2:06 PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 174 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 51 of 57

219.    Accordingly, Plaintiffs, individually and on behalf of the Class, respectfully request this Court award all available damages for Defendant's breach of express contract.

### COUNT V
### Breach of Implied Contract
### (On Behalf of Plaintiffs and the Class)

220.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

221.    Plaintiffs bring this claim on behalf of herself and all members of the Class

222.    Through their course of conduct, Defendant, Plaintiffs, and Class Members entered into implied contracts for the provision of medical care and treatment, as well as implied contracts for the Defendant to retain and protect the privacy of Plaintiffs' and Class Members' Private Health Information.

223.    Specifically, Plaintiffs and the Class Members entered into valid and enforceable implied contracts with Defendant when they first went for medical treatment at one of Defendant's facilities.

224.    The valid and enforceable implied contracts to provide medical healthcare services that Plaintiffs and Class Members entered into with Defendant included Defendant's promise to not disclose nonpublic Private Health Information given to Defendant without their consent.  Plaintiffs and Class Members provided this Private Health Information in reliance of that promise.

225.    Defendant solicited and invited Plaintiffs and Class Members to provide their Private Health Information on its website as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Health Information to Defendant as part of acquiring Defendant's medical services.

226.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's complied with relevant laws and regulations, including

50

Date Filed 12/27/2022 22:06:03 Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 175 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 52 of 57

HIPAA, and would not allow third parties to collect or exploit their communications with Defendant without their consent.

227.    Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to obtain operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so.

228.    Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiffs and Class Members; and (b) protect Plaintiffs and the Class Members' Private Health Information provided to obtain such healthcare. In exchange, Plaintiffs and Class Members agreed to pay money for these services, and to turn over their Private Health Information through the use of Defendant's websites.

229.    Both the provision of medical services healthcare and the protection of Plaintiffs and Class Members' Private Health Information were material aspects of these implied contracts.

230.    The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiffs and Class Members' Private Health Information unless they consent—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's published Notice of Privacy Practices.

231.    Defendant's express representations, including, but not limited to the express representations found in its Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Defendant refrain from aiding or allowing third parties to collect or Plaintiffs and Class Members' Private Health Information without consent.

232.    Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private.  To customers such as Plaintiffs and the Class Members, healthcare that allows third parties to secretly

51

Date Filed 10/27/2022 22:06 PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 176 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 53 of 57

collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiffs and Class Members would not have entrusted their Private Health Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Health Information would be safeguarded and protected or entrusted their Private Health Information to Defendant in the absence of its implied promise to do so.

233.    A meeting of the minds occurred when Plaintiffs and the Class Members agreed to, and did, provide their Private Health Information to Defendant and/or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, (a) the provision of healthcare and medical services and (b) the protection of their Private Health Information.

234.    Plaintiffs and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

235.    Defendant materially breached its contractual obligation to protect the nonpublic Private Health Information Defendant gathered when it allowed third parties to collect and exploit that information without Plaintiffs and Class Members' consent.

236.    As a result of Defendant's failure to fulfill the data privacy promised in these contracts, Plaintiffs and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts.  Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare with data privacy they paid for and the healthcare they received.

237.    Had Defendant disclosed that it would allow third parties to secretly collect Plaintiffs and Class Members' Private Health Information without consent, neither the Plaintiffs, the Class

Date Filed 10/27/2022 22:06 PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 177 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS    Document 1-4    Filed 12/23/22    Page 54 of 57

Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

238.    As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health Information, the loss of control of their Private Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

239.    Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

240.    Plaintiffs and the Class Members are also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Private Health Information.

## COUNT VI
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Class)

241.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

242.    Plaintiffs hereby plead this Count in the alternative to Counts IV and V.

243.    Plaintiffs bring this claim on behalf of herself and all members of the Class.

244.    Plaintiffs and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private.  Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties.  Additionally, Plaintiffs and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

245.    Plaintiffs and the Class Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

246.    Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

247.    The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members.  It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

248.    Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, ask for judgment in her favor, and that the Court enter an order as follows:

a.    Certifying the Class and appointing Plaintiffs as the Class's representatives;

b.    Appoint the law firms of Sweeny Merrigan Law, Keller Postman LLC, and Ahmad, Zavitsanos, & Mensing P.C. as proposed interim class counsel;

c.    Finding that Defendant's conduct as alleged herein was unlawful;

d.    Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendant from making any further disclosure of Plaintiffs or Class Members' communications to third parties without the Plaintiffs or Class Members' express, informed, and written consent;

e.      Awarding statutory damages of $1,000 per Plaintiff and Class Members pursuant to G.L. c. 272, § 99;

f.      Imposing a constructive trust against Defendant through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendant;

g.      Awarding damages for violations of Plaintiffs and Class Members' right to privacy;

h.      Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

i.      Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

j.      Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

k.      Awarding costs of suit; and

l.      Such other and further relief to which Plaintiffs and Class Members may be entitled.

Date Filed 10/27/2022 22:06PM Case 1:22-cv-12196-FDS   Document 12   Filed 01/03/23   Page 180 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS   Document 1-4   Filed 12/23/22   Page 57 of 57

RESPECTFULLY SUBMITTED,
COUNSEL FOR PLAINTIFFS JOHN DOE
AND JANE DOE, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

Dated: October 17, 2022

56

# Exhibit E

Date Filed 10/27/2022 12:00 AM
Superior Court - Norfolk
Docket Number 2282CV00982

| CIVIL ACTION COVER SHEET | DOCKET NUMBER 2282CV00982 | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| | | COUNTY |

| Plaintiff | John and Jane Doe | Defendant: | Atrius Health Group, Inc. |
|---|---|---|---|
| ADDRESS: | c/o Sweeney Merrigan Law | ADDRESS: | 275 Grove Street, Suite 3-300 |
| 268 Summer St., LL | | Newton, MA 02466 | |
| Boston, MA 02210 | | | |
| Plaintiff Attorney: | Jonathan T. Merrigan | Defendant Attorney: | |
| ADDRESS: | Sweeney Merrigan Law | ADDRESS: | |
| 268 Summer Street, LL | | | |
| Boston, MA 02210 | | | |
| BBO: | 681627 | BBO: | |

**TYPE OF ACTION AND TRACK DESIGNATION (see instructions section below)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B99 | Violation of MA Wiretapping Law | F | ☒ YES   ☐ NO |

*If "Other" please describe: _____

Is there a claim under G.L. c. 93A?                    Is there a class action under Mass. R. Civ. P. 23?
☐ YES   ☒ NO                                        ☒ YES   ☐ NO

**STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**

A. Documented medical expenses to date

    1. Total hospital expenses                                              _____

    2. Total doctor expenses                                               _____

    3. Total chiropractic expenses                                          _____

    4. Total physical therapy expenses                                      _____

    5. Total other expenses (describe below)                                _____

    _____

                                     Subtotal (1-5):   $0.00

B. Documented lost wages and compensation to date                           _____

C. Documented property damages to date                                      _____

D. Reasonably anticipated future medical and hospital expenses               _____

E. Reasonably anticipated lost wages                                         _____

F. Other documented items of damages (describe below)                        $50,000,000.00+

Plaintiffs and Class Members have suffered damages pursuant to G.L.c.272 §99.

                                       TOTAL (A-F):   $50,000,000+_

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

Defendant disclosed Plaintiffs and Class Members' personal health information to third parties in violation of G.L. c. 272 §§ 99.

**CONTRACT CLAIMS**

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | Defendant breached express and implied contractual duties by disclosing Class Members' personal information. | $14,000,000.00+ |
| | Total | $14,000,000.00+ |

Signature of Attorney/Unrepresented Plaintiff: X  /s/ Jonathan T. Merrigan          Date: October 17, 2022

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

_____

**CERTIFICATION PURSUANT TO SJC RULE 1:18**

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney/Unrepresented Plaintiff: X  /s/ Jonathan T. Merrigan          Date: October 17, 2022

SC0001: 1/22/2021                          www.mass.gov/courts                          Date/Time Printed: 10-17-2022 11:51:12

Date Filed 10/27/2022 2:06 PM
Superior Court - Norfolk
Docket Number 2282CV00982

# CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

### AC Actions Involving the State/Municipality *

AA1 Contract Action involving Commonwealth,
   Municipality, MBTA, etc. (A)
AB1 Tortious Action involving Commonwealth,
   Municipality, MBTA, etc. (A)
AC1 Real Property Action involving
   Commonwealth, Municipality, MBTA etc. (A)
AD1 Equity Action involving Commonwealth,
   Municipality, MBTA, etc. (A)
AE1 Administrative Action involving
   Commonwealth, Municipality, MBTA,etc. (A)

### CN Contract/Business Cases

A01 Services, Labor, and Materials (F)
A02 Goods Sold and Delivered (F)
A03 Commercial Paper (F)
A04 Employment Contract (F)
A05 Consumer Revolving Credit - M.R.C.P. 8.1 (F)
A06 Insurance Contract (F)
A08 Sale or Lease of Real Estate (F)
A12 Construction Dispute (A)
A14 Interpleader (F)
BA1 Governance, Conduct, Internal
   Affairs of Entities (A)
BA3 Liability of Shareholders, Directors,
   Officers, Partners, etc. (A)
BB1 Shareholder Derivative (A)
BB2 Securities Transactions (A)
BC1 Mergers, Consolidations, Sales of
   Assets, Issuance of Debt, Equity, etc. (A)
BD1 Intellectual Property (A)
BD2 Proprietary Information or Trade
   Secrets (A)
BG1 Financial Institutions/Funds (A)
BH1 Violation of Antitrust or Trade
   Regulation Laws (A)
A99 Other Contract/Business Action - Specify (F)

\* Choose this case type if ANY party is the
Commonwealth, a municipality, the MBTA, or any
other governmental entity UNLESS your case is a
case type listed under Administrative Civil Actions
(AA).

† Choose this case type if ANY party is an
incarcerated party, UNLESS your case is a case
type listed under Administrative Civil Actions (AA)
or is a Prisoner Habeas Corpus case (E97).

### ER Equitable Remedies

D01 Specific Performance of a Contract (A)
D02 Reach and Apply (F)
D03 Injunction (F)
D04 Reform/ Cancel Instrument (F)
D05 Equitable Replevin (F)
D06 Contribution or Indemnification (F)
D07 Imposition of a Trust (A)
D08 Minority Shareholder's Suit (A)
D09 Interference in Contractual Relationship (F)
D10 Accounting (A)
D11 Enforcement of Restrictive Covenant (F)
D12 Dissolution of a Partnership (F)
D13 Declaratory Judgment, G.L. c. 231A (A)
D14 Dissolution of a Corporation (F)
D99 Other Equity Action (F)

### PA Civil Actions Involving Incarcerated Party †

PA1 Contract Action involving an
   Incarcerated Party (A)
PB1 Tortious Action involving an
   Incarcerated Party (A)
PC1 Real Property Action involving an
   Incarcerated Party (F)
PD1 Equity Action involving an
   Incarcerated Party (F)
PE1 Administrative Action involving an
   Incarcerated Party (F)

### TR Torts

B03 Motor Vehicle Negligence - Personal
   Injury/Property Damage (F)
B04 Other Negligence - Personal
   Injury/ Property  Damage (F)
B05 Products Liability (A)
B06 Malpractice - Medical (A)
B07 Malpractice - Other (A)
B08 Wrongful Death - Non-medical (A)
B15 Defamation (A)
B19 Asbestos (A)
B20 Personal Injury - Slip & Fall (F)
B21 Environmental (F)
B22 Employment Discrimination (F)
BE1 Fraud, Business Torts, etc. (A)
B99 Other Tortious Action (F)

### RP Summary Process (Real Property)

S01 Summary Process - Residential (X)
S02 Summary Process - Commercial/
   Non-residential (F)

### RP Real Property

C01 Land Taking (F)
C02 Zoning Appeal, G.L. c. 40A (F)
C03 Dispute Concerning Title (F)
C04 Foreclosure of a Mortgage (X)
C05 Condominium Lien & Charges (X)
C99 Other Real Property Action (F)

### MC Miscellaneous Civil Actions

E18 Foreign Discovery Proceeding (X)
E97 Prisoner Habeas Corpus (X)
E22 Lottery Assignment, G.L. c. 10, § 28 (X)

### AB Abuse/Harassment Prevention

E15 Abuse Prevention Petition, G.L. c. 209A (X)
E21 Protection from Harassment, G.L. c. 258E (X)

### AA Administrative Civil Actions

E02 Appeal from Administrative Agency,
   G.L. c. 30A (X)
E03 Certiorari Action, G.L. c. 249, § 4 (X)
E05 Confirmation of Arbitration Awards (X)
E06 Mass Antitrust Act, G.L. c. 93, § 9 (A)
E07 Mass Antitrust Act, G.L. c. 93, § 8 (X)
E08 Appointment of a Receiver (X)
E09 Construction Surety Bond, G.L. c. 149,
   §§ 29, 29A (A)
E10 Summary Process Appeal (X)
E11 Worker's Compensation (X)
E16 Auto Surcharge Appeal (X)
E17 Civil Rights Act, G.L. c.12, § 11H (A)
E24 Appeal from District Court
   Commitment, G.L. c.123, § 9(b) (X)
E25 Pleural Registry (Asbestos cases)
E94 Forfeiture, G.L. c. 265, § 56 (X)
E95 Forfeiture, G.L. c. 94C, § 47 (F)
E99 Other Administrative Action (X)
Z01 Medical Malpractice - Tribunal only,
   G.L. c. 231, § 60B (F)
Z02 Appeal Bond Denial (X)

### SO Sex Offender Review

E12 SDP Commitment, G.L. c. 123A, § 12 (X)
E14 SDP Petition, G.L. c. 123A, § 9(b) (X)

### RC Restricted Civil Actions

E19 Sex Offender Registry, G.L. c. 6, § 178M (X)
E27 Minor Seeking Consent, G.L. c.112, § 12S (X)

**TRANSFER YOUR SELECTION TO THE FACE SHEET**

**EXAMPLE:**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES ☐ NO |

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF -** The plaintiff shall set forth, on the face of the civil action cover sheet (or attach additional sheets as necessary), a statement specifying the facts on which the plaintiff relies to determine money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served with the complaint. **A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.**

**DUTY OF THE DEFENDANT -** If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with his/her answer a statement specifying the potential damages which may result if the plaintiff prevails.

**A CIVIL COVER SHEET MUST BE FILED WITH EACH COMPLAINT.
FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY
MAY RESULT IN DISMISSAL OF THIS ACTION.**

Date Filed 12/27/2022 12:45PM 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 184 of 204
Superior Court - Norfolk
Docket Number 2282CV00982  Case 1:22-cv-12196-FDS   Document 1-6   Filed 12/23/22   Page 1 of 6

# Exhibit F

Date Filed 10/28/2022 12:48 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 185 of 204

Case 1:22-cv-12196-FDS    Document 1-6    Filed 12/23/22    Page 2 of 6

Docketed 10/28/2022                                                    3

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, S.S.                                   SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | §<br>§<br>§<br>§<br>§ | C.A. No. 2282CV00982 |
| Plaintiffs | §<br>§<br>§ | |
| v. | §<br>§ | |
| ATRIUS HEALTH, INC. | §<br>§<br>§ | |
| Defendant. | §<br>§ | |

## PLAINTIFFS' MOTION FOR IMPOUNDMENT OF PERSONAL IDENTIFYING INFORMATION

Now come the Plaintiffs, John Doe and Jane Doe, individually and on behalf of all others similarly situated, to impound their names and/or other identifying information for the pendency of this case pursuant to Massachusetts Uniform Rules on Impoundment Procedure ("URIP") Rule 2[1]. The material sought to be impounded are the plaintiffs' names and/or other identifying information[2] for the pendency of this matter. Impoundment is necessary in this matter because the facts of the underlying action relate directly and specifically to all plaintiffs' sensitive medical information. Specifically, the claim arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent. Therefore, in order to protect the medical

---

[1] URIP Rule 2 provides: "The motion shall describe with particularity (i) the material sought to be impounded, (ii) the duration for which impoundment is sought, (iii) the reasons impoundment is necessary, and (iv) the reasons other alternatives to impoundment will not afford adequate protection."

[2] This could include social media handles, IP addresses, etc.

Date Filed 12/23/2022 12:43 PM
Superior Court - Norfolk
Docket Number 2282CV00982    Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 186 of 204
Case 1:22-cv-12196-FDS    Document 1-6    Filed 12/23/22    Page 3 of 6

information that will necessarily be disclosed as part of the factual allegations and discovery in this matter, it is necessary to file this Complaint and proceed with the use of a pseudonym.

Alternatives to impoundment would not serve the same function and would not adequately protect the plaintiff, whose personal medical information has already been improperly used by the Defendant. Plaintiffs recognize that Massachusetts adheres to a presumption of openness, but this presumption is offset by the equally if not more important premise that the citizens of Massachusetts have a right to the privacy and confidentiality of their medical information, a right which is protected by statute, including G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

Perhaps as importantly, proceeding with the Plaintiffs' full names would have the unwelcome effect of making impoundment a more laborious, tedious and inefficient task. For each piece of discovery regarding the Plaintiffs' medical information, Plaintiffs would have to seek impoundment of those materials. It would impact the ability to move forward efficiently in both written and oral discovery. An impoundment order (attached at Exhibit B) would serve both purposes of protecting the Plaintiffs' private medical information and also allowing efficient prosecution of this case.

WHEREFORE, Plaintiff respectfully requests this court ALLOW Plaintiffs' Motion for Impoundment of Personal Identifying Information and request a hearing on the same.

Date Filed 10/25/2022 12:48 PM
Superior Court - Norfolk
Docket Number 2282CV00982    Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 187 of 204

Case 1:22-cv-12196-FDS    Document 1-6    Filed 12/23/22    Page 4 of 6

**COUNSEL FOR PLAINTIFFS JOHN DOE
AND JANE DOE, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED**

Respectfully submitted,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

Dated: October 25, 2022

Date Filed 10/28/2022 12:48 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 188 of 204
Case 1:22-cv-12196-FDS    Document 1-6    Filed 12/23/22    Page 5 of 6

3.1

Docketed 10/28/2022

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, S.S.               SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § § § § | C.A. No. 2282CV00982 |
|          Plaintiffs | § § § | |
| v. | § § | |
| ATRIUS HEALTH, INC. | § § § | |
|          Defendant. | § § | |

### AFFIDAVIT OF ATTORNEY J. TUCKER MERRIGAN IN SUPPORT OF PLAINTIFFS' MOTION FOR IMPOUNDMENT OF PERSONAL IDENTIFYING INFORMATION

I, J. Tucker Merrigan, hereby state and depose:

1. I am counsel for the Plaintiffs in the above-captioned case.

2. The information inappropriately obtained by the Defendant in this matter is of a highly sensitive, personal and confidential nature.

3. In order to protect the privacy interests of the Plaintiffs in this case, it is necessary to proceed under a pseudonym so as not to cause further harm by additional, repeated disclosure of highly confidential medical information throughout the course of this litigation.

4. Allowing the plaintiffs to file under a pseudonym also allows for the most efficient disclosure of documents and discovery.

Date Filed 10/25/2022 12:48 PM
Superior Court - Norfolk
Docket Number 2282CV00982    Case 1:22-cv-12196-FDS   Document 1-6   Filed 12/23/22   Page 6 of 6

Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 189 of 204

Signed under the pains and penalties of perjury this 25th day of October, 2022.

/s/ Jonathan T. Merrigan
J. Tucker Merrigan, BBO# 681627
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com

# Exhibit G



# SWEENEY MERRIGAN LAW, LLP

PETER M. MERRIGAN *
J. TUCKER MERRIGAN
BRADLEY M. HENRY
VICTORIA M. SANTORO MAIR
MATTHIEU J. PARENTEAU **
JESSICA M. GRAY
ERIN E. McHUGH ***
DYLAN T. HIXSON
KYLE A. CAMILLERI ****
MAGGIE K. O'DONNELL
HON. THOMAS T. MERRIGAN (RET.)

268 SUMMER STREET, LL
BOSTON, MA 02210

WWW.SWEENEYMERRIGAN.COM
PHONE: (617) 391-9001
FAX: (617) 357-9001

IN ADDITION TO MASSACHUSETTS, LICENSED IN:

PENNSYLVANIA      *
MAINE      **
CONNECTICUT      ***
NEW HAMPSHIRE      ****

ATTORNEYS AT LAW

**SENT VIA EFILE**

November 10, 2022

Norfolk Superior Court
Civil Clerk's Office
650 High Street
Dedham, MA 02026

RE:    <u>**John Doe and Jane Doe, Individually and On Behalf of All Other Similarly Situated**</u>
        <u>**v. Atrius Health, Inc.**</u>
        **Norfolk Superior Court, C.A. No.: 2282CV00982**

Dear Sir or Madam,

Relative to the above refenced matter, please forward one summons to our office at your earliest convenience.

Thank you for your time and attention.

Very truly yours,

*/s/ Kristen Field*

Kristen Field, Senior Litigation Paralegal

# Exhibit H

Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Date Filed 10/28/2022 09:09 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Docketed 10/28/2022

3

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, S.S.                                  SUPERIOR COURT

JOHN DOE AND JANE DOE,            §
INDIVIDUALLY AND ON                 §        C.A. No. 2282CV00982
BEHALF OF ALL OTHERS SIMILARLY  §
SITUATED,                                    §
                                             §
              Plaintiffs                     §
                                             §
v.                                           §
                                             §
ATRIUS HEALTH, INC.                   §
                                             §
                                             §
              Defendant.                  §

### PLAINTIFFS' MOTION FOR IMPOUNDMENT OF PERSONAL IDENTIFYING INFORMATION

Now come the Plaintiffs, John Doe and Jane Doe, individually and on behalf of all others

similarly situated, to impound their names and/or other identifying information for the pendency

of this case pursuant to Massachusetts Uniform Rules on Impoundment Procedure ("URIP") Rule

2.[1] The material sought to be impounded are the plaintiffs' names and/or other identifying

information[2] for the pendency of this matter. Impoundment is necessary in this matter because the

facts of the underlying action relate directly and specifically to all plaintiffs' sensitive medical

information. Specifically, the claim arises from Defendant's systematic violation of the medical

privacy rights of its patients, exposing highly sensitive personal information to third parties

without those patients' knowledge or consent. Therefore, in order to protect the medical

---

[1] URIP Rule 2 provides: "The motion shall describe with particularity (i) the material sought to be impounded, (ii) the duration for which impoundment is sought, (iii) the reasons impoundment is necessary, and (iv) the reasons other alternatives to impoundment will not afford adequate protection."
[2] This could include social media handles, IP addresses, etc.

Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982M
Superior Court - Norfolk
Docket Number 2282CV00982

information that will necessarily be disclosed as part of the factual allegations and discovery in this matter, it is necessary to file this Complaint and proceed with the use of a pseudonym.

Alternatives to impoundment would not serve the same function and would not adequately protect the plaintiff, whose personal medical information has already been improperly used by the Defendant. Plaintiffs recognize that Massachusetts adheres to a presumption of openness, but this presumption is offset by the equally if not more important premise that the citizens of Massachusetts have a right to the privacy and confidentiality of their medical information, a right which is protected by statute, including  G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

Perhaps as importantly, proceeding with the Plaintiffs' full names would have the unwelcome effect of making impoundment a more laborious, tedious and inefficient task. For each piece of discovery regarding the Plaintiffs' medical information, Plaintiffs would have to seek impoundment of those materials. It would impact the ability to move forward efficiently in both written and oral discovery. An impoundment order (attached at Exhibit B) would serve both purposes of protecting the Plaintiffs' private medical information and also allowing efficient prosecution of this case.

WHEREFORE, Plaintiff respectfully requests this court ALLOW Plaintiffs' Motion for Impoundment of Personal Identifying Information and request a hearing on the same.

Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982
Case 1:22-cv-12196-FDS   Document 1-8   Filed 12/23/22   Page 4 of 4
Superior Court - Norfolk
Docket Number 2282CV00982

**COUNSEL FOR PLAINTIFFS JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

Respectfully submitted,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

Dated: October 25, 2022

# Exhibit I

Date Filed 12/28/2022 3:08:53 PM
Superior Court - Norfolk
Docket Number 2282CV00982

4

Docketed 12/18/22

**CEO PLAINTIFF'S ATTORNEY:**    PLEASE CIRCLE TYPE OF ACTION INVOLVED:
TORT - MOTOR VEHICLE TORT - CONTRACT -
EQUITABLE RELIEF - OTHER)

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION

NO. 2282CV00982

John Doe and Jane Doe, Individually
and on Behalf of Other Similarly Situated
_____, Plaintiff(s)

v.

Atkins Health, Inc. _____, Defendant(s)

### SUMMONS

To the above-named Defendant:

You are hereby summoned and required to serve upon J. Tucker Merrigan Esq
plaintiff's attorney, whose address is 268 Summer St. LL Boston, MA 02210
an answer to the complaint which is herewith served upon you, within 20 days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken
against you for the relief demanded in the complaint. You are also required to file your answer to the
complaint in the office of the Clerk of this court at Dedham either before service upon the plaintiff's
attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim
which you may have against the plaintiff which arises out of the transaction or occurrence that is the
subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other
action.

WITNESS, Heidi E. Brieger    Esquire ), at _____ the _____
day of _____, in the year of our Lord two thousand and _____

_____ Clerk.

NOTES:
1. This summons is issued pursuant to Rules 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption.
   If a separate summons is used for each such defendant, each should be addressed to the particular defendant.

F-33

## PROOF OF SERVICE OF PROCESS



**Middlesex Sheriff's Office** • 40 Brick Kiln Rd, Chelmsford, MA 01824 • 617-547-1171
**Middlesex, ss.**

December 7, 2022

I hereby certify and return that on 12/6/2022 at 9:35 AM I served a true and attested copy of the SUMMONS AND COMPLAINT & JURY DEMAND in this action in the following manner: To wit, by delivering in hand to JANICE LUISI, agent, person in charge at the time of service for ATRIUS HEALTH INC., at 275 GROVE Street SUITE -300 NEWTON, MA 02459 . Fees: Attest ($5.00) Basic Service Fee ($30.00) Postage and Handling ($3.00) Travel ($5.12) Conveyance ($4.50) Total: $47.62

Laurie Aufiero

_____
Laurie Aufiero

Deputy Sheriff

, 20

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION

NO.

.................., Plaintiff

v.

.................., Defendant

SUMMONS

(Mass. R. Civ. P. 4)

2282CV013801

Date Filed 12/27/2022 12:46 PM    Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 199 of 204
Superior Court - Norfolk
Docket Number 2282CV00982    Case 1:22-cv-12196-FDS    Document 1-10    Filed 12/23/22    Page 1 of 1

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
JOHN DOE and JANE DOE, individually and on behalf of all others similarly situated

**(b)** County of Residence of First Listed Plaintiff    **Norfolk**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Matthew T. Merrigan, Victoria Santoro Mair & Erin E. McHugh, Sweeney Merrigan Law, 268 Summer St. LL, Boston, MA 02210 Tele: (617) 391-9001

## DEFENDANTS
Atrius Health, Inc.

County of Residence of First Listed Defendant    **Middlesex**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Maria R. Durant and Kayla H. Ghantous, Hogan Lovells US LLP, 125 High Street, Suite 2010, Boston, MA 02110

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | Liability | **PERSONAL PROPERTY** | **LABOR** | | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | ☐ 862 Black Lung (923) | Exchange |
| | ☐ 362 Personal Injury - Medical Malpractice | Product Liability | Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C § 1442
Brief description of cause:
Removal pursuant to federal officer removal statute

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.    **DEMAND $**    CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
December 23, 2022

SIGNATURE OF ATTORNEY OF RECORD
/s/ Kayla H. Ghantous

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

Date Filed 12/27/2022 12:05:54 PM Case 1:22-cv-12196-FDS    Document 12    Filed 01/03/23    Page 200 of 204
Superior Court - Norfolk
Docket Number 2282CV00982 Case 1:22-cv-12196-FDS    Document 1-11    Filed 12/23/22    Page 1 of 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1.  **Title of case (name of first party on each side only)** _____

_____

2.  **Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.** **(See local rule 40.1(a)(1)).**

☐    I.      **160, 400, 410, 441, 535, 830\*, 835\*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.**

☐    II.     **110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820\*, 840\*, 895, 896, 899.**

☐    III.    **120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.**
        **\*Also complete AO 120 or AO 121. for patent, trademark or copyright cases.**

3.  **Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.**

_____

4.  **Has a prior action between the same parties and based on the same claim ever been filed in this court?**

        YES ☐      NO ☐

5.  **Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)**

        YES ☐      NO ☐

    **If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?**

        YES ☐      NO ☐

6.  **Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?**

        YES ☐      NO ☐

7.  **Do all of the parties in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).**

        YES ☐      NO ☐

    A.    **If yes, in which division do all of the non-governmental parties reside?**

          **Eastern Division** ☐          **Central Division** ☐          **Western Division** ☐

    B.    **If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?**

          **Eastern Division** ☐          **Central Division** ☐          **Western Division** ☐

8.  **If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)**

        YES ☐      NO ☐

**(PLEASE TYPE OR PRINT)**

**ATTORNEY'S OR PRO SE'S NAME** _____

**ADDRESS** _____

**TELEPHONE NO.** _____

**EMAIL ADDRESS** _____

(CategoryForm6-2021.wpd )

6.0

Superior Court - Norfolk
Docket Number 2282CV00982

COMMONWEALTH OF MASSACHUSETTS

11/8/22
RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
12/07/22

NORFOLK, S.S.                                    SUPERIOR COURT

JOHN DOE AND JANE DOE,          §
INDIVIDUALLY AND ON              §          C.A. No. 2282CV00982
BEHALF OF ALL OTHERS SIMILARLY   §
SITUATED,                        §
                                 §
          Plaintiffs             §
                                 §
v.                               §
                                 §
ATRIUS HEALTH, INC.              §
                                 §
          Defendant.             §

## ORDER

SO ORDERED, that Plaintiff's name and any identifying information shall be impounded for the pendency of this litigation. The Court finds that good cause for impoundment of the plaintiff's name has been shown by the movant to protect the plaintiff's interest in their private, sensitive and confidential medical records. The Court finds that there is no less restrictive measure available to protect this interest and that the degree, duration and manner of impoundment ordered herein are no broader than necessary.

*publicly filed with the name redacted*

It is ORDERED that the Clerk of this Court shall impound the Plaintiff's name in this case. Any such materials that identify the plaintiff shall be ~~kept separate and apart from those materials to which the public has access~~. The filer of any document shall ensure that the Plaintiff's name is redacted from all public filings. The Clerk shall redact any individual docket entries as necessary. The docket and case filings shall otherwise remain available to the public.

*An unredacted copy shall be filed under seal.*

By the Court

11/8/22

I ATTEST THAT THIS DOCUMENT IS A
CERTIFIED PHOTOCOPY OF AN ORIGINAL
ON FILE

Deputy Assistant Clerk          12/07/22

Docketed on 12/27/2022

## COMMONWEALTH OF MASSACHUSETTS

Norfolk, S.S.                                    SUPERIOR COURT

---

JOHN DOE and JANE DOE, individually and
on behalf of all others similarly situated,

                     Plaintiffs,          Civil Action No. 2282CV00982

       v.

ATRIUS HEALTH, INC.

                Defendant.

---

## NOTICE OF FILING OF NOTICE OF REMOVAL

PLEASE TAKE NOTICE THAT on December 23, 2022, Defendant Atrius Health, Inc. ("Atrius Health") removed this action to federal court by filing a Notice of Removal pursuant to 28 U.S.C. § 1442(a)(1) in the United States District Court for the District of Massachusetts. A true and correct copy of the Notice of Removal is attached hereto as Exhibit A.

PLEASE TAKE FURTHER NOTICE that, upon the filing of the Notice of Removal with the United States District Court for the District of Massachusetts, and filing copies thereof with the Clerk at the Norfolk County Superior Court, Atrius Health has effected removal and the Superior Court shall proceed no further in this action unless the action is remanded pursuant to 28 U.S.C. § 1146(d).

Dated: December 23, 2022

Respectfully submitted,

**HOGAN LOVELLS LLP US**

*/s/ Kayla H. Ghantous*

By:    Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
maria.durant@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (*pro hac vice forthcoming*)
Adam A. Cooke (BBO # 679637)
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

*Counsel for Atrius Health, Inc.*

I ATTEST THAT THIS DOCUMENT IS A
CERTIFIED PHOTOCOPY OF AN ORIGINAL
ON FILE

Deputy Assistant Clerk

12/27/22

## CERTIFICATE OF SERVICE

      I hereby certify that on December 23, 2022, copies of the foregoing Notice of Filing of Notice of Removal were sent via electronic mail and overnight delivery to the addresses listed below:

Sweeney Merrigan Law
J. Tucker Merrigan
Victoria Santoro Mair
Erin E. McHugh
268 Summer St. LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Ahmad, Zavitsanos, & Mensing, P.C.
Foster C. Johnson
David Warden
Nathan Campbell
1221 McKinney Street, Suite 3460
Houston, Texas 77010
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Keller Postman LLC
Seth Meyer
Alex Dravillas
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
sam@kellerpostman.com
adj@kellerpostman.com

*Counsel for Plaintiffs John Doe and Jane Doe, Individually and on Behalf of all Others Similarly Situated*

                 */s/ Kayla H. Ghantous*
                 *Counsel for Defendant Atrius Health, Inc.*